UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re WAYFAIR INC. Securities Litigation | No. 1:19-cv-10062-DPW |
| | CLASS ACTION |
| This Document Relates To: | |
| ALL ACTIONS. | |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF THE ACTION ....1

II. JURISDICTION AND VENUE ....4

III. PARTIES ....5

A. Lead Plaintiff ....5

B. Defendants ....5

IV. SUBSTANTIVE ALLEGATIONS ....7

A. Background of the Company ....7

B. The Company's Business Is Increasingly Competitive ....8

C. The Company Spent Massive Amounts of Money to Boost Revenue Growth in the Face of Growing Competition ....10

D. The Company's Bottom Line Deteriorated Due to High Spending and Advertising Deleverage, But Defendants Knowingly Misled the Market ....12

E. Defendants Were Forced to Reveal the Truth About the Company's Troubled Financial Condition, Causing Its Stock Price to Plummet ....15

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD ....16

VI. THE TRUTH BEGAN TO EMERGE ....22

VII. POST-CLASS PERIOD DEVELOPMENTS ....27

VIII. DEFENDANTS ACTED WITH SCIENTER ....30

A. Defendants' Own Public Statements, Among Other Factors, Support Their Knowledge or Reckless Disregard of the Matters Alleged Herein ....31

B. Defendants Were Motivated and Acted with Scienter to Artificially Inflate the Company's Stock Value, in Order to Maximize Proceeds from Inside Stock Sales ....33

IX. LOSS CAUSATION ....42

X. PRESUMPTION OF RELIANCE ....45

XI. NO SAFE HARBOR ....48

XII. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ....49

By and through his undersigned counsel, Iain Kaplan ("Lead Plaintiff") brings this federal securities class action against Defendants Wayfair Inc. ("Wayfair" or "Company"), Niraj Shah ("Shah"), Steven K. Conine ("Conine"), and Michael D. Fleisher ("Fleisher") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Wayfair and other related non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other related non-parties; and (c) review and analysis of securities analyst reports, news articles, websites, and other publicly available information concerning Defendants and other related non-parties. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. Lead Plaintiff brings this action on behalf of himself and all persons or entities that purchased or otherwise acquired shares of Wayfair Class A common stock[1] during the Class Period (August 2, 2018 to October 31, 2018), and were damaged thereby, pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC.

---

[1] Wayfair has two classes of common stock. The Company's Class A common stock is publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "W" and carries one vote per share. The Company's Class B common stock is non-publicly traded and carries ten votes per share. Class B common stock is convertible at any time into Class A common stock at the option of the holder. If Class B common stock is transferred, it automatically converts to Class A common stock, subject to certain exceptions.

2. Wayfair is an online retailer of household goods. The Company sells a wide variety of products at Wayfair.com and four other websites owned by the Company, including furniture, kitchen appliances, bedding and bath supplies, and décor. Wayfair is managed and overseen by the Individual Defendants in this action, Shah, Conine, and Fleisher, who serve as the Company's most senior executive officers and directors.

3. Wayfair's business is highly competitive. It competes with many other retailers selling similar household products, including online retailers, traditional furniture stores, and big box retailers. Many of these companies enjoy advantages over Wayfair such as greater brand recognition, larger customer bases, and more developed infrastructures.

4. Chief among them is Amazon, the world's largest online retailer. In 2017, Amazon expanded its presence in the household goods business, creating two new furniture brands in direct competition with Wayfair. Within a year, Amazon had captured nearly half of the online furniture and home goods market, and was poised to take an even greater share in the future.

5. In the face of this growing competition, Defendants employed an aggressive "growth at all costs" strategy. They spent hundreds of millions of dollars each year to increase revenue growth. Defendants poured money into all types of advertising in an attempt to build the Wayfair brand and drive new and repeat business around the globe. The Company's advertising expenses soared to over $700 million in 2018, quadruple the amount it spent just four years earlier.

6. On the surface, Defendants' massive spending was effective, boosting top line revenue growth. But it also crushed the bottom line. The Company was unable to turn a profit, spending much more money than it was able to generate from sales to customers. The situation grew worse during the Class Period as competitive pressure mounted from the likes of Amazon, forcing Wayfair to spend even more money to keep pace.

7. During the Class Period, Defendants knowingly concealed the severity of this financial dilemma. They falsely assured investors that the Company was becoming profitable, particularly in the U.S. market, that the Company's advertising expenses were coming down, and that the Company was generating positive advertising leverage, meaning that advertising expenses were increasingly effective at driving revenue. Defendant Shah, for example, boasted that "the costs get less and less on the advertising" and "[t]he U.S. has now been EBITDA [earnings before interest, tax, depreciation, and amortization] profitable, 6 of the last 7 quarters . . . . you can actually see how growing very quickly actually evolves you into the profitable model."

8. Defendants could only conceal the truth for so long, as Wayfair's fundamentals continued to erode throughout the Class Period. Before the market opened on November 1, 2018, Defendants stunned investors by revealing a surprisingly high quarterly loss, driven by significant increases in advertising and other spending. Even the U.S. market, hyped by Defendant Shah as a profit source just a few weeks earlier, suffered a loss. Defendants also revealed for the first time that the Company experienced ***negative*** advertising leverage (deleverage) during the quarter, meaning that the Company's advertising expenses were less effective at driving revenue than they were the previous year.

9. Securities analysts observed that Wayfair's "results were in contrast to the margin optimism we perceived on its last call" and recognized the severity of Wayfair's problem, noting that "it will take longer to reach profitability than the market expects, given our view [that] ad spend and investments must stay elevated to sustain a high level of top-line growth as competitors become more sophisticated online."

10. The Company's stock price suffered a steep decline in response to Defendants' revelations, plummeting ***12.8%*** in a single trading day on November 1, 2018, resulting in millions

in investor losses. In contrast, while investors suffered, Defendants Shah, Conine, and Fleisher each enjoyed a financial windfall. During the Class Period, they sold a combined ***$69 million*** of their personal Wayfair shares at prices that were artificially inflated by their material misstatements and omissions.

11. Wayfair's bottom line has continued to erode since the end of the Class Period. As *The Wall Street Journal* observed on May 2, 2019, following another disappointing quarter: "Buying revenue growth through aggressive spending isn't reassuring investors of the business's health. And the horizon for reaching profitability keeps retreating into the distance."

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c) and Section 27 of the Exchange Act because Wayfair transacts business in this District, Wayfair's principal office is located in this District, many of the acts and practices complained of herein occurred in substantial part in this District, and Defendants disseminated from this District materially false and misleading statements complained of herein.

14. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

15. Iain Kaplan was appointed to serve as Lead Plaintiff in this action by Order of this Court dated April 1, 2019 [ECF No. 18]. As set forth in the certification filed with the Court on March 11, 2019 [ECF No. 17-2], and incorporated herein, Lead Plaintiff purchased or otherwise acquired shares of the Company's Class A common stock at artificially inflated prices during the Class Period. Lead Plaintiff suffered economic losses when facts about the Company's true financial condition were disclosed and the artificial inflation was removed from the price of Wayfair's Class A common stock

### B. Defendants

16. Defendant Wayfair is a Delaware corporation with its principal place of business located in Boston, Massachusetts.

17. Defendant Shah is a co-founder of Wayfair, and has served as Chief Executive Officer ("CEO") and a director of Wayfair since 2002. He also served as President and Co-Chairman of the Board of Directors of Wayfair throughout the Class Period, and continues to serve in such positions.

18. Defendant Conine is a co-founder of Wayfair, and has served as a director of Wayfair since 2002. He also served as Co-Chairman of the Board of Directors of Wayfair throughout the Class Period, and continues to serve in such position. He previously served as Wayfair's Chief Technology Officer from 2002 to 2015.

19. Defendant Fleisher has served as Chief Financial Officer ("CFO") of Wayfair since joining the Company in October 2013.

20. Defendants Shah, Conine, and Fleisher are collectively referred to herein as the "Individual Defendants."

21. During and prior to the Class Period, the Individual Defendants were privy to confidential and proprietary information concerning Wayfair, as further detailed herein. Through their positions as senior executive officers and directors of Wayfair, the Individual Defendants had access to non-public information about the Company's financial condition, business operations, performance, and future prospects, through internal corporate documents and other information, connections with other corporate officers and employees, and attendance at management and/or Board meetings.

22. The Individual Defendants are liable as direct participants in the wrongs complained of herein. They participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications specified herein. They knew, or recklessly disregarded, that the material adverse information specified herein had not been disclosed to, and was concealed from, the investing public, and that the communications specified herein contained materially false and misleading statements and material omissions of fact.

23. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors of the Company, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly control the conduct of the Company's business.

24. As senior executive officers, directors, and controlling persons of a publicly traded company whose Class A common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information

with respect to the Company's financial condition, business operations, performance, and future prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's Class A common stock would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers or acquirers of the Company's Class A common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's operating and financial condition and the intrinsic value of Wayfair's Class A common stock, causing Lead Plaintiff and other members of the Class to purchase or otherwise acquire such stock at artificially inflated prices.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

26. The Company is an online retailer of household goods, co-founded by Defendants Shah and Conine in 2002. The Company began operating through collection of discrete retail websites under the umbrella of "CSN Stores." In 2011, Defendants Shah and Conine rebranded CSN Stores as "Wayfair" and launched a new website, Wayfair.com. Wayfair went public and began trading on the NYSE in 2014.

