UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re WAYFAIR INC. Securities Litigation<br><br>This Document Relates To:<br>     ALL ACTIONS. | Civil Action No. 1:19-cv-10062-DPW<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**ASSENTED-TO MOTION FOR LEAVE TO FILE EXCESS PAGES GRANTED AUGUST 29, 2019** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

Roberto M. Braceras (BBO # 566816)
Caroline H. Bullerjahn (BBO # 657241)
Ian Stearns (BBO # 693374)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
rbraceras@goodwinlaw.com
cbullerjahn@goodwinlaw.com
istearns@goodwinlaw.com

*Counsel for Defendants*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ..........................................................................................................................4

    A.    Wayfair Accurately Disclosed Its "Extremely Competitive" Market, "Massive" Advertising Spending To Keep Pace, And Lack Of Profitability..........4

    B.    As It Truthfully Disclosed, Wayfair Successfully Increased Its Advertising Leverage For Years Leading Into The Class Period...............................................6

    C.    During The Class Period, Defendants Spoke Optimistically, But Cautiously, About Wayfair's Past Success In Increasing Advertising Leverage. ......................6

ARGUMENT..................................................................................................................................9

I.     THE AC DOES NOT ALLEGE FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER. ..........................................................................................10

    A.    The AC Fails To Allege A Single Particularized Fact Supporting Any Inference Of Scienter, Much Less A Strong Inference...........................................11

    B.    The Defendants' "High-Ranking" Positions, "Repeated" Statements, And "Access to" Unidentified Data Fail To Support Any Inference Of Scienter. ........13

    C.    The AC Does Not Allege That Defendants' Trades Were Unusual. .....................15

    D.    Non-Fraudulent Inferences Far Outweigh Any Inference Of Scienter..................17

II.    PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS. .................................................................................................................19

    A.    The AC's Puffery and Statements Of Opinion Or Belief Are Non-Actionable. ...........................................................................................................19

    B.    The AC's Forward-Looking Statements Are Immunized by the PSLRA. ............20

    C.    The AC Fails To Allege With Particularity That Defendants' Statements Concerning Advertising Spending And Leverage Were False or Misleading.......22

    D.    The AC Fails To Allege Any Duty To Disclose....................................................23

III.   THE AC DOES NOT ADEQUATELY ALLEGE LOSS CAUSATION. ........................24

IV.   THE SECTION 20(a) CLAIM FAILS. ..........................................................................25

CONCLUSION...........................................................................................................................25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ariad Pharm., Inc. Sec. Litig.*,
   842 F.3d 744 (1st Cir. 2016)....................................................................................16

*In re Atl. Power Corp. Sec. Litig.*,
   98 F. Supp. 3d 119 (D. Mass. 2015) ........................................................................18

*Auto. Indus. Pension Tr. Fund v. Textron Inc.*,
   682 F.3d 34 (1st Cir. 2012)......................................................................................12

*In re Biogen Inc. Sec. Litig.*,
   193 F. Supp. 3d 5 (D. Mass. 2016) ..............................................................13, 15, 19

*In re Biogen Inc. Sec. Litig.*,
   857 F.3d 34 (1st Cir. 2017)..........................................................................9, 10, 18, 22

*In re Bos. Sci. Corp. Sec. Litig.*,
   2011 WL 4381889 (D. Mass. Sept. 19, 2011) ..............................10, 13, 14, 15, 20

*In re Bos. Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012)...................................................................................9, 11

*Brennan v. Zafgen, Inc.*,
   199 F. Supp. 3d 444 (D. Mass. 2016) .........................................................12, 16, 17

*Brennan v. Zafgen, Inc.*,
   853 F.3d 606 (1st Cir. 2017)............................................................................ *passim*

*City of Bristol Pension Fund v. Vertex Pharm. Inc.*,
   12 F. Supp. 3d 225 (D. Mass. 2014) ........................................................................23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
   632 F.3d 751 (1st Cir. 2011)...............................................................................16, 17

*Cody v. Conformis, Inc.*,
   199 F. Supp. 3d 409 (D. Mass. 2016) ......................................................................12

*Corban v. Sarepta Therapeutics, Inc.*,
   2015 WL 1505693 (D. Mass. Mar. 31, 2015)..........................................................20

*Corban v. Sarepta Therapeutics, Inc.*,
   868 F.3d 31 (1st Cir. 2017)................................................................................10, 20

ii

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) ................................................................. *passim*

*Ezra Charitable Tr. v. Tyco Int'l, Ltd.*,
    466 F.3d 1 (1st Cir. 2006) ................................................................................. 3, 13

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) ............................................................................. *passim*

*Ganem v. InVivo Therapeutics Holdings Corp.*,
    845 F.3d 447 (1st Cir. 2017) ........................................................................ 10, 23, 25

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) ...................................................................................... 24

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ............................................................................... 15, 16

*Guerra v. Teradyne Inc.*,
    2004 WL 1467065 (D. Mass. Jan. 16, 2004) ........................................................... 15

*Harrington v. Tetraphase Pharm. Inc.*,
    2017 WL 1946305 (D. Mass. May 9, 2017) ....................................................... 17, 20

*Hensley v. Imprivata, Inc.*,
    260 F. Supp. 3d 101 (D. Mass. 2017) ...................................................................... 20

*Isham v. Perini Corp.*,
    665 F. Supp. 2d 28 (D. Mass. 2009) ........................................................................ 21

*Kader v. Sarepta Therapeutics, Inc.*,
    2016 WL 1337256 (D. Mass. Apr. 5, 2016) ............................................................ 23

*Lenartz v. Am. Superconductor Corp.*,
    879 F. Supp. 2d 167 (D. Mass. 2012) ................................................................ 15, 16

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*,
    838 F.3d 76 (1st Cir. 2016) ......................................................................... 10, 14, 16

*Mahoney v. Found. Med., Inc.*,
    342 F. Supp. 3d 206 (D. Mass. 2018) ...................................................................... 16

*Maldonado v. Dominguez*,
    137 F.3d 1 (1st Cir. 1998) ........................................................................................ 13

*Metzler Asset Mgmt. GmbH v. Kingsley*,
    305 F. Supp. 3d 181 (D. Mass. 2018) ...................................................................... 15

iii

*Metzler Asset Mgmt. GmbH v. Kingsley*,
    928 F.3d 151 (1st Cir. 2019)..................................................................9, 10, 14, 15

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)....................................................................17, 23

*In re Ocular Therapeutix, Inc. Sec. Litig.*,
    2019 WL 1950399 (D. Mass. Apr. 30, 2019) ...........................................12

*In re Parametric Tech. Corp.*,
    300 F. Supp. 2d 206 (D. Mass. 2001) .......................................................22

*In re Praecis Pharm., Inc. Sec. Litig.*,
    2007 WL 951695 (D. Mass. Mar. 28, 2007)..............................................22

*Pyramid Hldgs., Inc. v. Inverness Med. Innovations, Inc.*,
    638 F. Supp. 2d 120 (D. Mass. 2009) .......................................................23

*Shaw v. Dig. Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)...............................................................14, 19

*Sousa v. Sonus Networks, Inc.*,
    261 F. Supp. 3d 112 (D. Mass. 2017) .................................13, 15, 18, 25

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)........................................................................24

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).................................................................21, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................10, 17

*Tharp v. Acacia Commc'ns, Inc.*,
    321 F. Supp. 3d 206 (D. Mass. 2018) ................................................16, 22

*Van Ormer v. Aspen Tech., Inc.*,
    145 F. Supp. 2d 101 (D. Mass. 2000) .......................................................23

*Washtenaw Cty. Emps.' Ret. Sys. v. Princeton Review, Inc.*,
    2012 WL 727125 (D. Mass. Mar. 6, 2012) ..............................................24

*Washtenaw Cty. Emps.' Ret. Sys. Ret. Sys. v. Talbots, Inc.*,
    2013 WL 5348569 (D. Mass. Sept. 23, 2013) ....................................14, 25