27. Today, Wayfair calls itself as "one of the world's largest online destinations for the home," offering online shoppers "over fourteen million products from over 11,000 suppliers," and employing over 12,000 people full-time. Wayfair offers a seemingly unlimited choice of household products. The Company sells all types of furniture, including beds, sofas and dining

room sets, outdoor items, bedding and bath materials, décor, pillows, kitchen appliances, lighting, storage items, and rugs, among other products.

28. The vast majority of the Company's net revenue (99%) is reported as "Direct Retail." This includes sales from five distinct websites with unique brand identities. Most net revenue comes from Wayfair.com, which the Company has branded as, "Everything home for every budget." The Company's four other Direct Retail websites are Joss & Main ("Stylish designs to discover daily"), AllModern ("The best of modern, priced for real life"), Birch Lane ("Classic home. Comfortable cost."), and Perigold ("The widest-ever selection of luxury home furnishings").

29. The Company's remaining net revenue (1%) is reported as "Other" and derived from one of two sources: "Retail Partners" (revenue from the sale of Wayfair products on the websites of third party retail partners) and "Wayfair Media Solutions" (revenue from the sale of advertisements to third party advertisers on Wayfair's sites).

30. In addition, Wayfair reports net revenue in two geographic segments: the "U.S." segment, representing 86% of net revenue, and the "International" segment (Canada, Germany, and the United Kingdom), representing 14% of net revenue.

**B. The Company's Business Is Increasingly Competitive**

31. Wayfair operates in an extremely competitive business environment, fragmented among numerous retailers selling the same types of household goods as Wayfair. The Company's competitors come in many forms, including:

- **Online retailers and marketplaces** such as Amazon, eBay, Houzz, and Overstock;
- **Traditional furniture stores** such as Ashley Furniture, Bob's Discount Furniture, Havertys, Raymour & Flanagan, Rooms to Go;

- **Specialty retailers** such as Crate and Barrel, Ethan Allen, TJX, At Home, Williams Sonoma, Restoration Hardware, Arhaus, Horchow, Room & Board, and Mitchell Gold + Bob Williams;
- **Big box retailers** such as Walmart, Bed Bath & Beyond, Home Depot, IKEA, Lowe's, Target, and Walmart; and
- **Department stores** such as JCPenney and Macy's.

32. Many of these companies are larger and more established than Wayfair. As such, they enjoy competitive advantages that Wayfair must contend with, such as greater brand recognition, more developed infrastructures, better technical capabilities, and faster and less costly shipping. In addition, Wayfair relies solely on online sales, while many competitors benefit from more traditional brick-and-mortar stores, such as Williams Sonoma, Ashley Furniture, Crate and Barrel, and Ethan Allen. Customers often favor these stores for large pieces of furniture, rather than buying them online.

33. The Company also faces fierce competition within the e-commerce space. Chief among these competitors is Amazon, the largest e-commerce company in the world. Amazon dwarfs Wayfair in size. It has a bigger customer base, far better name recognition, and a much greater distribution network than Wayfair. Until recently, however, furniture sales represented a small part of Amazon's business.

34. This began to change in 2017. That year, Amazon launched a new online marketplace called "Amazon Home," which sells household products including two private label furniture brands (Rivet and Stone & Beam). Leveraging its mass scale and market clout, Amazon soon caught up to online competitors such as Wayfair. According to a June 2018 study by One Click Retail, Amazon "already holds the largest market share of online furniture sales and is likely to capture the bulk of future growth in the long term. . . . Furniture brands looking to compete in e-commerce, the industry's fastest-growing space, need to begin at Amazon." The study estimated

that Amazon's furniture sales had jumped to $4 billion in 2017, a 51% increase over 2016. By 2018, Amazon had captured almost half (46%) of the entire online furniture and home goods market, as reported by *Bloomberg*.

### C. The Company Spent Massive Amounts of Money to Boost Revenue Growth in the Face of Growing Competition

35. In the face of intense competition from Amazon and scores of other companies, Wayfair was forced to spend aggressively, especially on advertising. Advertising is critical to spread awareness of the Wayfair brand, drive customers to Wayfair.com and other Company websites, and increase revenue through the purchase of Wayfair products.

36. The Company pours hundreds of millions of dollars into numerous advertising channels, creating a seemingly ubiquitous presence. The largest advertising channel is online. Wayfair employs a variety of online advertising strategies including search engine marketing and optimization, display advertising, and social media campaigns on platforms such as Instagram, Facebook, and Pinterest. The Company also purchases television advertisements, product placements on television channels such as HGTV (Home & Garden Television), and magazine advertisements. Other advertising methods include direct mailings, such as postcards and catalogs, mobile push notifications, and e-mail campaigns.

37. To conduct this strategy, the Company employs a massive in-house advertising team, comprised of thousands of paid employees, and also pays for the services of external advertising agencies. Wayfair's large in-house team devotes considerable resources to the development of proprietary advertising technologies. For example, Wayfair has developed certain algorithms designed to best target its advertising toward online customers, in an effort to drive more traffic to its websites.

38. The Company also spends heavily to promote sales events such as Cyber Monday, a holiday-related sale after Thanksgiving, and Way Day, an annual sale patterned after Amazon's Prime Day. During these promotions, the Company steeply discounts tens of thousands of products and often ships them to customers free of charge.

39. As a result of the Company's aggressive, multi-faceted advertising strategy, the Company's annual advertising expenses have skyrocketed over time, and show no signs of slowing down. Wayfair's advertising expenses reached $774 million in 2018, compared to $550 million in 2017, $409 million in 2016, $278 million in 2015, and $191 million in 2014. Therefore, in just four years, the Company's annual advertising expenses have ***quadrupled***.

40. The Company signaled to the market that, although such expenses were increasing, they were becoming more effective at the same time, driving more revenue per advertising dollar. According to the Company, this happened because it was getting more business from loyal, repeat customers, who could be targeted more cheaply and efficiently through channels such as e-mail and mobile push notifications. In other words, the advertising expenses were expected to generate "leverage" over time. The Company quantifies this leverage on a quarterly basis, as the percentage of total advertising cost in relation to total net revenue. A decrease in the percentage (compared to the prior-year quarter) would mean that the Company has achieved positive advertising leverage, while an increase in the percentage would mean that the Company has achieved negative advertising leverage, or deleverage.

41. In addition to its advertising expenses, the Company incurs tremendous operating expenses in an effort to expand its infrastructure across the globe. The Company has hired thousands of employees (headcount), including over 2,000 engineers and data scientists and 3,000 customer service representatives. Many were hired for the purpose of developing the Company's

costly in-house advertising technology discussed above. These numbers continue to rise as the Company continues to expand.

42. Wayfair has also devoted significant money and resources to developing its supply chain logistics and fulfillment, in order to increase delivery speed and efficiency. The Company has implemented an extensive "Wayfair Delivery Network" including consolidation centers, cross docks, and last mile delivery facilities. The Company has also built a series of warehouses called "CastleGate," which are state-of-the-art facilities located in key markets to quickly receive, sort, and deliver products received from Wayfair's suppliers. As a result of these initiatives, Wayfair now owns millions of square feet of warehouse space throughout North America and Europe.

43. Wayfair's high-spending advertising and expansion strategies have been effective at generating overall net revenue growth. The Company's annual net revenue reached $6.78 billion in 2018, increasing from $4.72 billion in 2017, $3.38 billion in 2016, $2.25 billion in 2015, and $1.32 billion in 2014.

### D. The Company's Bottom Line Deteriorated Due to High Spending and Advertising Deleverage, But Defendants Knowingly Misled the Market

44. The Company's apparent top line success has come at a steep price. Though Wayfair drives enough customers to grow revenue, they simply do not spend enough, on a repeat basis, for the Company to turn a profit. In fact, the Company experiences ***negative*** free cash flow, meaning more money goes out than comes in.

45. The Company's shaky financial situation came to a head during the Class Period. As competition mounted from the likes of Amazon, Defendants stepped up their efforts to grow revenue, in order to maintain the perception that the Company was a rising force in the retail industry. Defendants poured massive amounts of money into advertising in an attempt to obtain more business, while proceeding with Wayfair's costly expansion efforts. But this ill-fated

strategy backfired. The Company's losses widened, and its prospects of a profitable business looked bleaker than ever.

46. Moreover, the Company was not getting as much bang for its advertising buck during the Class Period. Advertising spending as a percentage of net revenue began to rise, meaning the Company was generating ***negative*** advertising leverage (deleverage) on a year-over-year basis. In other words, the Company's advertising dollars were less effective at driving business than they were in the previous year.

47. Defendants had inside knowledge of these problems during the Class Period. They admittedly received granular financial data informing them of the Company's precise advertising expenses, leverage from such expenses, performance vis-à-vis customers (called "customer key performance indicators" or "customer KPIs"), and profitability. For example, Defendant Fleisher stated publicly that "[w]ith the majority of our ad dollars spent on digital channels and 6 years of data on customer behavior under the Wayfair brand, we are able to measure [advertising] payback on an extremely granular basis." Similarly, Defendant Shah boasted that "we're highly confident that we understand what each tranche [of advertising] costs us"; "customer acquisition we're very quantitative about that"; and "[w]hat I want to make sure there's kind of a good understanding of, though, is we are very, very quantitative . . . we're very focused on protecting the unit economics. . . . the unit economics is around getting customers, so that's advertising." *See* Section VIII, below (detailing additional statements and other facts supporting Defendants' knowledge).