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* ...................... *passim*

Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78(t)(a) ....................................... *passim*

**Other Authorities**

SEC Regulation S-K, 17 C.F.R. § 229.303 .................................................................................24

SEC Rule 10b5-1, 17 C.F.R. § 240.10b5-1 ...............................................................................17

## PRELIMINARY STATEMENT

This case is a classic example of a plaintiff rushing into court and alleging securities fraud merely because a company barely (here, by a ***few tenths of one percent***) missed a quarterly financial projection. It is the exact type of fraud-by-hindsight case that spurred Congress to enact the Private Securities Litigation Reform Act ("PSLRA"). And, in the wake of the PSLRA, this is the exact type of case that the First Circuit and courts in this District have repeatedly dismissed with prejudice. Indeed, Lead Plaintiff Iain Kaplan's ("Plaintiff") Amended Complaint ("AC")— covering the Class Period from August 2, 2018 through October 31, 2018—lacks a single (i) confidential witness allegation, admission, or other internal record concerning the Defendants' knowledge, (ii) suspicious or at all unusual insider stock sale, or (iii) actionable misstatement or omission. The AC simply has no merit and should be dismissed with prejudice.

Wayfair Inc. ("Wayfair" or the "Company") is an online home goods retailer that, since its 2014 initial public offering, has produced extraordinary revenue and stock price growth. *See infra* at 4. But, as the Company repeatedly has warned investors, it operates in a crowded, highly competitive marketplace, and it must, therefore, spend heavily on advertising to attract new shoppers and retain repeat customers. *See infra* at 4-5. As the AC concedes, Wayfair openly (and accurately) disclosed its high advertising expenditures, which quadrupled from 2014 to 2018— commensurate with revenue that quintupled over the same period. AC ¶¶ 39, 43. Partly due to this heavy advertising spending, Wayfair has never been profitable as a public company, and it has cautioned that "[i]f we fail to acquire new customers or retain existing customers, or fail to do so in a cost-effective manner, we may not be able to achieve profitability." *See infra* at 6.

Wayfair has consistently explained that an important factor in its expected path to profitability is to increase the efficiency of its advertising, or what it refers to as advertising ***leverage***. That is, while the Company continues to increase advertising spending, it collects more

revenue from each additional advertising dollar—in large part because of the growth of its existing customer base—thereby decreasing advertising expense as a percentage of net revenue. *See infra* at 5-6. And as the Company disclosed, during every year as a public company from 2015 through 2017 (and the first two quarters of 2018), Wayfair's advertising spending increased on a gross basis, but ***decreased*** as a percentage of net revenue, thus increasing advertising leverage. *See infra* at 6. Nevertheless, when the Company released its second quarter earnings on August 2, 2018 (AC ¶ 59), and disclosed a 10.7% advertising spend as a percentage of net revenue, it cautiously forecasted for the third quarter that advertising spending as a percentage of net revenue would actually ***increase*** versus the second quarter's 10.7%. AC ¶ 61. But it disclosed that it "expect[ed]" a "modest" decline in this third quarter percentage versus the previous year's third quarter percentage of 11.8%. In other words, the Company forecasted advertising spending as a percentage of net revenue for the third quarter to be above ***10.7%*** but below ***11.8%***, a projection consistent with the Company's three-year track record of year-over-year increasing leverage. AC ¶ 61. When Wayfair released third quarter results three months later, it announced that it slightly missed this range, with advertising expenses as a percentage of net revenue of ***11.9%***. AC ¶ 75. Allegedly due, in part, to this miss of as few as two tenths of one percent, Wayfair's stock price suffered a short-lived decline (until it fully recovered only weeks later). *See infra* at 9. Regardless, by the time the Company announced first quarter 2019 earnings, its stock price had risen nearly 38% from its pre-Class Period prices. *See* AC ¶¶ 105-06.

Thus, the heart of Plaintiff's fraud theory is the "difference" between (i) Wayfair's forward-looking third quarter projection of a "modest" decrease from 11.8% (advertising expenses as a percentage of net revenue) on August 2, and (ii) the actual result of 11.9% announced on November 1. Reaching back with the benefit of hindsight—but with zero

particularized allegations of Defendants' knowledge—the AC alleges that Defendants Wayfair, CEO Niraj Shah, CFO Michael Fleisher, and co-founder and director Steven Conine (collectively, "Defendants") ***must have known*** that the Company would miss its anticipated third quarter projection for advertising expenses as a percentage of net revenue by a few tenths of one percent, and that, as a result, all of their statements about advertising spending between August 2 and November 1 were fraudulently misleading. AC ¶¶ 59-69. As the First Circuit has long held, however, "making general allegations that defendants knew earlier what later turned out badly . . . is not sufficient." *Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466 F.3d 1, 6 (1st Cir. 2006).

Plaintiff's § 10(b) claim should be dismissed for the following independent reasons:

- **No *Strong* Inference Of Scienter.** While the 143-paragraph AC repeatedly claims that Defendants knew facts contrary to their statements, it provides no particularized factual allegations supporting such conclusory claims—not a single confidential witness allegation, admission, or internal record. Instead, the AC retreats to two sets of allegations that fail to raise any inference of scienter, much less the statutorily-mandated *strong* inference. First, Plaintiff claims that a strong inference of scienter arises merely from Defendants' employment positions at Wayfair and the fact that they had "access" to unidentified corporate information about advertising spending, but the First Circuit and courts in this District have consistently rejected such allegations. Second, the AC lists Defendants' Class Period sales of Wayfair stock, but the First Circuit has likewise repeatedly held that the mere listing of stock sales—without any particularized allegations concerning their context—fails to satisfy a plaintiff's burden of demonstrating that those sales were suspicious. Indeed, each Defendant retained at least 98% of his Class Period Wayfair holdings, and every Class Period stock sale was non-discretionary (in fact, many of them were mandated for tax purposes). Finally, the AC's scienter allegations are far outweighed by the non-fraudulent inference—which tracks Wayfair's disclosures—that the Company unexpectedly missed a quarterly projection by a mere few tenths of one percent.

- **No Actionable Misstatements Or Omissions.** The AC fails to allege a single misrepresentation or omission: each challenged statement is either a non-actionable statement of opinion or puffery, or an immunized forward-looking statement. Independently, Plaintiff fails to allege with the particularity required by the PSLRA and Rule 9(b) why the alleged misrepresentations are misleading, especially given that they are consistent with Wayfair's accurately disclosed financial results and the Company's risk disclosures.

- **No Loss Causation.** The AC fails to plead loss causation, as the alleged corrective disclosures merely revealed quarterly results barely missing certain projections, not fraud.

Further, because the AC fails to allege primary liability under § 10(b), the § 20(a) claim must also be dismissed. Therefore, the AC should be dismissed in its entirety with prejudice.

**BACKGROUND**[1]

A.    **Wayfair Accurately Disclosed Its "Extremely Competitive" Market, "Massive" Advertising Spending To Keep Pace, And Lack Of Profitability.**

Wayfair quintupled its net revenue from 2014 to 2018 (AC ¶ 43) and experienced 368% stock price growth from January 1, 2015 through the end of the Class Period on November 1, 2018 (AC ¶ 78; Ex. C). Nevertheless, the AC (falsely) claims that the Company had a "shaky financial situation" leading into the Class Period (AC ¶ 45)—a transparent attempt to contrast Defendants' optimistic Class Period statements with Plaintiff's narrative that the Company was purportedly in a "shaky" situation. Plaintiff also makes much of the Company's "extremely competitive business environment" (AC ¶¶ 31-34), "massive" advertising spending (AC ¶¶ 35-43), and "negative free cash flow" (AC ¶¶ 44-45). But Plaintiff's emphasis on such risk factors is not news to anyone: Wayfair repeatedly (and accurately) disclosed such risks and provided cautionary warnings about its competition, advertising spending, and unprofitability. *See* Ex. A.