48. Despite this knowledge, Defendants concealed the problems from investors during Class Period. Instead, they made numerous public statements that gave the market a false impression of the Company's financial condition. They told investors that the Company was becoming profitable, particularly in the U.S. market, that advertising expenses were coming down,

and that the Company was generating positive advertising leverage, meaning that advertising expenses were more effective at driving revenue than they were the previous year.

49. For example, Defendant Shah made the following materially false and misleading statements during the Class Period, while the Company was experiencing the spending and profitability issues discussed above:

- "So ad spend, if you look at it sequentially over the last few years, it continues to drift down . . . . the costs get less and less on the advertising."
- "And what you see, no matter which way you cut, you can see systematically that actually as customers increasingly repeat, the effective ad cost to get them [to] come back goes down and those models are kind of self-learning. . . . [W]e're highly confident that we understand what each tranche costs us. And you pretty much clearly see it coming down."
- "And we talked about advertising. We talked about the payback cycle and keeping that very tight. . . . But when you take the profit margin we talk about, and you multiply it by a very large top line, you start talking about a very significantly profitable company."
- "The U.S. has now been EBITDA profitable, 6 of the last 7 quarters . . . . you can actually see how growing very quickly actually evolves you into the profitable model."

*See* Section V, below (further detailing Defendants' material misstatements and omissions).

50. Defendants' material misstatements and omissions caused Wayfair's stock price to skyrocket during the Class Period. The price reached an artificially inflated Class Period high of $151.20 per share on September 14, 2018, and remained artificially inflated throughout the remainder of the Class Period.

51. The Individual Defendants, Shah, Conine, and Fleisher, personally benefitted from this artificial inflation, supporting their motive to misrepresent and conceal the truth about the Company's financial problems. They collectively sold more than ***$69 million*** of their personally held Wayfair shares, in dozens of suspiciously-timed transactions throughout the Class Period while the stock traded at artificially inflated prices. *See* Section VIII, below (additional detail

regarding these inside sales). While Defendants were cashing in, investors were in the dark about the true extent of the Company's problems, and ultimately suffered as a result.

### E. Defendants Were Forced to Reveal the Truth About the Company's Troubled Financial Condition, Causing Its Stock Price to Plummet

52. On November 1, 2018, the truth about the Company's deteriorating bottom line began to be revealed. Before the market opened, Defendants reported a quarterly loss that was far greater than anticipated. Even the U.S. market, which Defendant Shah had highlighted as a consistent source of profit, was now in the red.

53. Defendants revealed that these losses were primarily caused by higher advertising expenses, along with elevated headcount hiring. Moreover, Defendants admitted that the Company failed to drive any leverage from its bloated advertising expenses. This meant that the Company's advertising expenses were not getting more effective over time, another sign of the Company's lack of progress toward profitability. *See* Section VI, below (additional discussion of Defendants' revelations).

54. The market was stunned by these revelations. The Company's Class A common stock suffered a ***12.8% loss*** in a single trading day, closing at $96.16 per share on November 1, 2018, on unusually heavy trading volume. Wayfair investors lost millions when the truth was revealed, as the artificial inflation suddenly came out of the stock price.

55. Securities analysts and other commentators expressed surprise at the Company's disappointing results. One analyst noted that Wayfair's "losses widened more than anticipated" and "it will take longer to reach profitability than the market expects, given our view [that] ad spend and investments must stay elevated to sustain a high level of top-line growth as competitors become more sophisticated online" Similarly, marketing expert Daniel McCarthy, a professor at Emory University, observed that Wayfair has been "spending more money to acquire customers

than they are getting back after those customers have been acquired, and for this reason, they continue beating on revenues *by* missing earnings."

56. The Company's bottom line continued to erode after the Class Period. On May 2, 2019, after Wayfair had reported two more quarters without profit or advertising leverage, *The Wall Street Journal* summed up Wayfair's financial dilemma as follows: "By spending so much on acquiring customers, Wayfair keeps raising the bar for how good those customers need to be to make that investment profitable. Buying revenue growth through aggressive spending isn't reassuring investors of the business's health. And the horizon for reaching profitability keeps retreating into the distance." *See* Section VII, below (discussing post-Class Period developments).

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD

57. Throughout the Class Period, Defendants made materially false and misleading statements about the Company's advertising spending, ability to leverage such spending, and profitability, as described further below. These statements failed to provide a full picture of the true circumstances at the Company. When Defendants spoke, they were under a duty to disclose the full truth, but violated that duty. Specifically, Defendants violated their duty to disclose that:

- in the face of intense competition, Wayfair significantly increased advertising spending to meet revenue growth expectations;
- the Company's high advertising expenses, together with high operating expenses such as headcount hiring, reduced the Company's margins to an extent much worse than the Company disclosed;
- the Company was unable to drive positive advertising leverage (*i.e.*, lower advertising spending as a percentage of net revenue); and
- the Company was becoming increasingly unprofitable due to the escalating expenses needed to maintain revenue growth.

58. These undisclosed facts were material because they would have altered the total mix of information about the Company that was available to reasonable investors during the Class

Period. Such materiality was supported by Wayfair's sharp stock price decline, on unusually heavy trading volume, when investors ultimately learned the truth about the Company's problems, as the artificial inflation caused and maintained by Defendants' misstatements and omissions came out of the stock price.

59. Defendants' material misstatements and omissions began before the market opened on the first day of the Class Period, August 2, 2018. On that date, Wayfair issued a press release announcing its financial results for the second fiscal quarter of 2018 (April 1, 2018 to June 30, 2018) ("2Q18"). In the release, Defendant Shah portrayed the Company's financial condition in a positive light, stating: "We are delighted with the progress that we are making and the way in which we are positioned to keep taking market share as dollars shift online."

60. Wayfair also held a conference call with investors and securities analysts before the market opened on August 2, 2018. Defendant Fleisher issued prepared remarks at the beginning of the call, discussing both 2Q18 and the third fiscal quarter of 2018 (July 1, 2018 to September 30, 2018) ("3Q18"). Based on "Q3 quarter-to-date" (*i.e.*, a full month into the quarter), Defendant Fleisher made the following statement regarding the Company's margins for that quarter:

> ***For consolidated adjusted EBITDA, we forecast margins of negative 3.7% to negative 4% for Q3 2018***. We expect international adjusted EBITDA to be negative $45 million to negative $50 million in Q3 as we continue to add resources and ad spend in Canada, the U.K. and Germany. In the U.S. business, we expect to deliver adjusted EBITDA margin of approximately negative 1% as we invest primarily in headcount to build continued scale in our primary market.

61. Defendant Fleisher also addressed the Company's advertising spending in his prepared remarks. He reassured investors that advertising spending was paying off (*i.e.*, driving positive year-over-year leverage) during that quarter, and that the Company was moving to a lower level of ad spend per revenue dollar:

> Q2 advertising spend of $178 million or 10.7% of net revenue represents year-over-year leverage of over 30 basis points, as we invest in engaging both new and repeat

> customers and ***benefit from a growing base of repeat customers who require a lower level of ad spend per dollar of revenue***. . . . Looking out to Q3, we're comfortable leaning in on ad spend, while maintaining our overall 1-year contribution margin payback target, given the ongoing strength we're seeing in customer KPIs [key performance indicators]. We, therefore, expect overall ad spend as a percentage of net revenue to increase sequentially in Q3 versus Q2, as it did last year, ***while still showing a modest amount of year-over-year leverage*** compared to the 11.8% level of Q3 last year.

62. Defendant Fleisher further emphasized: "We remain incredibly bullish about our business, both in the near term and long term. The investments we have been making to bring our customers the best possible offering are clearly working with strength across our customer KPIs [key performance indicators] and our market share growing, as a result."

63. During a question-and-answer session following Defendants' prepared remarks, Defendant Shah was asked by an analyst: "[C]an you talk about what you're doing differently on the marketing side that you can still drive leverage while adding nearly 1 million customers? Anything to call out there? Or is it really just the repeat rate growing?" In response, Defendant Shah pointed to the "huge" competitive advantage the Company was gaining through in-house advertising technology:

> I think the key thing to keep in mind on what we do on our paid advertising, and this is a very unique thing for us when you compare us to other folks, is we built all our advertising technology in-house. . . . So there's a lot of new customers to get. And then, obviously, the share of wallet is a huge opportunity. So to your point, repeat is, obviously, a big opportunity too. So I think building our own ad tech has been a huge advantage, but there's also a lot more customers to get, so that's why we keep adding them.