Specifically, before the Class Period, Wayfair warned investors that "[o]ur competition includes furniture stores, big box retailers, department stores, specialty retailers and online retailers," and that this crowded market was "highly competitive, fragmented and rapidly changing." Ex. D, 2017 10-K at 5. Wayfair also cautioned that (i) "[c]ompetition presents an ongoing threat to the success of our business," (ii) its customer base "may decline as a result of [this] increased competition," and (iii) "as [its] market bec[ame] increasingly competitive,

---

[1] The factual background is drawn from the AC's allegations, as well as (i) documents and transcripts incorporated by reference in the AC, and (ii) Wayfair's judicially noticeable SEC filings, all of which are submitted as exhibits to the Declaration of Caroline H. Bullerjahn dated August 30, 2019. For the Court's convenience, Exhibit A is a chart containing excerpts from Wayfair's SEC filings with the cited risk and warning disclosures, and Exhibit B is a chart containing the AC's alleged misrepresentations and omissions and relevant context from surrounding statements. Unless otherwise noted, all emphasis is added, and all abbreviations are defined in the AC.

maintaining and enhancing [its] brands may become increasingly difficult and ***expensive***." *Id.* at 7, 9, 12. As to the e-commerce market on which Plaintiff focuses (AC ¶¶ 33-34), Wayfair disclosed that it expected competition "to increase," and that its results depended heavily on its "marketing efforts" versus competitors, who had "greater brand recognition" and "significantly greater . . . marketing and other resources" that "may allow [them] to . . . acquire customers at lower costs." Ex. D, 2017 10-K at 12.

It was no secret that Wayfair "spent massive amounts" on advertising expenses "in the face of [this] growing competition." AC ¶ 35. Indeed, Plaintiff concedes that Wayfair openly disclosed accurate quarterly and annual historical advertising expenses, and that investors knew those expenses were growing at significant rates. AC ¶ 39. The Company was upfront with investors about the potential downsides of its resource-intensive advertising strategy, advising the market before the Class Period that "[t]hese efforts are expensive and ***may not result in the cost-effective acquisition of customers***," and "[w]e cannot assure you that the net profit from new customers we acquire will ultimately exceed the cost of acquiring those customers." Ex. D, 2017 10-K at 8; *see also id.* at 15 ("[W]e may spend more than we anticipate acquiring and retaining customers or may generate less net revenue per active customer than anticipated."). And while Wayfair spoke openly about increasing advertising "leverage" (AC ¶ 40)—*i.e.*, increasing the revenue produced from each additional advertising dollar—it was transparent about the associated risks:[2] "[w]e have made significant investments related to customer acquisition and expect to continue to spend significant amounts to acquire additional customers,"

---

[2] Wayfair repeatedly cautioned investors that advertising leverage was a longer-term metric that took up to a year to materialize, and that it was subject to short-term fluctuations from a variety of factors, including the Company's investments internationally.  As Mr. Fleisher told investors, "the year-over-year leverage we delivered is despite the negative mix shift impact from our international business, which runs at a higher ad spend as a percentage of revenue due to its lower base of repeat customers," and "[l]ooking out to Q3, we're comfortable leaning in on ad spend, while maintaining our overall 1-year contribution margin payback target." Ex. E, 2Q18 Call Tr. at 9.

but "[i]f we fail to acquire new customers or retain existing customers, *or fail to do so in a cost-effective manner*, we may not be able to achieve profitability." Ex. D, 2017 10-K at 8. Wayfair's advertising expenditures affected the Company's bottom line, as Wayfair warned investors: "[w]e have a history of losses and expect to have operating losses and negative cash flow as we continue to expand our business," and "we may never achieve profitability." *Id.* at 10.

**B.      As It Truthfully Disclosed, Wayfair Successfully Increased Its Advertising Leverage For Years Leading Into The Class Period.**

Wayfair successfully executed on its advertising strategy since its 2014 IPO. In every Form 10-K from 2015 to 2017, and in the first two Form 10-Qs leading into the Class Period beginning on August 2, 2018, the Company projected that "[w]e expect advertising expense to continue to increase but decrease as a percentage of net revenue over time due to our increasing base of repeat customers."[3] And without fail, for the three years and two quarters leading into the Class Period, that pattern of increasing sequential advertising expenses with increasing advertising leverage is *exactly* what occurred, as the following chart demonstrates:[4]

| Year | Advertising Exp. ($M) | % Growth YoY | Advertising Exp. % Net Rev. | Sequential Trend - Advertising Exp. % Net Rev. |
|------|------|------|------|------|
| 2014 | 191.3 | - | 14.5% | ⬇ |
| 2015 | 278.2 | 45.4% | 12.4% | ⬇ |
| 2016 | 409.1 | 47.1% | 12.1% | ⬇ |
| 2017 | 550.0 | 34.4% | 11.6% | ⬇ |
| 1Q18 | 161.6 | 36.7% | 11.5% | ⬇ |
| 2Q18 | 177.6 | 42.9% | 10.7% | ⬇ |

**C.      During The Class Period, Defendants Spoke Optimistically, But Cautiously, About Wayfair's Past Success In Increasing Advertising Leverage.**

During the Class Period that began with the announcement of Wayfair's second quarter

---

[3] Ex. F, 2015 10-K at 34; Ex. G, 2016 10-K at 38; Ex. D, 2017 10-K at 37; Ex. H, 1Q18 10-Q at 24; Ex. I, 2Q18 10-Q at 24. Each of these statements was prefaced by ample cautions regarding forward-looking statements. Of course, Wayfair's advertising expenditures as a percentage of net revenue were subject to small intra-year, quarter-over-quarter fluctuations. For example, in the third quarter of 2017, this percentage increased slightly from 11.1% in the previous quarter to 11.8%. *See* Ex. J, 3Q17 10-Q at 26; Ex. I, 2Q18 10-Q at 25 (showing 11.1% for 2Q17).
[4] The above chart summarizes the following public disclosures in Wayfair's SEC filings: Ex. F, 2015 10-K at 36; Ex. G, 2016 10-K at 41; Ex. D, 2017 10-K at 40; Ex. H, 1Q18 10-Q at 25; Ex. I, 2Q18 10-Q at 25.

earnings on August 2, 2018, Defendants issued statements reflecting this record of increasing advertising leverage. *See* AC ¶¶ 59-69. But in the AC's eleven paragraphs of alleged misstatements, it fails to identify *any* difference between the Company's accurately disclosed historical results above and the Defendants' optimism: "[w]e are delighted with the progress we are making"; "growing base of repeat customers who require a lower level of ad spend per dollar of revenue"; "we remain incredibly bullish"; "I think building our own ad tech has been a huge advantage"; "we expect advertising expense to continue to . . . decrease as a percentage of net revenue over time"; "our costs for repeat orders continues to get lower and lower"; "ad spend [as a percentage of revenue], if you look at it sequentially over the last few years, it continues to drift down"; "as customers increasingly repeat, the effective ad cost to get them [to] come back goes down"; "you can actually see how growing very quickly actually evolves into the profitable model"; "we see that we get good leverage out of [tv advertising] today." *Id.*

Despite the Company's recent success in executing on its strategy, Defendants continued their cautious tone during the Class Period. For example, during the August 2, 2018 earnings call that Plaintiff quotes heavily—but selectively—in the AC (AC ¶¶ 60-63), Mr. Shah tempered expectations in response to an analyst's question about the potential "tailwind" from advertising expenses to "margins [in] the longer term":

> We *think* advertising is an area of very high *potential* benefit. To be fair, on one hand, we *think* we're very excited about it. . . . So in terms of when it's *real impact on the P&L, it's still a little ways out*. . . . So we're actually very excited about some advertising product that we have underway. *But in terms of the P&L impact*, I'd both say I'm [] excited about how big it can be, *but I'd also say that, that's a ways out*.