64. The same day, on August 2, 2018, Wayfair filed its Form 10-Q for 2Q18 with the SEC. The Form 10-Q was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Shah and Fleisher. In the Form 10-Q, Defendants emphasized that the Company's advertising expenses were expected to decrease as a percentage of net revenue (*i.e.*, drive positive advertising leverage):

> Advertising consists of direct response performance marketing costs, such as display advertising, paid search advertising, social media advertising, search engine optimization, comparison shopping engine advertising, television advertising, direct mail, catalog and print advertising. ***We expect advertising expense to continue to increase but decrease as a percentage of net revenue over time due to our increasing base of repeat customers.***

65. In subsequent conference calls during the Class Period, Defendants made additional material misstatements and omissions, even as the Company's advertising spending continued to increase and bottom line continued to deteriorate. On August 8, 2018, Defendant Shah represented the Company at the Canaccord Genuity Growth Conference. When asked about the Company's marketing, Defendant Shah emphasized that marketing costs were paying off by generating both new and repeat customers, according to quantitative data observed by Defendants:

> Actually, ***so our cost for repeat orders continues to get lower and lower***, because customers -- basically we invest a lot to make the experience great, okay. And that's useful, if someone experiences it, but they have customers who have and customers who haven't, so. Then customer acquisition, we're very quantitative about that. We'll spend an amount of money such that we get paid back within a year. So the number of customers we get is the outcome of basically how many customers we can acquire with that payback methodology. The reason we grow so quickly is that every quarter since we went public, you can look at our growth based on repeat orders and our growth based on new orders, so new customers basically, and you look at our overall growth rate, and our repeat growth has outpaced our total growth every quarter.

66. In response to a separate question on profitability, Defendant Shah asserted that "the revenue growth, in fact, has accelerated, and it's gotten -- the revenue growth in dollars got increasingly, increasingly high, and the ad cost as a percentage keeps coming down. So I think the understanding that the repeat base drives leverage is reasonably well understood now." When questioned further on advertising expenses and their impact on margins, Defendant Shah assured analysts that spending was coming down and profitability was improving, particularly within the Company's U.S. market:

> ***So ad spend, if you look at it sequentially over the last few years, it continues to drift down***, and that's despite the fact that international deleveraged it, because

> international ad costs, because we don't have a repeat base there, is ad cost is much, much higher as a percentage of net revenues. So the fact that's coming down, the U.S. is even lower than that line, right, delevered then by the international, which pulls it back up to where you see it. . . . The reason the profitability of the business has kept getting better is not actually that we've ever pulled back on investing. It's just that we're simply not spending all of the incremental contribution margin dollars.

67. The following month, on September 5, 2018, Defendant Shah represented the Company at the Goldman Sachs Global Retailing Conference. Although the Company was more than two months into 3Q18 at that point, giving Defendants a wealth of additional financial data, Defendant Shah's misstatements and omissions continued. Defendant Shah was asked directly about the Company's return on marketing dollars. He answered as follows, citing data that customer acquisition costs through advertising were going down:

> In terms of how we know what it cost us, what we do is, basically, every bit of our spend is -- we have fairly complex attribution. So we don't just do last click or multi-click. But we have multiple different attribution models that we overlay on top of each other to basically make sure we triangulate in on what we think actual -- every action had cost us in spend. And then we also add up spend against the cohorts of the different customers. And so we're able to know is, well, what's it cost us to get a new customer from a certain channel or a campaign. But we actually also can know what's it cost us when we move customers from one order to 2 orders, or 2 orders to 3 orders, or 3 orders to 4 orders. And what's it cost us for customers of different ages.
>
> So you can kind of cut it many different ways when you do this type of attribution. ***And what you see, no matter which way you cut, you can see systematically that actually as customers increasingly repeat, the effective ad cost to get them come back goes down and those models are kind of self-learning***. . . .
>
> So that is a long-winded way of saying, we're highly confident that we understand what each tranche costs us. ***And you pretty much clearly see it coming down.*** I would agree with you if we only sold a very narrow set of very high-cost low-frequency goods -- if we were selling cars or something like that. Then you're right. You would have to effectively reacquire them very -- each time unless they had like particular brand loyalty. But basically, the mix of goods we have does lend itself to being able to build a relationship.

68. In response to another question, Defendant Shah further added: "And we talked about advertising. We talked about the payback cycle and keeping that very tight. . . . [W]hen

you take the profit margin we talk about, and you multiply it by a very large top line, ***you start talking about a very significantly profitable company***." He additionally boasted that "[t]he U.S. has now been EBITDA profitable, 6 of the last 7 quarters . . . . ***you can actually see how growing very quickly actually evolves you into the profitable model***."

69. The following day, on September 6, 2018, Defendants Conine and Fleisher represented the Company at a separate event, the Citi Global Technology Conference. When questioned about television advertising, and whether the Company could "start to leverag[e] some of that investment" and "maybe even push on that and get the flywheel working even more and more," Defendant Conine answered in the affirmative, adding that "the investment we're making in TV, we'll continue to sort of grow at a reasonable rate. And we see that we get good leverage out of it today . . . ." Defendant Fleisher followed up on that statement by remarking that "the bigger investment over the last few years [than television] has really been in the direct online [advertising] where we know exactly what the yield is that what we're getting. And I think that's TV – and the brand awareness creates a halo around all of that, that's really quite powerful."

70. As a result of Defendants' false and misleading statements and omissions, the price of Wayfair Class A common stock skyrocketed during the Class Period. The stock increased from a closing price of $107.23 per share on August 1, 2018 (the day before the Class Period began) to an artificially inflated Class Period high of $151.20 per share on September 14, 2018, and remained artificially inflated through the end of the Class Period on October 31, 2018.

71. The statements referenced above in ¶¶57-69 were materially false and misleading because they failed to disclose the following material adverse facts which were known to Defendants or recklessly disregarded by them:

(a) in the face of intense competition, Wayfair significantly increased advertising spending to meet revenue growth expectations;

(b) the Company's high advertising expenses, together with high operating expenses such as headcount hiring, reduced the Company's margins to an extent much worse than the Company disclosed;

(c) the Company was unable to drive positive advertising leverage (*i.e.*, lower advertising spending as a percentage of net revenue);

(d) the Company was becoming increasingly unprofitable due to the escalating expenses needed to maintain revenue growth; and

(e) the Company's Form 10-Q for 2Q18 failed to disclose to the market (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's costs and profitability, as the market would later learn (*see* Sections VI and VII, below).

## VI. THE TRUTH BEGAN TO EMERGE

72. Investors began to learn the truth on November 1, 2018. Before the market opened, Defendants issued a press release revealing surprisingly poor results for 3Q18, in stark contrast to Defendants' rosy Class Period statements. Defendants reported that, despite revenue growth, the Company was deeply unprofitable. The Company experienced an adjusted EBITDA loss of $76.4 million (representing an adjusted EBITDA margin of negative 4.5% of total net revenue), a net loss of $151.7 million ($1.69 per share), and negative free cash flow of $58.8 million. The losses were much worse than Defendants had signaled during the Class Period.

73. The press release further revealed that the losses were experienced around the globe, coming from both the U.S. and International segments of the Company (adjusted EBITDA

losses of $26.0 million and $50.4 million, and adjusted EBITDA margins of negative 1.8% and negative 9.5%, respectively).

74. The Company also held a conference call with investors and securities analysts before the market opened on November 1, 2018. Defendant Shah issued prepared remarks discussing the Company's losses. He acknowledged that the Company's "path to profitability won't necessarily come in a straight line," based on high advertising and operating expenses.

75. Defendant Fleisher provided additional detail on the Company's heavy advertising expenses and losses during the quarter. He stated, for example: "As Q3 progressed, we continued to see compelling opportunities to lean in and invest further advertising spend . . . . This resulted in Q3 advertising spend of $203 million or 11.9% of net revenue, broadly in line with Q3 last year." Through this statement, Defendant Fleisher revealed the Company's advertising had actually ***de***leveraged year-over-year, increasing by 100 basis points (11.9% in 3Q18 vs. 11.8% in the third fiscal quarter of 2017), rather than experiencing positive leverage, as Defendants had misleadingly signaled during the Class Period.

76. Defendant Fleisher also provided guidance for the Company's next quarter, the fourth fiscal quarter of 2018 (October 1, 2018 to December 31, 2018) ("4Q18"). He forecasted another losing quarter due in part to escalated advertising spending:

> As stated earlier, we anticipate ad spend as a percent of revenue this quarter [4Q18] to be at similar levels to Q4 last year. . . . For consolidated adjusted EBITDA, we forecast margins of negative 3.8% to negative 4.1% for Q4 2018. We expect international adjusted EBITDA to be negative $55 million to negative $60 million in Q4 as we continue to add resources and ad spend in Canada, the U.K. and Germany. In the U.S. business, we expect to deliver adjusted EBITDA of negative 1% to negative 1.5% as we continue to invest in penetrating the very large addressable market we see in our category in our primary market.