Ex. E, 2Q18 Call Tr. at 16-17. During the same call, Mr. Fleisher cautioned that the Company "expect[ed] overall ad spend as a percentage of net revenue to *increase* sequentially in Q3 versus Q2 . . . while still showing a *modest* amount of year-over-year leverage compared to the 11.8%

7

level of Q3 last year." AC ¶ 61. And during the August 8, 2018 conference call that the AC also selectively quotes (AC ¶¶ 65-66), Mr. Shah reminded investors of Wayfair's high growth in advertising spending, projecting that "[t]his year, we'll spend *$700 million* on advertising." *Compare* Ex. K, Aug. 8, 2018 Call Tr. at 11, *with* AC ¶ 5 (emphasizing advertising expenses "soar[ing] to over $700 million in 2018").

On November 1, 2018, the Company announced third quarter 2018 results, with an EBITDA loss slightly higher than market estimates, driven by higher headcount and, in part, an uptick in advertising expenses as a percentage of net revenue—11.9%, up from 11.8% a year earlier and 10.7% the previous quarter. AC ¶¶ 72-75. The chart below includes the additional highlighted row for the third quarter of 2018, reflecting the 11.9% advertising spend as a percentage of net revenue—a mere few tenths of one percent higher than the Company's guidance:[5]

| Year | Advertising Exp. ($M) | % Growth YoY | Advertising Exp. % Net Rev. | Sequential Trend - Advertising Exp. % Net Rev. |
|---|---|---|---|---|
| 2014 | 191.3 | - | 14.5% | ⬇ |
| 2015 | 278.2 | 45.4% | 12.4% | ⬇ |
| 2016 | 409.1 | 47.1% | 12.1% | ⬇ |
| 2017 | 550.0 | 34.4% | 11.6% | ⬇ |
| 1Q18 | 161.6 | 36.7% | 11.5% | ⬇ |
| 2Q18 | 177.6 | 42.9% | 10.7% | ⬇ |
| 3Q18 | 202.6 | 43.0% | 11.9% | ⬆ |

After congratulating Defendants on "strong revenue growth and the improving key performance indicators," an analyst asked about the EBITDA miss, and Mr. Fleisher stated, "[a]s we talked about . . . at last quarter's call, we *did expect* to show some ad spend leverage," but the Company experienced "ad spend [leverage] basically flat year-over-year as opposed to showing 30 or 40 basis points of leverage." AC ¶ 77. Allegedly as a result of the one-quarter earnings

---

[5] Ex. F, 2015 10-K at 36; Ex. G, 2016 10-K at 41; Ex. D, 2017 10-K at 40; Ex. H, 1Q18 10-Q at 25; Ex. I, 2Q18 10-Q at 25; Ex. L, 3Q18 10-Q at 26.

miss and downtick in advertising leverage, Wayfair's stock price declined 12.8% from $110.29 to $96.16 on November 1, 2018. AC ¶ 78. This blip, however, was short-lived—the Company's stock price recovered to more than $111 roughly one month later, and soared to $149 by the time a lead plaintiff was appointed in this action on April 1, 2019. *See* Ex. C; ECF No. 18.

## ARGUMENT

A plaintiff alleging a § 10(b) violation must plead, among other things, (i) a strong inference of scienter, (ii) a material misrepresentation or omission, and (iii) loss causation. *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019). To satisfy these elements, a plaintiff must "meet the heightened pleading standards of the PSLRA, which requires that [the AC] 'specify each statement alleged to have been misleading' as well as 'the reason or reasons why the statement is misleading.'" *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(1)). "The PSLRA also separately imposes a rigorous pleading standard on allegations of scienter." *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 240 (1st Cir. 2015); *see* 15 U.S.C. § 78u-4(b)(2). In passing the PSLRA, Congress intended these heightened pleading standards to curb "routine filings" of "unpromising cases" in the wake of a company's disappointing financial earnings. *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 30 (1st Cir. 2012). Facing far more particularized allegations of securities fraud than are present in the AC, courts in this District (including this Court) regularly dismiss such cases with prejudice, and the First Circuit repeatedly affirms.[6] Here, the AC's § 10(b) claim

---

[6] *See, e.g.*, *Metzler*, 928 F.3d 151 (affirming dismissal for lack of strong inference of scienter, despite allegations from seventeen confidential witnesses contradicting company's disclosures); *Brennan v. Zafgen, Inc.*, 853 F.3d 606 (1st Cir. 2017) (same, despite uncontested non-disclosure of adverse events in drug trials and allegations of "heavy" insider sales); *Biogen*, 857 F.3d 34 (same, despite allegations of defendants' knowledge from ten confidential witnesses); *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31 (1st Cir. 2017) (same, despite FDA's communication of "serious concerns" to defendants regarding drug's potential approval); *Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447 (1st Cir. 2017) (affirming dismissal for failure to allege material misrepresentation or omission); *Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*, 838 F.3d 76 (1st Cir. 2016) (affirming dismissal for lack of strong inference of scienter, despite defendants' disclosure of incorrect drug trial results and

should be dismissed because it fails to plead a strong inference of scienter, an actionable misstatement or omission, and loss causation. The AC's § 20(a) claim therefore fails as well.

## I.   THE AC DOES NOT ALLEGE FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.

"Under the PSLRA, . . . plaintiffs must state with ***particularity*** facts giving rise to a ***strong*** inference that the defendant[s] acted with scienter," which is "defined as either the intentional or willful conduct designed to deceive or defraud investors or a high degree of recklessness." *Metzler*, 928 F.3d at 158 (emphasis in original). "Recklessness, as used in this context, does not include ordinary negligence, but is closer to being a lesser form of intent." *Biogen*, 857 F.3d at 41. In the First Circuit, this "degree of recklessness demands a highly unreasonable omission, one that not only involves an extreme departure from the standards of ordinary care, but also presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Corban*, 868 F.3d at 37. And "[f]or an inference of scienter to be strong, a reasonable person would [have to] deem [it] cogent and at least as compelling as any opposing inference one could draw." *Biogen*, 857 F.3d at 41 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

The PSLRA's scienter standard can be satisfied in two ways: first, by "clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant[s] were aware that they were withholding vital information or at least were warned by others that this was so." *Brennan*, 853 F.3d at 614. Alternatively, "a plaintiff may combine [other] facts and circumstances indicating fraudulent intent, including those demonstrating motive and opportunity." *Id.*

---

insider stock sales); *Abiomed*, 778 F.3d 228 (affirming dismissal for lack of strong inference of scienter despite insider sales and allegations of unlawful off-label marketing from seven confidential witnesses); *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259 (D. Mass. 2013) (Woodlock, J.) (dismissing for failure to plead scienter and loss causation); *In re Bos. Sci. Corp. Sec. Litig.*, 2011 WL 4381889 (D. Mass. Sept. 19, 2011) (Woodlock, J.), *aff'd*, 686 F.3d 21 (1st Cir. 2012) (affirming this Court's dismissal despite allegations from two confidential witnesses).

Here, the AC lacks a single confidential witness allegation, admission, or internal document (AC ¶¶ 91-97), or any suspicious stock sales (AC ¶¶ 98-103). The AC's scienter allegations thus fail to support *any* inference of fraudulent intent or extreme recklessness by the Defendants, much less a strong inference.