77. Following their prepared remarks, Defendants engaged in a question-and-answer session with securities analysts. The very first question attempted to drill down on the Company's

higher-than-expected loss. Defendant Fleisher responded that advertising was one of two key areas driving the loss (along with headcount hiring), and that the Company failed to drive leverage from such advertising:

> **Peter Jacob Keith – Piper Jaffray Companies, Research Division – Principal and Senior Research Analyst**:
>
> Congrats on the continued strong revenue growth and the improving KPIs [key performance indicators], I did want to dig into the EBITDA for the quarter, however. It did -- your total EBITDA margin came in below your guided range despite the sales beat. Michael, I know you mentioned headcount may be a little bit above, but could you dig into that a little bit for us and help us understand where some of the profitability measures missed a bit?
>
> **Defendant Fleisher**:
>
> Yes, Peter. I think 2 key areas to look at in terms of EBITDA, both of which I mentioned in the talk track as well. One is ad spend. As we talked about at the beginning -- or at last quarter's call, we did expect to show some ad spend leverage. But as we went through the quarter, we continued to see great opportunities within our paybacks. As everyone, I think, is aware, we look for a 1-year -- on average, a 1-year payback on new customer acquisitions on ad spend. And we've said time and time again, if in the middle of the quarter, we see those opportunities and the team is finding that, we're going to go lean in and take advantage of it. And we're always going to do it from the perspective of what's the right long-term return for the business as opposed of sort of trying to make a particular number, even if it's something that we guided. ***So I think you had ad spend basically flat year-over-year as opposed to showing 30 or 40 basis points of leverage.*** And then on the other side is the OpEx headcount hiring. . . . And I think those 2 key factors were really the drivers of incremental expense versus even the sort of good revenue performance that lead -- that led to the higher EBITDA loss.

78. On this news, the price of Wayfair's Class A common stock fell dramatically. After closing at $110.29 on October 31, 2018, the stock price fell 12.8% to a closing price of $96.16 per share on November 1, 2018, on unusually high trading volume of nearly 10 million shares. The stock price continued to fall 3.3% the following day, November 2, 2018, closing at $92.96 per share on unusually high volume of 4.3 million shares. The total stock price decline over this two-day period was 15.7%.

79. Several securities analysts expressed surprise over the Company's high spending and deteriorating bottom line. For example:

(a) On November 1, 2018, J.P.Morgan dramatically lowered its EPS estimates for the Company and observed that 3Q18 "results were in contrast to the margin optimism we perceived on its last call while decelerating sales growth and stepped up advertising (no leverage in 2H18) struck at the root of one of the big bear cases on W[ayfair] (i.e., they need to reacquire customers)";

(b) Morgan Stanley issued a report on November 1, 2018, noting that the Company's "losses widened more than anticipated" in 3Q18 and "revenue/profit guidance [for 4Q18] was worse . . . it will take longer to reach profitability than the market expects, given our view [that] ad spend and investments must stay elevated to sustain a high level of top-line growth as competitors become more sophisticated online";

(c) Wells Fargo sharply reduced its Wayfair stock price target from $150 to $105 in a report dated November 1, 2018, stating that the Company's topline (revenue) growth "came at a cost, with ad spend . . . driving . . . Adj. EBITDA margin compression . . . and the widest FCF loss W[ayfair] has posted in over a year. . . . [W]e believe today's cautious consumer commentary adds incremental uncertainty towards W[ayfair]'s ultimate path to profitability.";

(d) In a report dated November 1, 2018, Morningstar noted the Company's "lower-than-anticipated EBITDA performance" and expressed that "[o]ur biggest concern surrounds customer acquisition and infrastructure spend, as Wayfair continues to outpace its home furnishing peers in absolute dollars spent on each . . .";

(e) On November 2, 2018, IFS Securities slashed its Wayfair stock price target from $121 to $100 and observed that Wayfair's "[c]ompanywide adjusted EBITDA was a loss of

$76 million on a consolidated basis or negative 4.5% of net revenue. It was the largest EBITDA loss in the Company's history and the largest percentage loss in four years. A similar EBITDA loss is projected for 4Q18";

(f) On November 2, 2018, Cowen and Company significantly reduced its stock price target for Wayfair (from $137 to $120), citing lower-than-expected EBITDA due to higher advertising and operating costs;

(g) Wedbush also issued a report on November 2, 2018 stating that Wayfair's 3Q18 revenue "came at the expense of profitability, with adjusted EBITDA . . . sharply missing consensus . . . and 4Q margin guidance well below consensus. . . . W[ayfair] continues to spend heavily on customer acquisition, logistics, category expansion and International growth, with the 3Q EBITDA miss attributable mostly to record customer acquisition costs and logistics cost pressures. W[ayfair] guided for these pressures to persist in 4Q even as it slows hiring and experiences its highest seasonal volume quarter of the year.";

(h) On November 5, 2018, William Blair issued a report stating: "Regardless of a better-than-expected top line, we have lowered our earnings estimates for both this and next year; mostly as a result of guidance for a flat advertising ratio year-over-year in the fourth quarter on top of elevated recent hiring levels, which should drive greater operating deleverage than initially expected."; and

(i) On November 13, 2018, Wedbush issued another report regarding the "continued cost concerns" at Wayfair, observing that "customer acquisition costs (and overall spending) are very high for the current level of per-customer revenue and profit. . . . Results from 3Q18 showed that investors are increasingly focused on growing losses and rising customer acquisition costs despite strong revenue growth."

80. Financial media also reported on the Company's unexpectedly poor results, and the resulting stock price decline. CNBC posted an article on November 1, 2018, noting Wayfair's steep stock price drop "after the company reported a wider-than-expected loss for the third quarter and high spending to attract new customers." Quoting Neil Saunders, managing director of GlobalData Retail, the article stated that the Company's customer acquisition costs were "rather excessive, and completely unprofitable."

81. On November 1, 2018, *The Wall Street Journal* released an article titled, "Path to Profits Still Eludes Wayfair." The article noted that the Company's stock was plummeting after the Company announced its results, and observed that:

> Though the company claims to have mastered the art of selling and delivering furniture, it shows no signs of doing so profitably. Its free cash flow for the quarter was negative $58.8 million, ***more than triple what the outflow was for the same quarter last year.***
>
> In fact, the company hasn't been able to beat earnings estimates in any of the past four quarters, though it consistently does so on revenue. These are related. Daniel McCarthy, a marketing professor at Emory University, calculates that the company's customer-acquisition cost [CAC] has jumped to $86.8 per customer in the third quarter – a new high. ***It is spending more money on acquiring customers than it is getting back.***
>
> The company has tried to pin some of these issues on growing pains in the international business, but as Mr. McCarthy points out, Wayfair's adjusted margin of earnings before interest, taxes, depreciation and amortization [EBITDA] in its U.S. business was still ***at its worst level in three years***.

82. In a separate social media post, Professor McCarthy further observed that, based on the Company's terrible bottom line results, "it should be no surprise why the stock is down" on November 1, 2018.

## VII. POST-CLASS PERIOD DEVELOPMENTS

83. The Company's financial problems continued after the Class Period. On November 14, 2018, just two weeks after Wayfair revealed the disappointing 3Q18 financial results discussed

above, Wayfair announced that it intended to raise a substantial amount of cash through a private offering of $500 million in convertible senior notes. As Wedbush observed in a report dated November 14, 2018: "Today, losses are rising and the company appears multiple years away from turning cash flow positive. Accordingly, this capital raise appears to be more out of necessity than conservatism."

84. Consistent with this observation, on February 22, 2019, the Company reported another losing quarter in 4Q18. It suffered an adjusted EBITDA loss of $53.8 million, an adjusted EBITDA margin of negative 2.7% of total net revenue, and a net loss of $143.8 million ($1.59 per share), as well as negative free cash flow of $23.2 million. Wayfair also reported a lack of advertising leverage for the second straight quarter (advertising spending at 11.5% of net revenue, the same as the fourth fiscal quarter of 2017). In response to these results, Morgan Stanley noted on February 25, 2019 that the Company's "[n]ear-term profitability is deteriorating faster than anticipated."

85. Wayfair's fundamentals continued to weaken in 2019. Before the market opened on May 2, 2019, Defendants issued a press release reporting ballooning losses during the Company's first fiscal quarter of 2019 (January 1, 2019 to March 31, 2019) ("1Q19") that were far greater than the previous quarter. Specifically, Defendants reported an adjusted EBITDA loss of $102.2 million, an adjusted EBITDA margin of negative 5.3% of total net revenue, and a net loss of $200.4 million ($2.20 per share), as well as negative free cash flow of $166.8 million.

86. During a conference call on the same date, May 2, 2019, Defendants elaborated on another quarter of disappointing bottom line results. Defendant Fleisher announced that advertising spending as a percentage of net revenue had increased by 100 basis points year-over-year (*i.e.*, advertising deleverage): "The opportunities we saw in capture resulted in Q1 advertising

spend of $244 million or 12.5% of net revenue, approximately 100 basis points higher than Q1 last year."

87. Later in the call, when asked by an analyst "[c]an you maybe explain why there was not more leverage on EBITDA with such good sales growth," Defendant Shah again cited increased advertising and operating expenses, and acknowledged that "the route on advertising leverage over time is not linear and that's one of the factors that would hit EBITDA in the near period . . ." Separately, Defendant Shah admitted that advertising was "not really driving any of the [gross margin] number today."

88. In response to this news, the Company's Class A common stock price fell 7.1%, from a closing price of $163.53 per share on May 1, 2019, to a closing price of $151.96 per share on May 2, 2019, on unusually high trading volume of 6.6 million shares.