**A.     The AC Fails To Allege A Single Particularized Fact Supporting Any Inference Of Scienter, Much Less A Strong Inference.**

The AC does not include a single particularized fact about the Defendants' knowledge—no confidential witness allegations, admissions, or internal records—much less any allegations supporting a strong inference that Defendants knew facts contradicting their statements at the relevant time. *See* AC ¶¶ 91-97. As this Court has held, "[i]t is not sufficient to allege that Defendants knew of underlying facts that *Plaintiff alleges* are inconsistent. A plaintiff must allege specific facts supporting the inference that *Defendants knew* that a statement was false or misleading." *Coyne*, 943 F. Supp. 2d at 272. Thus, the First Circuit has repeatedly explained that "[i]n cases where we have found the [PSLRA's] pleading standard satisfied, the complaint often contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so." *In re Bos. Sci.*, 686 F.3d at 31. In affirming this Court's dismissal of a complaint that—like the AC here—lacked such "clear allegations," the First Circuit emphasized that "no such direct evidence [was] pled in the complaint." *Id.* Indeed, dismissal here is "especially warranted" because the AC contains no confidential witness allegations concerning "specific facts about any warnings by subordinates or expressions of concern by executives regarding the propriety of allegedly deceptive disclosures" regarding Wayfair's advertising expenditures, nor is there any other allegation that Defendants believed, at the time of their statements, that such statements

11

were inaccurate in any way. *Brennan*, 853 F.3d at 615; *accord Auto. Indus. Pension Tr. Fund v. Textron Inc.*, 682 F.3d 34, 39 (1st Cir. 2012) (same).

Following the First Circuit's repeated directives, courts in this District routinely dismiss securities fraud complaints like the AC that "do not allege any contemporaneous facts, such as emails, internal documents, or reports, to demonstrate" the Defendants' knowledge. *In re Ocular Therapeutix, Inc. Sec. Litig.*, 2019 WL 1950399, at *6 (D. Mass. Apr. 30, 2019); *accord Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 451, 467 (D. Mass. 2016) (criticizing complaint for "not point[ing] to a single confidential-source allegation, internal e-mail, or any other direct evidence," and noting that "the First Circuit has found complaints containing far stronger allegations insufficient under the PSLRA's robust scienter standard"). Here, "[a]bsent . . . the[se] typical hallmarks of scienter . . . [P]laintiff [is] left simply to speculate as to what [Defendants] might have known or thought" about Wayfair's projected third quarter 2018 advertising leverage, but "[t]hat guesswork does not measure up to the standard required by the PSLRA," because "[p]ossibility is not enough even for Rule 8, let alone the PSLRA standard." *Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 421 (D. Mass. 2016).

Lacking any confidential witness allegations or particularized "facts supporting the inference that Defendants knew that a statement was false or misleading," *Coyne*, 943 F. Supp. 2d at 272, the AC retreats to a "must have known" theory of scienter. Plaintiff insists that "[t]he ongoing fraud described herein"—a miss of at most a few tenths of one percent in projecting future advertising leverage—"***could not have been*** perpetrated without Defendants' knowledge and/or recklessness." AC ¶ 91; *see also* AC ¶¶ 22, 71. Such conclusory allegations, however, amount to nothing more than "fraud by hindsight," which the First Circuit has long rejected. *See, e.g., Ezra*, 466 F.3d at 6 ("making general allegations that defendants knew earlier what later

turned out badly . . . is not sufficient"). Plaintiff "may not simply contrast [Defendants'] past optimism" about Wayfair's historical advertising leverage "with less favorable actual results, and then contend that the difference must be attributable to fraud." *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 37 (D. Mass. 2016).

**B.      The Defendants' "High-Ranking" Positions, "Repeated" Statements, And "Access to" Unidentified Data Fail To Support Any Inference Of Scienter.**

Lacking any direct allegations concerning Defendants' knowledge, the AC asserts that a strong inference of scienter arises from Defendants' (i) "high-ranking" positions (AC ¶ 93), and (ii) "repeated statements" about advertising leverage, including their "access to" unidentified data concerning advertising spending (AC ¶¶ 94-96).[7] It is well-settled that such generalized allegations are insufficient to support any inference of scienter. *See, e.g.*, *Biogen*, 193 F. Supp. 3d at 50 (rejecting allegations that defendants "must have known that [company's] revenue guidance was wrong due to their positions and access to prescription and sales information").

First, as this Court has repeatedly held, it is "well established" that scienter allegations based "on a defendant's high-ranking position in the company are not sufficient." *Coyne*, 943 F. Supp. 2d at 272; *accord Bos. Sci.*, 2011 WL 4381889, at *14 (same). Simply put, "[a] vague assertion that defendants must have known something by virtue of their position of authority does not suffice" under the PSLRA. *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017); *see Maldonado v. Dominguez,* 137 F.3d 1, 9-10 (1st Cir. 1998) (same).

Second, the AC's allegations about Defendants' "repeated statements" and "access to" unidentified "precise data" regarding the Company's advertising spending and leverage (AC ¶¶ 94-96) amount to "general allusions to unspecified internal corporate information" that are

---

[7] Because Plaintiff cannot "plead the existence of direct evidence of scienter," the AC's "indirect-evidence allegations in the [AC] . . . need to do more work to carry the burden of raising a strong inference of scienter on their own." *Brennan*, 853 F.3d at 615 n.8.

13

"insufficient." *Washtenaw Cty. Emps.' Ret. Sys. v. Talbots, Inc.*, 2013 WL 5348569, at \*24 (D. Mass. Sept. 23, 2013). As the First Circuit has continually explained, conclusory allegations about the "existence of," and Defendants' "access to," various "corporate information system[s] do[] not plead scienter" because such allegations "may speak to the question of *how* [D]efendants might have known what they allegedly knew," but they do not provide any "indication of the specific factual *content* of any single report generated by the alleged reporting system." *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1224 n.38 (1st Cir. 1996); *see Metzler*, 928 F.3d at 162 (defendant's monitoring of "reporting metrics" does not support an inference of scienter because "one would need to know what [he] learned from such monitoring, and whether what he learned was at odds with any of his [] statements"); *Local No. 8*, 838 F.3d at 83 (alleging "*access* to the raw data" allegedly contradicting defendants' statements is inadequate).

The AC's *most* particularized allegation of "access to information" points to a February 22, 2018 public statement that "[w]e take a highly analytic approach to how we invest ad dollars," and "we are able to measure payback on an extremely granular basis." AC ¶ 95. There is, however, no difference between this allegation and the allegations that this Court rejected in *Boston Scientific*, where the CEO admitted that he "had access to a computer system that enabled him to view [] sales . . . on a real-time basis" and stated that "he would focus" on these sales. *Bos. Sci.*, 2011 WL 4381889, at \*14. Applying the Court's previous rationale here, scienter "cannot be drawn from the fact that Defendant[s] [] had access, and recognized the value of using, the online computer system for tracking [performance]" because "there is a big difference between knowing about [financial reports] and knowing that the reports are false" or contradict their public statements.[8] *Id.* Similarly, the AC's allegation that Defendants made "repeated

---

[8] Courts in this District routinely reject as insufficient generalized "access to information" allegations that do not allege the *contents* of internal reports or data. *See, e.g.*, *Sousa*, 261 F. Supp. 3d at 120 (finding allegations that

14

statements" on "such matters" (AC ¶ 94)—advertising spending and leverage generally—is "plainly a conclusory assertion that lacks the specific allegations necessary to support an inference" that Defendants knew facts contradicting their public statements. *Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 218 (D. Mass. 2018) (rejecting allegation that "specific statements made by the individual defendants reflect that they received specific information"), *aff'd*, 928 F.3d at 165 (finding no inference of scienter from allegation that defendants' statements were "repeated" and "specific").

## C.     The AC Does Not Allege That Defendants' Trades Were Unusual.

The AC reverts to listing Class Period stock sales by the Defendants, contending that they support an inference of scienter. AC ¶¶ 98-103. Although "allegations of unusual insider trading [] can support a strong inference of scienter," *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999), it is Plaintiff's burden to show that the "insider sales were in fact unusual or suspicious in timing or amount." *Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 186 (D. Mass. 2012). To satisfy this burden, Plaintiff must establish that Defendants' trading is "[a]t a minimum . . . unusual, ***well beyond*** the normal patterns of trading." *Greebel*, 194 F.3d at 198. The AC's allegations come nowhere close to meeting this burden. Moreover, the AC omits the most important facts: Defendants (i) retained nearly all of—or even ***increased***—their Class Period Wayfair holdings; and (ii) executed every sale on a ***non-discretionary*** basis.