89. Following the Company's disclosures, securities analysts and financial media took account of the Company's persistent spending and profitability issues. For example:

(a) On May 2, 2019, Wells Fargo lowered financial estimates for Wayfair, observing that the Company's adjusted EBITDA in 1Q19 again missed expectations and "[s]ustainable U.S. profitability remains a sticking point. . . . U.S. profitability remains elusive, and elevated losses in International further cloud the path to sustainable profits. Considering this dynamic, we view it difficult to argue for considerable upside here.";

(b) On May 3, 2019, IFS Securities issued a report stating: "We continue to be disappointed with the increasing losses, but continue to hope to see a future focus on leveraging expenses. We also worry that the free cash flow burn is getting worse as the environment appears to be getting tougher[,]. . . . approximately 3.5 times worse than 1Q18 and greater than the entire fiscal FY18."; and

(c) Morgan Stanley issued a report on May 3, 2019 observing: "We think sustaining a high rate of revenue growth is likely to be more costly than anticipated, and believe we saw a glimpse of this dynamic in Q1 results. We think [this] hints that growth may be becoming more expensive incrementally rais[ing] the risk of greater than expected losses persisting throughout 2019."

90. Similarly, on May 2, 2019, Professor McCarthy observed "[m]ore of the same" with respect to the Company's continued spending and margin problems:

> To summarize very briefly, the main thing that stuck out was that Wayfair's customer acquisition cost [CAC] continued its ascent to a new all-time high of $88.3 this quarter. As a result, ***we actually saw negative operating leverage on advertising expenses, which rose as a percentage of revenues to a two-year high***. Most everything else – revenue growth, gross margin, repeat orders as a percent of total order – remained the same. As a result, we saw another quarter of highly disappointing adjusted EBITDA profitability, with Wayfair losing more than $5 in adjusted EBITDA for every $100 of revenues they are generating, ***the worst level for this metric in recent history. Their revenue growth is actually causing them to lose more, not less, money than before.***

## VIII. DEFENDANTS ACTED WITH SCIENTER

91. Defendants acted with scienter in that they knew or recklessly disregarded that statements issued or disseminated in the name of the Company were materially false and misleading and omitted material facts. Defendants substantially participated or acquiesced in the issuance or dissemination of such statements, knowingly or recklessly, as primary violators of the federal securities laws. The ongoing fraud described herein could not have been perpetrated without Defendants' knowledge and/or recklessness.

92. Each Defendant's scienter is collectively supported by the facts described herein, including the indicia of scienter set forth below.

### A. Defendants' Own Public Statements, Among Other Factors, Support Their Knowledge or Reckless Disregard of the Matters Alleged Herein

93. During the Class Period, the Individual Defendants were the Company's high-ranking officers and directors (*i.e.*, Defendant Shah as CEO and Co-Chairman, Defendant Conine as Co-Chairman, and Defendant Fleisher as CFO). They were heavily involved with the Company's operations and finances, and had day-to-day responsibilities concerning critical matters affecting the Company. As such, they were intimately aware of the financial condition of the Company, including the Company's advertising expenses, leverage from such expenses (advertising expenses as a percentage of net revenue), and profitability. Therefore, they knew that the Company's financial condition was worse than Defendants disclosed to the market during the Class Period.

94. This is supported by Defendants' repeated statements on such matters, and emphasis on the importance of such matters, during public conference calls, where they provided detailed opening statements and responses to specific questions from securities analysts, and in SEC filings and press releases. *See* Sections V-VII, above. By choosing to speak about such matters, Defendants led investors to believe that they had knowledge of such matters and were speaking truthfully to the market about them.

95. Defendants specifically acknowledged that they had access to, and were continuously monitoring, reviewing, and evaluating, precise data regarding the Company's advertising expenses, leverage from such expenses, performance vis-a-vis customers ("customer key performance indicators"), and profitability. For example, Defendants stated as follows:

- **<u>Defendant Fleisher, 02/22/18</u>**: "We take a highly analytic approach to how we invest ad dollars measuring ROI [return on investment] on the spend across channels to achieve an overall payback period of approximately 12 months on a contribution margin basis. With the majority of our ad dollars spent on digital channels and 6 years of data on customer behavior under the Wayfair brand, we are able to measure payback on an extremely

granular basis. Our proprietary ad tech stack that we brought in-house over the last 4 years, is also a competitive advantage that allows us to leverage internal and external data to target customers efficiently. The ongoing improvement in the performance of our site has resulted in more and more opportunities for us to invest ad dollars while staying within the same overall payback period on a contribution margin basis."

- **<u>Defendant Fleisher, 03/06/18</u>**: "We've been, I think, very thoughtful about protecting and being very maniacally focused on our unit economics, right? It's – I think it is easy to build e-commerce businesses that have a flashy front-end and don't care about unit economics and that will come later. That's not our model and the way we think about the world."

- **<u>Defendant Conine, 05/02/18</u>**: "On previous earning calls, we've spoken about the data-driven approach we take across our business. And today, I wanted to tell you more about how we are constantly using data to drive our business forward. . . . We have a culture that has always placed a high degree of importance on data . . . . [W]e collect rich customer and product data. We have a depth of data that is rare within the home category due to the scale of our customer base and product offering and longevity of our business online. This data is what powers our data science team's work. On average, we capture and store 4 terabytes of data every day. And over the course of a year, we tracked approximately 40 billion customer actions on our site . . . ."

- **<u>Defendant Shah, 05/02/18</u>**: "And we're investing into basically what will basically create huge long-term return. What I want to make sure there's kind of a good understanding of, though, is we are very, very quantitative in how we do that and we're very focused on protecting the unit economics. . . . In other place the unit economics is around getting customers, so that's advertising. And that, we've always kept this really tight payback framework so that we always know we won't be upside down when we're investing in getting a new cohort of customers and we get paid back fairly quickly."

- **<u>Defendant Fleisher, 08/02/18</u>**: "Looking out to Q3, we're comfortable leaning in on ad spend, while maintaining our overall 1-year contribution margin payback target, given the ongoing strength we're seeing in our customer KPIs [key performance indicators]. We, therefore, expect overall ad spend as a percentage of net revenue to increase sequentially in Q3 versus Q2, as it did last year, while still showing a modest amount of year-over-year leverage compared to the 11.8% level of Q3 last year."

- **<u>Defendant Shah, 08/08/18</u>**: "Actually, so our cost for repeat orders continues to get lower and lower. . . . Then customer acquisition we're very quantitative about that. We'll spend an amount of money such that we get paid back within a year. So the number of customers we get is the outcome

of basically how many customers we can acquire with that payback methodology."

- **<u>Defendant Shah, 08/08/18</u>**: "And so then what's happened over the years, as people have seen that like the revenue growth, in fact, has accelerated, and it's gotten -- the revenue growth in dollars got increasingly, increasingly high, and the ad cost as a percentage keeps coming down. So I think the understanding that the repeat base drives leverage is reasonably well understood now."

- **<u>Defendant Shah, 09/05/18</u>**: "And what you see, no matter which way you cut, you can see systematically that actually as customers increasingly repeat, the effective ad cost to get them come back goes down and those models are kind of self-learning. . . . [W]e're highly confident that we understand what each tranche costs us. And you pretty much clearly see it coming down."

- **<u>Defendant Fleisher, 09/06/18</u>**: "But the bigger investment over the last few years has really been in the direct online [advertising] where we know exactly what the yield is that what we're getting."

96. As discussed above in Section VI, Defendants later admitted that the same data they were closely monitoring, reviewing, and evaluating showed higher advertising expenses and lower margins than they had falsely and misleadingly stated throughout the Class Period, and showed negative rather than positive advertising leverage.

97. Defendants Shah and Fleisher also undertook the affirmative obligation to obtain knowledge in order to ensure the Company's disclosures to the market were truthful by executing certifications of the Company's SEC Form 10-Q for 2Q18, as described above in ¶64, which further supports their knowledge or reckless disregard of the materially false and misleading statements and omissions contained therein.

### B. Defendants Were Motivated and Acted with Scienter to Artificially Inflate the Company's Stock Value, in Order to Maximize Proceeds from Inside Stock Sales

98. Defendants' scienter is further supported by the fact that they were highly motivated to misrepresent and omit material facts concerning the true financial and operating

condition of Wayfair in order to artificially inflate the price of Wayfair's Class A common stock, enabling them to capitalize on the artificial inflation by selling their personal shares of Wayfair's Class A common stock.

99. As a result of Defendants' false and misleading Class Period statements and omissions, detailed above, the price of Wayfair Class A common stock exploded, reaching an artificially inflated Class Period high of $151.20 per share on September 14, 2018, well above the closing price of $107.23 on August 1, 2018 (the day before the Class Period began). The stock price remained artificially inflated throughout the remainder of the Class Period, before tumbling upon the Company's revelations discussed above.

100. All three of the Individual Defendants, Shah, Conine, and Fleisher, cashed in this artificial inflation before Wayfair's stock price fell. As described further below, they collectively sold ***more than $69 million*** of their personally held Wayfair shares in dozens of well-timed transactions throughout the Class Period.