It is revealing that, as to amount, the AC merely lists Defendants' Class Period sales without ***any*** comparison to (i) their relative Wayfair holdings, or (ii) their sales during other time periods outside of the Class Period. Notably, the First Circuit and courts in this District have

"defendants closely monitored [] sales" and "were regularly updated" on performance insufficient); *Biogen*, 193 F. Supp. 3d at 50 (rejecting "general and conclusory" allegations about "access to . . . sales information"); *Guerra v. Teradyne Inc.*, 2004 WL 1467065, at *25 (D. Mass. Jan. 16, 2004) (rejecting such allegations because the complaint "otherwise failed to identify any specific [internal] report itself, the information in the reports they deem significant, or how such information rendered the representations at issue misleading").

15

repeatedly rejected the "mere pleading of insider trading, without regard to [] context," and the AC's failure to include "context" independently is fatal to the trading allegations. *Id.* at 198, 207 (rejecting allegations based solely on "large" "total sum" of sales where "plaintiffs produced no evidence that the trading was out of the ordinary"); *see also Abiomed*, 778 F.3d at 246 (same where "complaint is silent as to the percentage of holdings sold"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 762 n.5 (1st Cir. 2011) ("[L]isting only bare facts about the shares sold" does "not provide any information about the trades indicating that they were unusual.").[9]

As to timing, the AC asserts, in conclusory fashion, that the trades were "suspiciously-timed *throughout the Class Period*" and "well-timed [] *throughout the Class Period*," without actually identifying a single "suspiciously-timed" transaction. AC ¶¶ 51, 100. But according to the First Circuit, stock sales are "perfectly understandable" and "innocent" where, as here (AC ¶¶ 101-03), Defendants spread them across a Class Period while the Company's stock price is increasing. *See, e.g.*, *Local No. 8*, 838 F.3d at 85; *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 754 (1st Cir. 2016) (sales "readily explainable" by "steady increase" in share price).

The AC's mere listing of stock sales fails to satisfy Plaintiff's burden. But worse yet, the AC misleadingly omits the most important facts drawn from Defendants' SEC Forms 4,[10] which independently negate an inference of Defendants' purported fraudulent motive:

- **Defendants retained *nearly all* or *increased* their Wayfair stock holdings during the Class Period.** The AC ignores that Mr. Fleisher *increased* his Wayfair holdings during the Class Period by 22%,[11] and that Mr. Shah's and Mr. Conine's sales amounted to *just 2%* of their Wayfair holdings during the Class

---

[9] *See also, e.g.*, *Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 216 (D. Mass. 2018) (rejecting trading allegations where they were not "compared to Defendants' trading outside the Class Period"); *Tharp v. Acacia Commc'ns, Inc.*, 321 F. Supp. 3d 206, 229 (D. Mass. 2018) (same); *Lenartz*, 879 F. Supp. 2d at 186-87 (same).

[10] Defendants' Forms 4 filed with the SEC are both (i) judicially noticeable, and (ii) incorporated by reference in the AC. *See* AC ¶¶ 101-03; *see also Brennan*, 199 F. Supp. 3d at 452.

[11] *See* Ex. M, Fleisher Form 4, dated July 24, 2018, at Table I (101,640 shares owned prior to start of Class Period) & Fleisher Form 4, dated Oct. 23, 2018, at Table I (124,269 shares owned at end of Class Period).

Period.[12] *See, e.g.*, *Abiomed*, 778 F.3d at 238, 246 (one defendant's increase in holdings and second defendant's retention of 93% of holdings "negates any inference" of motive); *Brennan*, 199 F. Supp. 3d at 469 (trades "not out of the ordinary" where defendant retained 93% of holdings and other insiders retained 85% of holdings). The First Circuit has concluded that far more compelling trading allegations do ***not*** support a strong inference of scienter. *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 42, 57 (1st Cir. 2008) (no scienter where five insiders sold $84 million of stock, with three selling "virtually all" of their shares and two others selling 78% and 91%, respectively).

- **Every single Class Period sale by each Defendant was *non-discretionary*.** As the footnotes to Defendants' SEC Forms 4 demonstrate, each Class Period sale was non-discretionary, executed either: (i) pursuant to pre-existing Rule 10b5-1 trading plans;[13] or (ii) to cover tax withholding obligations in connection with the vesting of restricted stock units. *See* Exs. M-O. It is well-settled that such non-discretionary trades "rebut[] an inference of scienter and support[] the reasonable inference that stock sales were prescheduled and not suspicious." *Harrington v. Tetraphase Pharm. Inc.*, 2017 WL 1946305, at *7 (D. Mass. May 9, 2017).

### D.    Non-Fraudulent Inferences Far Outweigh Any Inference Of Scienter.

The PSLRA mandates that Plaintiff's inference of scienter be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Waters Corp.*, 632 F.3d at 757 (quoting *Tellabs*, 551 U.S. at 314). Plaintiff asks the Court to accept an illogical theory: Defendants, having disclosed Wayfair's aggressive approach to advertising spending, having repeatedly cautioned investors of the associated risks, and having expressly warned investors that they expected that advertising spending as a percentage of revenue would increase from Q2 to Q3, suddenly decided to provide a knowingly false forward-looking projection of advertising leverage that was a few tenths of one percent amiss, all while (i) knowing that their fraud would be inevitably disclosed in Wayfair's Q3 results, and (ii) retaining nearly all of (or increasing) their holdings in Company

---

[12] *Compare* AC ¶ 101 (alleging Shah's sales of 256,772 shares), *with* Ex. N, Shah Form 4, dated Aug. 3, 2018, at Tables I, II (89,151 Class A shares and 12,717,044 Class B shares owned at start of Class Period); *compare* AC ¶ 102 (alleging Conine's sales of 255,991 shares), *with* Ex. O, Conine Form 4, dated Aug. 3, 2018, at Tables I, II (89,153 Class A shares and 12,717,346 Class B shares owned at start of Class Period). Defendants' Class B shares, which are not publicly listed, can be converted into Class A shares and sold at any time. AC ¶ 1 n.1.

[13] As the Defendants' pre-Class Period Forms 4 show, they adopted such plans before the Class Period. *See* Exs. M-O.

stock. Far from compelling, "[i]t is at least on the surface implausible, and thus inconsistent with a strong inference of scienter, to conclude that the [D]efendants would intentionally make a [] projection . . . that they knew to be likely wrong, with the almost certain prospect of having to publicly correct the projection just a little over a month later." *Sousa*, 261 F. Supp. 3d at 120-21.

Plaintiff's theory, absent any confidential witness or other direct allegations concerning Defendants' state of mind, essentially amounts to fraud-by-hindsight—Defendants ***must have known*** that Wayfair's advertising leverage, after increasing for three years and two quarters leading into the Class Period (*see supra* at 6), would abruptly suffer a downtick of a mere few tenths of one percent. Conversely, the non-fraudulent inferences here are especially strong, given Wayfair's public disclosures, where Defendants (i) regularly and openly disclosed challenges from its competitive business and risks associated with its advertising expenditures (*see supra* at 4-5),[14] (ii) accurately disclosed historical financial results that demonstrated a pattern of increasing advertising leverage (*see supra* at 6),[15] and (iii) therefore spoke optimistically, but still cautiously, during the Class Period about advertising leverage (*see supra* at 7-9).[16] Further, Defendants couched their cautiously optimistic statements as forward-looking projections, statements of opinion, and generalized puffery (*see infra* at 19-22), and the "marginal materiality of the[se] alleged statements . . . concerning revenues weighs against an argument that [D]efendants here possessed the requisite scienter." *Abiomed*, 778 F.3d at 243; *accord Brennan*, 853 F.3d at 616 (same). Put simply, "[t]hese are not the actions of a company bent on deceiving investors." *Abiomed*, 778 F.3d at 243. Considered as a whole, the AC's allegations "support the inference that [D]efendants were, ***at worst***, overly optimistic" (by a few tenths of one percent) in

---

[14] *See, e.g.*, *Brennan*, 853 F.3d at 618 (collecting cases, holding that cautionary "disclosures both before and during the class period further undercut any inference of fraudulent intent").