101. Specifically, Defendant Shah sold a total of 256,772 shares of Wayfair Class A common stock for approximately ***$33.64 million*** in proceeds, taking advantage of artificially inflated prices at numerous times throughout the Class Period, as follows:

| **Date of Sale** | **Shares Sold** | **Sales Price Per Share** | **Sales Proceeds** |
|---|---|---|---|
| August 6, 2018 | 3,139 | $113.95 | $357,689.05 |
| | 8,504 | $112.73 | $958,655.92 |
| | 300 | $110.06 | $33,018.00 |
| | 757 | $114.51 | $86,684.07 |
| | 1,300 | $112.04 | $145,652.00 |
| August 13, 2018 | 6,800 | $122.87 | $835,516.00 |

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| | 4,100 | $123.88 | $507,908.00 |
| | 800 | $124.80 | $99,840.00 |
| | 5,300 | $122.15 | $647,395.00 |
| August 15, 2018 | 1,145 | $121.19 | $138,762.55 |
| August 20, 2018 | 12,900 | $121.90 | $1,572,510.00 |
| | 2,400 | $120.77 | $289,848.00 |
| | 1,300 | $119.40 | $155,220.00 |
| | 400 | $122.50 | $49,000.00 |
| August 27, 2018 | 8,160 | $128.88 | $1,051,660.80 |
| | 5,037 | $129.79 | $653,752.23 |
| | 3,803 | $127.82 | $486,099.46 |
| September 4, 2018 | 7,112 | $136.69 | $972,139.28 |
| | 5,105 | $134.71 | $687,694.55 |
| | 3,383 | $138.86 | $469,763.38 |
| | 3,100 | $135.91 | $421,321.00 |
| | 2,300 | $137.89 | $317,147.00 |
| September 10, 2018 | 3,000 | $135.64 | $406,920.00 |
| | 6,940 | $134.49 | $933,360.60 |
| | 10,840 | $136.55 | $1,480,202.00 |
| | 220 | $137.24 | $30,192.80 |
| September 11, 2018 | 201 | $144.16 | $28,976.16 |
| | 1,500 | $143.37 | $215,055.00 |

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| | 3,299 | $142.48 | $470,041.52 |
| September 17, 2018 | 10,700 | $144.78 | $1,549,146.00 |
| | 4,900 | $145.38 | $712,362.00 |
| | 5,445 | $143.66 | $782,228.70 |
| | 2,800 | $146.57 | $410,396.00 |
| | 2,155 | $142.07 | $306,160.85 |
| | 1,168 | $146.56 | $171,182.08 |
| September 24, 2018 | 500 | $133.63 | $66,815.00 |
| | 600 | $134.94 | $80,964.00 |
| | 700 | $132.26 | $92,582.00 |
| | 11,600 | $137.40 | $1,593,840 |
| | 2,700 | $136.14 | $367,578.00 |
| | 4,900 | $137.99 | $676,151.00 |
| September 26, 2018 | 5,000 | $142.08 | $710,400.00 |
| October 1, 2018 | 1,900 | $144.92 | $275,348.00 |
| | 1,600 | $149.14 | $238,624.00 |
| | 1,100 | $145.85 | $160,435.00 |
| | 16,400 | $144.01 | $2,361,764.00 |
| | 2,700 | $142.98 | $386,046.00 |
| | 2,300 | $141.97 | $326,531.00 |
| October 8, 2018 | 2,400 | $129.68 | $311,232.00 |
| | 6,654 | $131.76 | $876,731.04 |

| **Date of Sale** | **Shares Sold** | **Sales Price Per Share** | **Sales Proceeds** |
|---|---|---|---|
| | 8,246 | $130.92 | $1,079,566.32 |
| | 300 | $132.57 | $39,771.00 |
| October 15, 2018 | 1,700 | $117.68 | $200,056.00 |
| | 1,400 | $118.49 | $165,886.00 |
| | 1,158 | $117.99 | $136,632.42 |
| | 300 | $116.63 | $34,989.00 |
| | 100 | $122.68 | $12,268.00 |
| | 4,900 | $120.96 | $592,704.00 |
| | 3,700 | $119.81 | $443,297.00 |
| | 3,150 | $121.88 | $383,922.00 |
| October 16, 2018 | 950 | $123.96 | $117,762.00 |
| | 200 | $125.05 | $25,010.00 |
| | 600 | $123.26 | $73,956.00 |
| October 22, 2018 | 7,773 | $125.35 | $974,345.55 |
| | 4,650 | $124.36 | $578,274.00 |
| | 1,700 | $122.01 | $207,417.00 |
| | 1,400 | $121.03 | $169,442.00 |
| | 900 | $123.26 | $110,934.00 |
| | 577 | $125.99 | $72,696.23 |
| October 29, 2018 | 1,578 | $111.78 | $176,388.84 |
| | 1,500 | $110.34 | $165,510.00 |
| | 1,300 | $105.37 | $136,981.00 |

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| | 1,000 | $101.83 | $101,830.00 |
| | 900 | $104.34 | $93,906.00 |
| | 900 | $106.09 | $95,481.00 |
| | 800 | $102.82 | $82,256.00 |
| | 600 | $108.71 | $65,226.00 |
| | 500 | $107.62 | $53,810.00 |
| | 223 | $100.10 | $22,322.30 |
| | 200 | $112.63 | $22,526.00 |
| October 31, 2018 | 2,200 | $112.20 | $246,840.00 |
| **TOTAL** | 256,772 | | $33,640,546.70 |

102. Like Defendant Shah, Defendant Conine also cashed in massively on the artificial inflation, selling a total of 255,991 shares of Wayfair Class A common stock for approximately ***$33.55 million*** in proceeds, as follows:

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| August 6, 2018 | 8,350 | $112.73 | $941,295.50 |
| | 2,104 | $113.79 | $239,414.16 |
| | 1,746 | $114.43 | $199,794.78 |
| | 1,500 | $112.07 | $168,105.00 |
| | 300 | $110.06 | $33,018.00 |
| August 13, 2018 | 5,781 | $122.20 | $706,438.20 |
| | 4,100 | $123.98 | $508,318.00 |

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| | 500 | $124.85 | $62,425.00 |
| | 6,619 | $122.96 | $813,872.24 |
| August 15, 2018 | 1,145 | $121.19 | $138,762.55 |
| August 20, 2018 | 500 | $122.49 | $61,245.00 |
| | 12,900 | $121.90 | $1,572,510.00 |
| | 2,300 | $120.76 | $277,748.00 |
| | 1,300 | $119.40 | $155,220.00 |
| August 27, 2018 | 4,110 | $127.79 | $525,216.90 |
| | 5,235 | $129.80 | $679,503.00 |
| | 7,655 | $128.88 | $986,576.40 |
| September 4, 2018 | 6,300 | $136.80 | $861,840.00 |
| | 5,200 | $134.74 | $700,648.00 |
| | 4,100 | $136.04 | $557,764.00 |
| | 3,200 | $138.87 | $444,384.00 |
| | 2,200 | $137.98 | $303,556.00 |
| September 10, 2018 | 200 | $137.27 | $27,454.00 |
| | 3,800 | $135.72 | $515,736.00 |
| | 6,970 | $134.47 | $937,255.90 |
| | 10,030 | $136.59 | $1,369,997.70 |
| September 11, 2018 | 300 | $144.12 | $43,236.00 |
| | 1,400 | $143.32 | $200,648.00 |
| | 3,300 | $142.55 | $470,415.00 |

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| September 17, 2018 | 1,163 | $146.56 | $170,449.28 |
| | 2,100 | $146.66 | $307,986.00 |
| | 2,200 | $142.09 | $312,598.00 |
| | 3,441 | $145.64 | $501,147.24 |
| | 5,759 | $143.71 | $827,625.89 |
| | 12,500 | $144.86 | $1,810,750.00 |
| September 24, 2018 | 800 | $133.66 | $106,928.00 |
| | 600 | $134.99 | $80,994.00 |
| | 300 | $132.28 | $39,684.00 |
| | 11,550 | $137.42 | $1,587,201.00 |
| | 4,450 | $137.99 | $614,055.50 |
| | 3,300 | $136.17 | $449,361.00 |
| September 26, 2018 | 5,000 | $142.08 | $710,400.00 |
| October 1, 2018 | 1,900 | $144.96 | $275,424.00 |
| | 2,400 | $143.18 | $343,632.00 |
| | 2,900 | $142.05 | $411,945.00 |
| | 16,297 | $144.04 | $2,347,419.88 |
| | 1,500 | $149.18 | $223,770.00 |
| | 1,003 | $145.85 | $146,287.55 |
| October 8, 2018 | 8,209 | $130.91 | $1,074,640.19 |
| | 100 | $132.57 | $13,257.00 |
| | 2,300 | $129.59 | $298,057.00 |

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| | 6,991 | $131.78 | $921,273.98 |
| October 15, 2018 | 5,000 | $120.97 | $604,850.00 |
| | 3,400 | $119.86 | $407,524.00 |
| | 3,200 | $121.91 | $390,112.00 |
| | 1,700 | $117.77 | $200,209.00 |
| | 1,600 | $118.64 | $189,824.00 |
| | 1,158 | $118.01 | $136,655.58 |
| | 300 | $116.63 | $34,989.00 |
| October 16, 2018 | 100 | $125.32 | $12,532.00 |
| | 1,200 | $123.63 | $148,356.00 |
| | 500 | $124.66 | $62,330.00 |
| October 22, 2018 | 4,500 | $124.39 | $559,755.00 |
| | 1,800 | $122.00 | $219,600.00 |
| | 1,300 | $121.05 | $157,365.00 |
| | 1,100 | $123.36 | $135,696.00 |
| | 200 | $126.20 | $25,240.00 |
| | 8,100 | $125.38 | $1,015,578.00 |
| October 29, 2018 | 1,000 | $109.98 | $109,980.00 |
| | 1,400 | $104.62 | $146,468.00 |
| | 1,400 | $102.33 | $143,262.00 |
| | 1,467 | $105.77 | $155,164.59 |
| | 1,484 | $111.81 | $165,926.04 |