[15] *See, e.g.*, *In re Atl. Power Corp. Sec. Litig.*, 98 F. Supp. 3d 119, 132 (D. Mass. 2015) ("[F]ull and accurate disclosures of [defendant's] financial data cuts against a strong inference [of scienter].").

[16] *See, e.g.*, *Biogen*, 857 F.3d at 42 (no scienter where "defendants were cautious in projecting [] growth").

18

projecting advertising leverage for the third quarter of 2018. *Biogen*, 193 F. Supp. 3d at 54. But "[D]efendants' failure to predict the future does not support a claim for securities fraud." *Id.*

## II.   PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

Independently, the AC should also be dismissed because it fails to identify any actionable misstatements or omissions under the PSLRA and Fed. R. Civ. P. 9(b). Each one of the eleven alleged misstatements (AC ¶¶ 59-69) is not actionable as either: (i) immaterial puffery or a protected statement of opinion; (ii) a statutorily-immunized forward-looking statement; (iii) not misleading given Wayfair's disclosures about advertising expenditures; or, (iv) not triggering a duty to disclose. *See* Ex. B (chart listing grounds for dismissal of each alleged misstatement).

### A.   The AC's Puffery and Statements Of Opinion Or Belief Are Non-Actionable.

The majority[17] of Plaintiff's eleven alleged misstatements are non-actionable statements of corporate optimism or "puffery" that courts in this Circuit repeatedly discard as non-actionable. *See Shaw*, 82 F.3d at 1217 ("loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available" are immaterial). Specifically, non-actionable statements include "loose optimism about both a company's current state of affairs and its future prospects." *Biogen*, 193 F. Supp. 3d at 41. Most of the AC's alleged misrepresentations are quintessential "loose optimism." For example: "We are delighted with the progress we are making . . ." (AC ¶ 59); "[w]e remain incredibly bullish . . ." (AC ¶ 62); "the share of wallet is a huge opportunity . . ." (AC ¶ 63); and, "I think that[] . . . the brand awareness creates a halo around all of that, that's really quite powerful" (AC ¶ 69). As this Court has held, such statements "fall on their face within the penumbra of non-actionable puffing" and are

---

[17] *See* AC ¶¶ 59, 61, 62, 63, 65, 67, 68, 69.

immaterial as a matter of law. *See Bos. Sci.*, 2011 WL 4381889, at *11 ("very successful" and "stable, large, experienced" descriptions are non-actionable). Moreover, several of the alleged misstatements are nonactionable statements of opinion prefaced by "I think," such as: "***I think*** the key thing to keep in mind what we do on our paid advertising . . . is we built all our advertising technology in-house . . . so ***I think*** building our own ad tech has been a huge advantage . . ." (AC ¶ 63); "So ***I think*** the understanding that the repeat [customer] base drives [ad] leverage is reasonably well understood now . . ." (AC ¶ 66); and, "***I think*** . . . the investment we're making in TV [ads], we'll continue to sort of grow at a reasonable rate." (AC ¶ 69; Ex. R, Sept. 6, 2018 Call Tr. at 13). *See, e.g.*, *Harrington*, 2017 WL 1946305, at *11 ("The use of '[w]e believe' and 'I think' further bolsters that the statement is a[] [non-actionable] opinion.").[18]

**B.     The AC's Forward-Looking Statements Are Immunized by the PSLRA.**

The AC's remaining alleged misstatements are forward-looking statements immunized by the PSLRA's statutory safe harbor,[19] including statements such as "[f]or consolidated adjusted EBITDA, ***we forecast*** margins of negative 3.7% to negative 4% for Q3 2018" (AC ¶ 60); and "***[w]e expect*** advertising expense to continue to increase but decrease as a percentage of net revenue" (AC ¶ 64). *See Hensley v. Imprivata, Inc.*, 260 F. Supp. 3d 101, 120 (D. Mass. 2017) (financial projection prefaced by "expect" is immunized); *Coyne*, 943 F. Supp. 2d at 266 ("'we expect'" is "clear forward-looking, predictive language"). Under the safe harbor, a forward-looking statement, whether written or oral, cannot be a basis for liability under § 10(b) if ***either*** (1) regardless of intent, it is "identified as forward-looking, and is accompanied by

---

[18] Statements of opinion or belief are nonactionable "unless Plaintiff[] can allege that (1) the company's opinions were both objectively and subjectively false, *i.e.,* that the person holding the opinion did not subjectively believe in it, (2) self-embedded facts within the opinion are untrue, or (3) material facts about the [opinion holder's] inquiry into or knowledge concerning a statement of opinion were omitted." *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017). Here, the AC does not even attempt to allege any facts demonstrating that Defendants' opinions were objectively *and* subjectively false, that any embedded facts within the opinions were untrue, or that any material facts were omitted from the opinions.
[19] *See* AC ¶¶ 60, 61, 64, 68, 69.

meaningful cautionary statements identifying important factors that could cause actual results to differ," *or* (2) Plaintiff does not plead that the statement was made "with actual knowledge" that it was false or misleading. *See In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005) (quoting 15 U.S.C. § 78u-5(c)(1)). Both prongs apply to the statements here.

First, Wayfair's third quarter 2018 guidance and all forward-looking statements in the AC were identified as such, and accompanied by cautionary language "substantive and tailored to the specific future projections, estimates or opinions." *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 39 (D. Mass. 2009). Specifically, after highlighting in its August 2, 2018 10-Q that "you can identify forward-looking statements by terms such as . . . 'expects,'" the Company stated in its 10-Q and associated earnings release that it "***expect[s]*** overall ad spend as a percentage of net revenue to increase sequentially in Q3 versus Q2, as it did last year, while still showing a modest amount of year-over-year leverage compared to the 11.8% level of Q3 last year" and "***expect[s]*** advertising expense to continue to increase, but decrease as a percentage of net revenue over time due to our increasing base of repeat customers." *See* Ex. I, 2Q18 10-Q at 2, 24; Ex. E, 2Q18 Call Tr. at 9. As this Court has explained, these are "prototypical" "statement[s] of future economic performance" "falling into the heartland of the PSLRA safe harbor." *Coyne*, 943 F. Supp. 2d at 266. Having identified the AC's alleged misrepresentations as forward-looking, Wayfair also provided investors with cautionary warnings targeted to advertising expenditures, such as "[w]e may spend more than we anticipate acquiring and retaining customers or may generate less net revenue per active customer than anticipated." *See supra* at 5.[20] Because Defendants identified their statements as forward-looking and surrounded them with tailored

---

[20] Every forward-looking statement identified in the AC was accompanied by cautionary language, including by reference to publicly available documents—Forms 10-K—containing risk factors that could cause actual results to differ. *See* Ex. D, 2017 10-K at 1; 15 U.S.C. §§ 78u-5(c)(2)-(3); *In re Parametric Tech. Corp.*, 300 F. Supp. 2d 206, 219-20 (D. Mass. 2001) (reference to company's SEC filings is "adequate to invoke the statutory safe harbor").

21

cautionary language, they are statutorily immunized. *See In re Stone & Webster*, 414 F.3d at 212.[21]

### C.   The AC Fails To Allege With Particularity That Defendants' Statements Concerning Advertising Spending And Leverage Were False or Misleading.