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| | 700 | $110.71 | $77,497.00 |
| | 700 | $108.22 | $75,754.00 |
| | 400 | $103.46 | $41,384.00 |
| | 373 | $100.97 | $37,661.81 |
| | 300 | $106.86 | $32,058.00 |
| | 200 | $112.69 | $22,538.00 |
| October 31, 2018 | 1,401 | $112.17 | $157,150.17 |
| | 100 | $113.00 | $11,300.00 |
| **TOTAL** | 255,991 | | $33,554,043.03 |

103. During the Class Period, Defendant Fleisher sold a total of 20,565 shares of Wayfair Class A Common Stock for approximately ***$2.58 million*** in proceeds, as follows:

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| August 21, 2018 | 4,520 | $121.12 | $547,462.40 |
| September 17, 2018 | 508 | $146.79 | $74,569.32 |
| September 21, 2018 | 4,498 | $137.57 | $618,789.86 |
| October 15, 2018 | 6,632 | $118.01 | $782,642.32 |
| October 22, 2018 | 4,407 | $125.34 | $552,373.38 |
| **TOTAL** | 20,565 | | $2,575,837.28 |

## IX. LOSS CAUSATION

104. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Wayfair's Class A

common stock, or otherwise maintained the artificially inflated price of such stock, and operated as a fraud or deceit on Class Period purchasers of such stock. When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the price of Wayfair's Class A common stock fell as the prior artificial inflation came out. The truth began to emerge, and/or the risk caused by Defendants' fraud materialized, through revelations that cast doubt on the veracity of Defendants' Class Period statements. As a result of their purchases of Wayfair's Class A common stock during the Class Period, Lead Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

105. Before the market opened on November 1, 2018, the Company surprised investors by revealing higher-than-expected spending, negative advertising leverage, and worse-than-expected margins, as detailed further in Section VI, above. As a result, the Company's Class A common stock price fell 12.8%, from a closing price of $110.29 per share on October 31, 2018, to a closing price of $96.16 per share on November 1, 2018, on unusually high trading volume of nearly 10 million shares. The stock price continued to fall 3.3% the following day, November 2, 2018, closing at $92.96 per share on unusually high volume of 4.3 million shares. The total stock price decline over this two-day period was 15.7%.

106. Before the market opened on May 2, 2019, the Company revealed further losses due to high expenses and another quarter of negative advertising leverage, as detailed further in Section VII, above. As a result, the Company's Class A common stock price fell 7.1%, from a closing price of $163.53 per share on May 1, 2019, to a closing price of $151.96 per share on May 2, 2019, on unusually high trading volume of 6.6 million shares.

107. As a result of their purchases of Wayfair Class A common stock during the Class Period, Lead Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Wayfair's business and prospects. Defendants' materially false and misleading statements and material omissions had the intended effect and caused Wayfair's Class A common stock to trade at artificially inflated levels throughout the Class Period.

108. When the truth about the Company began to be disclosed, the price of Wayfair's Class A common stock declined. This removed the inflation from the price of Wayfair's Class A common stock, causing real economic loss to investors who had purchased such stock during the Class Period.

109. The decline in the price of Wayfair's Class A common stock after the revelations came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Wayfair's Class A common stock negate any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This is supported by the Class Period stock price chart below, which demonstrates the clear divergence of the Company's Class A common stock price ("W") from the Company's benchmark indices and the stock prices of its peer companies[2] when the truth began to emerge on November 1, 2018:

---

[2] The indices reflected in this chart, the NYSE Composite ("NYA") and S&P Retail Select Industry Index ("SPSIRE"), were used as benchmarks for Wayfair's common stock performance in Wayfair's Form 10-K for fiscal year 2018, filed with the SEC on February 25, 2019. The peer




110. The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and the other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the price of Wayfair's Class A common stock and the subsequent significant decline in the value of such stock when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## X. PRESUMPTION OF RELIANCE

111. A class-wide presumption of reliance is appropriate with respect to the claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United*

---

group ("PEER") reflected in this chart is comprised of the following publicly traded companies identified as competitors of Wayfair in the same Form 10-K: Havertys, Bed Bath & Beyond, Home Depot, Lowe's, Target, Walmart, JCPenney, Macy's, Ethan Allen, TJX, At Home, Williams-Sonoma, Restoration Hardware, Amazon, and eBay.

*States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects, as well as a massive fraudulent scheme – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

112. A class-wide presumption of reliance is also appropriate with respect to the claims in this action under the fraud-on-the-market doctrine. As a result of Defendants' materially false and misleading statements, the Company's Class A common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's Class A common stock relying upon the integrity of the market price of such stock and the market information relating to Wayfair, and have been damaged thereby.

113. At all relevant times, the market for the Company's Class A common stock was an efficient market for the following reasons, among others:

(a) as a regulated issuer, Wayfair regularly made public filings with the SEC and related press releases;

(b) Wayfair regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c) Wayfair was followed by several securities analysts employed by major brokerage firms, such as J.P.Morgan, Credit Suisse, Wells Fargo, and Morgan Stanley, among others, who wrote research reports concerning Wayfair that were distributed to the brokerage firms' sales forces, entered the public marketplace, and were publicly available; and

(d) the Company's Class A common stock met the requirements for listing on, and were listed and actively traded on, the NYSE, a highly efficient and automated market, during the Class Period.

114. As a result of the foregoing, the market for the Company's Class A common stock promptly digested current information regarding Wayfair from all publicly available sources and reflected such information in the price of such stock.

115. Under these circumstances, all purchasers or acquirers of the Company's Class A common stock during the Class Period suffered similar injury through their purchases or acquisitions of such stock at artificially inflated prices.

116. When they purchased or otherwise acquired the Company's Class A common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

117. As a result of the above circumstances, the presumption of reliance applies.

118. In sum, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations during the Class Period;

(b) the misrepresentations were material;

(c) the Company's Class A common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's Class A common stock; and

(e) Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's Class A common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XI. NO SAFE HARBOR

119. The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were loudly absent from Wayfair's Class Period filings.

120. The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein. These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize. Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless. Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability. The risk warnings were false and misleading because they did not disclose that Defendants were actually embroiled in the very

circumstances about which they purportedly warned, and Defendants had actual knowledge of material adverse facts undermining such disclosures.

121. Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of Wayfair who knew it was false or misleading when made.

## XII. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

122. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities that purchased or otherwise acquired the Class A common stock of Wayfair during the Class Period (between August 2, 2018 and October 31, 2018, inclusive), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

123. Because Wayfair has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE during the Class Period, members of the Class are so numerous that joinder of all members is impracticable. According to the Company, 61,804,108 shares of Wayfair Class A common stock were outstanding as of October 24, 2018. While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

124. Lead Plaintiff's claims are typical of the claims of the members of the Class because Lead Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

125. Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation. Lead Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Lead Plaintiff seeks to represent.

126. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

127. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(f) whether the market prices of the Company's Class A common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of the Company's Class A common stock when the truth was revealed and the artificial inflation came out of the stock price, and, if so, the appropriate measure of damages.

**COUNT I**

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

128. Lead Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

129. During the Class Period, Wayfair and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Lead Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's Class A common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase such stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Wayfair and the Individual Defendants, and each of them, took the actions set forth herein.

130. These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make

the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for such stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Wayfair, as alleged below.

131. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's Class A common stock would be based on truthful, complete, and accurate information.

132. Wayfair and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

133. These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's financial and

operational strength, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A common stock during the Class Period.

134. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (a) the Individual Defendants were senior executive officers and directors of the Company during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers and directors of the Company were privy to, and participated in, the creation, development, and reporting of the Company's projections, and financial condition; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

135. Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the

Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its Class A common stock. As demonstrated by the Individual Defendants and the misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

136. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the Company's Class A common stock was artificially inflated during the Class Period. In ignorance of the fact that market price of the Company's Class A common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which such stock traded, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and other members of the Class acquired such stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

137. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their

Wayfair Class A common stock during the Class Period; or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

138. By virtue of the foregoing, Wayfair and the Individual Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

139. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Class A common stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from such stock.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

140. Lead Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein. This claim is asserted against the Individual Defendants.

141. The Individual Defendants acted as controlling persons of Wayfair within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff

to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

142. In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

143. As set forth above, Wayfair and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Class A common stock during the Class Period, as evidenced by, among other things, the stock price declines discussed above, when the artificial inflation was released from such stock.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A. Declaring that this action is a proper class action and certifying Lead Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel for the proposed Class;

B. Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED: July 1, 2019

HUTCHINGS BARSAMIAN
MANDELCORN, LLP

*s/Theodore M. Hess-Mahan*
THEODORE M. HESS-MAHAN, BBO #557109

110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: 781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

*Local Counsel for Lead Plaintiff*

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ROBERT J. ROBBINS
ANDREW T. REES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
rrobbins@rgrdlaw.com
arees@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 1st day of July 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, and a copy of the foregoing pleading has been electronically mailed to all attorneys of record.

*s/Theodore M. Hess-Mahan*
THEODORE M. HESS-MAHAN, BBO #557109