Independently, the AC fails to satisfy the PSLRA's heightened mandate of alleging particularized "reasons why the statements [are] misleading." *Biogen*, 857 F.3d at 41. Plaintiff neither alleges that a ***single*** historical financial disclosure was misleading or false, nor challenges the undisputed fact that, for the three years and two quarters leading into the Class Period, the Company accurately disclosed that (i) advertising expenses were increasing, but (ii) advertising expenses as a percentage of net revenue were decreasing. *See supra* at 6. Instead, the AC cites to Defendants' optimistic interpretations of past financial results and trends—which are indisputably accurate—while ignoring Defendants' clear disclosures of risk factors. *See Tharp*, 321 F. Supp. 3d at 227 (Defendant "cannot be held liable for accurate reports of past successes, even if present circumstances are less rosy."); *Coyne*, 943 F. Supp. 2d at 269 ("A defendant does not have a duty to cast the descriptions of its business in the most negative light.").

For example, Plaintiff alleges that Mr. Shah made misleading statements during an August 8, 2018 conference call when he stated that "our cost for ***repeat orders continues*** to get lower and lower . . . [s]o ad spend,[22] if you look at it ***sequentially over the last few years***, it continues to drift down." AC ¶¶ 65-66; *see also* AC ¶ 67 ("And you pretty much clearly see it [*i.e.*, "effective ad cost to get" repeat customers] coming down."). These statements refer to past,

---

[21] Even if Defendants' statements had not been accompanied by tailored cautionary language, "recklessness" is not enough to overcome the safe harbor; rather "the facts pled . . . must be sufficient to raise a strong inference [of] ***actual knowledge*** of the statement's falsity." *In re Praecis Pharm., Inc. Sec. Litig.*, 2007 WL 951695, at *9 (D. Mass. Mar. 28, 2007). Plaintiff fails to allege any such particularized facts of actual knowledge here. *See supra* at 11-13.

[22] The context of Mr. Shah's statement demonstrates that he was clearly speaking about "ad cost ***as a percentage*** of net revenues." Ex. K, Aug. 8, 2018 Call Tr. at 10-11; AC ¶ 66; *see Kader v. Sarepta Therapeutics, Inc.*, 2016 WL 1337256, at *15 (D. Mass. Apr. 5, 2016) (statements not misleading when "read in context," as they must be).

accurate financial results, and the AC fails to allege any facts even suggesting that these financial results are false or misleading. *See City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014) ("[T]here is no indication that this statement is false, and [P]laintiff does not detail how [it] is misleading beyond giving a highly optimistic view of the possible consequences of the [accurately disclosed] results."); *see also Van Ormer v. Aspen Tech., Inc.*, 145 F. Supp. 2d 101, 106 (D. Mass. 2000) ( "Plaintiffs also fail to set forth any specific facts explaining why [defendants'] earnings projections were unacceptable . . . [i]n fact, plaintiffs never even challenge defendants' reported figures of past performance.").

Despite Plaintiff's misleading allegations that "[w]hen questioned further on advertising expenses . . . Defendant Shah assured analysts that *spending* was coming down" (AC ¶ 66), the August 8, 2018 transcript reveals that Mr. Shah was speaking about *advertising as a percentage of net revenue* "coming down."[23] Ex. K at 11-12. By contrast, when speaking about advertising spending generally, Mr. Shah emphasized *three* separate times that Wayfair would "spend $700 million on advertising" in 2018, which, as the AC concedes Wayfair disclosed, was quadruple Wayfair's ad spending from four years prior. *See supra* at 8; AC ¶ 39. In any event, Wayfair's ample warnings about its advertising spending, *see supra* at 4-9, and "explicit disclosure of the precise risk upon which [Plaintiff] rests [his] claim [are] ground[s] for dismissal." *Pyramid Hldgs., Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 125 (D. Mass. 2009).

### D.    The AC Fails To Allege Any Duty To Disclose.

Finally, the AC asserts in boilerplate fashion that Wayfair failed to disclose trends or uncertainties, as required under Item 303(a) of Regulation S-K, 17 C.F.R. § 229.303. AC ¶ 71(e).

---

[23] Further, Defendants' August and September 2018 statements could not have been misleading, as they occurred in the wake of the second quarter and well before the end of the third quarter. *See Biogen*, 537 F.3d at 45 ("A statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time."); *see also Ganem*, 845 F.3d at 457 (rejecting plaintiff's theory that results "must have always been impossible to achieve" because statement is fraud-by-hindsight where in "retrospect" results "lagged significantly behind [projections]").

Setting aside that the First Circuit has not held that Item 303's disclosure duty is actionable under § 10(b), Item 303(a) requires disclosure of "***known*** trends or uncertainties that have had or that the registrant ***reasonably expects*** will have a ***material*** favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). The AC, however, fails to allege any "trend or uncertainty" beyond Wayfair's disclosed risks related to its advertising spending and overall profitability, and it certainly fails to allege Defendants' knowledge of such a trend. *See Washtenaw Cty. Emps.' Ret. Sys. v. Princeton Review, Inc.*, 2012 WL 727125, at *6 (D. Mass. Mar. 6, 2012) ("That [defendants'] third quarter . . . results disappointed does not support the inference that [they] had hard information . . . – seven months prior – that would have predicted a material departure from a result based on known trends and risks."). The First Circuit requires that Item 303 "trends and uncertainties" be "discernible from hard information alone," and the AC identifies none. *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996). Further, Plaintiff cannot dispute the "hard information" that Wayfair ***did*** disclose on a quarterly basis demonstrating its increasing advertising spending, which was decreasing as a percentage of net revenue. *See supra* at 6. In any event, it is well-established that a change in Wayfair's advertising leverage ***during a single ongoing quarter*** is not an unfavorable "trend." *See, e.g.*, *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 38 (2d Cir. 2017) (metric never "fluctuated in the same direction for two successive quarters; in other words there was never a trend;" anything less is "too myopic . . . temporally").

## III.   THE AC DOES NOT ADEQUATELY ALLEGE LOSS CAUSATION.

The AC must be dismissed in its entirety because it fails to plead loss causation. As this Court has held in dismissing a complaint for failure to plead loss causation, "[i]t is not enough to allege that Defendants made false statements on the one hand and that some announcement caused a stock drop on the other. The announcement must have been a 'corrective disclosure,'

24

meaning that the announcement must **connect** the current, present, negative information to the earlier false or misleading statement." *Coyne*, 943 F. Supp. 2d at 273 (emphasis in original); *accord Washtenaw Cty.*, 2013 WL 5348569, at *27 (same).

Here, the drop in Wayfair's stock price on November 1, 2018 (AC ¶ 105) followed the Company's announcement of third quarter earnings that slightly missed certain projections—not any "corrective" disclosure of some untruth about previously disclosed, accurate financial results. Plaintiff ironically alleges that Wayfair's decline in advertising leverage continued after the "corrective disclosure" (AC ¶¶ 84-90) and even caused a stock drop on May 2, 2019 (AC ¶ 106); this confirms that nothing in the November 1, 2018 earnings revealed the "truth" about Defendants' Class Period statements.

## IV.   THE SECTION 20(a) CLAIM FAILS.

Plaintiff's § 20(a) claim fails because Plaintiff fails to plead a primary Exchange Act violation. *See, e.g.*, *Ganem*, 845 F.3d at 450 (affirming dismissal of § 20(a) claim where plaintiff failed to plead primary violation).

## CONCLUSION

The Court should dismiss the AC in its entirety with prejudice.[24]

---

[24] *See, e.g.*, *Sousa*, 261 F. Supp. 3d at 121-22 (dismissing with prejudice where plaintiff amended complaint once).

Dated: August 30, 2019

Respectfully submitted,

WAYFAIR INC., NIRAJ SHAH, STEVEN K. CONINE, and MICHAEL D. FLEISHER

By their attorneys,

/s/ Roberto M. Braceras
Roberto M. Braceras (BBO # 566816)
Caroline H. Bullerjahn (BBO # 657241)
Ian Stearns (BBO # 693374)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
rbraceras@goodwinlaw.com
cbullerjahn@goodwinlaw.com
istearns@goodwinlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 30, 2019.

/s/ Roberto M. Braceras

26