# EXHIBIT B

**EXHIBIT B[1]**

**ALLEGED OMISSIONS AND MISLEADING STATEMENTS AND WHY THEY ARE NOT ACTIONABLE**

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| 57; 71 (a) – (d) | "These statements failed to provide a full picture of the true circumstances at the Company. When Defendants spoke, they were under a duty to disclose the full truth, but violated that duty. Specifically, Defendants violated their duty to disclose that:<br><br>• in the face of intense competition, Wayfair significantly increased advertising spending to meet revenue growth expectations;<br><br>• the Company's high advertising expenses, together with high operating expenses such as headcount hiring, reduced the Company's margins to an extent much worse than the Company disclosed;<br><br>• the Company was unable to drive positive advertising leverage (*i.e.*, lower advertising spending as a percentage of net revenue); and | No Duty To Disclose<br><br>• Br. Section II.D.<br><br>Allegedly Omitted Information Disclosed:<br><br>• Br. at Background; Sections I.D, II.C. |

---

[1] Defendants incorporate by reference the arguments set forth in the Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Br.").

[2] Throughout the AC, Plaintiff identifies alleged misstatements and then alleges that those alleged misstatements are allegedly false and materially misleading due in part to the omissions identified in this column.

[3] In addition to the reasons set forth in this Exhibit, the alleged omissions identified herein fail to state a claim for securities fraud for the independent reasons that Plaintiff has failed to allege facts that support a strong inference of scienter and loss causation. *See* Br. Sections I, III.

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| | • the Company was becoming increasingly unprofitable due to the escalating expenses needed to maintain revenue growth." | |
| 71(e) | "[T]he Company's Form 10-Q for 2Q18 failed to disclose to the market (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's costs and profitability, as the market would later learn (see Sections VI and VII, below)." | No Duty To Disclose<br><br>• Br. Section II.D.<br><br>Allegedly Omitted Information Disclosed:<br><br>• Br. at Background; Sections I.D, II.C. |

| AC ¶ | Source | Alleged Misleading Statement | Why Statement Is Not Actionable[4] |
|---|---|---|---|
| 59 | Q2 2018 Press Release (August 2, 2018) | "We are delighted with the progress that we are making and the way in which we are positioned to keep taking market share as dollars shift online." | • Not False/Misleading: Br. Section II.C.<br>• Inactionable Puffery: Br. Section II.A. |
| 60 | Q2 2018 Earnings Call (August 2, 2018) | "For consolidated adjusted EBITDA, we forecast margins of negative 3.7% to negative 4% for Q3 2018. We expect international adjusted EBITDA to be negative $45 million to negative $50 million in Q3 as we continue to add resources and ad spend in Canada, the U.K. and Germany. In the U.S. business, we expect to deliver adjusted | • Not False/Misleading: Br. Section II.C.<br>• Forward-looking: Br. Section II.B. |

[4] For the Court's convenience, this column cross-references the Defendants' Brief to highlight why each alleged misstatement or portion of a statement is not actionable—*i.e.*, because (1) the statement is not adequately alleged to be false or misleading ("Not False/Misleading"); (2) the statement is forward-looking and therefore immunized by the PSLRA's safe harbor ("Forward-Looking"); (3) the statement is an immaterial, general expression of puffery or corporate optimism ("Inactionable Puffery"); and/or (4) the statement is an inactionable statement of opinion or belief ("Inactionable Opinion"). In addition to the reasons set forth in this Exhibit, the alleged misstatements identified herein fail to state a claim for securities fraud for the independent reasons that Plaintiff has failed to allege facts that support a strong inference of scienter and plead loss causation. *See* Br. at Sections I, III.

2

| AC ¶ | Source | Alleged Misleading Statement | Why Statement Is Not Actionable[4] |
|---|---|---|---|
| | | EBITDA margin of approximately negative 1% as we invest primarily in headcount to build continued scale in our primary market." | |
| 61; 95 | Q2 2018 Earnings Call (August 2, 2018) | "Q2 advertising spend of $178 million or 10.7% of net revenue represents year-over-year leverage of over 30 basis points, as we invest in engaging both new and repeat customers and benefit from a growing base of repeat customers who require a lower level of ad spend per dollar of revenue . . . Looking out to Q3, we're comfortable leaning in on ad spend, while maintaining our overall 1-year contribution margin payback target, given the ongoing strength we're seeing in our customer KPIs. We, therefore, expect overall ad spend as a percentage of net revenue to increase sequentially in Q3 versus Q2, as it did last year, while still showing a modest amount of year-over-year leverage compared to the 11.8% level of Q3 last year." | • Not False/Misleading: Br. Section II.C.<br>• Forward-looking: Br. Section II.B.<br>• Inactionable Puffery: Br. Section II.A. |
| 62 | Q2 2018 Earnings Call (August 2, 2018) | "We remain incredibly bullish about our business, both in the near term and long term.  The investments we have been making to bring our customers the best possible offering are clearly working with strength across our customer KPIs and our market share growing, as a result." | • Not False/Misleading: Br. Section II.C.<br>• Inactionable Puffery: Br. Section II.A. |
| 63 | Q2 2018 Earnings Call (August 2, 2018) | "I think the key thing to keep in mind what we do on our paid advertising, and this is a very unique thing for us when you compare us to other folks, is we built all our advertising technology in-house . . . So there's a lot of new customers to get. And then, obviously, the share of wallet, it's a huge opportunity. But to your point, repeat is, obviously, a big opportunity, too. So I think building our own ad tech has been a huge advantage, but there's also a lot more customers to get, so | • Not False/Misleading: Br. Section II.C.<br>• Inactionable Puffery: Br. Section II.A.<br>• Inactionable Opinion: Br. Section II.A. |

3

| AC ¶ | Source | Alleged Misleading Statement | Why Statement Is Not Actionable[4] |
|---|---|---|---|
| | | that's why we keep adding." | |
| 64 | Q2 2018 10-Q (August 2, 2018) | "Advertising consists of direct response performance marketing costs, such as display advertising, paid search advertising, social media advertising, search engine optimization, comparison shopping engine advertising, television advertising, direct mail, catalog and print advertising. We expect advertising expense to continue to increase but decrease as a percentage of net revenue over time due to our increasing base of repeat customers." | • Not False/Misleading: Br. Section II.C.<br>• Forward-looking: Br. Section II.B. |
| 65; 95 | Canaccord Genuity Call (August 8, 2018) | "Actually, so our cost for repeat orders continues to get lower and lower, because customers -- basically we invest a lot to make the experience great, okay. And that's useful, if someone experiences it, but they have customers who have and customers who haven't, so. Then customer acquisition, we're very quantitative about that. We'll spend an amount of money such that we get paid back within a year. So the number of customers we get is the outcome of basically how many customers we can acquire with that payback methodology. The reason we grow so quickly is that every quarter since we went public, you can look at our growth based on repeat orders and our growth based on new orders, so new customers basically, and you look at our overall growth rate, and our repeat growth has outpaced our total growth every quarter." | • Not False/Misleading: Br. Section II.C.<br>• Inactionable Puffery: Br. Section II.A. |
| 47; 66; 95 | Canaccord Genuity Call (August 8, 2018) | "And so then what's happened over the years, as people have seen that like the revenue growth, in fact, has accelerated, and it's gotten -- the revenue growth in dollars got increasingly, increasingly high, and the ad cost as a percentage | • Not False/Misleading: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.A. |

| AC ¶ | Source | Alleged Misleading Statement | Why Statement Is Not Actionable[4] |
|---|---|---|---|
| | | keeps coming down. So I think the understanding that the repeat base drives leverage is reasonably well understood now . . .<br><br>So ad spend, if you look at it sequentially over the last few years, it continues to drift down, and that's despite the fact that international deleveraged it, because international ad costs, because we don't have a repeat base there, is ad cost is much, much higher as a percentage of net revenues. So the fact that's coming down, the U.S. is even lower than that line, right, delevered then by the international, which pulls it back up to where you see it . . .<br><br>The reason the profitability of the business has kept getting better is not actually that we've ever pulled back on investing. It's just that we're simply not spending all of the incremental contribution margin dollars." | |
| 49; 67; 95 | Goldman Sachs Retailing Conference Call (September 5, 2018) | "In terms of how we know what it cost us, what we do is, basically, every bit of our spend is -- we have fairly complex attribution. So we don't just do last click or multi-click, but we have multiple different attribution models that we overlay on top of each other to basically make sure we triangulate on what we think actual -- every action had cost us in spend. And then we also add up spend against the cohorts of the different customers. And so we're able to know is well, what's it cost us to get a new customer from a certain channel or a campaign. But we actually also can know what's it cost us when we move customers from one order to 2 orders or 2 orders to 3 orders or 3 orders to 4 orders. And what's it cost us for customers of different ages. So you can kind of cut it many different ways when you do this type of | • Not False/Misleading: Br. Section II.C.<br>• Inactionable Puffery: Br. Section II.A. |

| AC ¶ | Source | Alleged Misleading Statement | Why Statement Is Not Actionable[4] |
|---|---|---|---|
| | | attribution. And what you see, no matter which way you cut, you can see systematically that actually as customers increasingly repeat the effective ad cost to get them come back goes down and those models are kind of self-learning . . . <br><br> So that is a long-winded way of saying, we're highly confident that we understand what each tranche cost us. And you pretty much clearly see it coming down. I would agree with you if we only sold a very narrow set of very high-cost low-frequency goods -- if we're selling cars or something like that. Then you're right. You would have to effectively reacquire very -- each time unless they have like particular brand loyalty. But basically, the mix of goods we have does lend itself to being able to build a relationship." | |
| 7; 49; 68 | Goldman Sachs Retailing Conference Call (September 5, 2018) | "And we talked about advertising. We talked about the payback cycle and keeping that very tight . . . But when you take the profit margin we talk about, and you multiply it by a very large top line, you start talking about a very significantly profitable company . . . <br><br> The U.S. has now been EBITDA profitable, 6 of the last 7 quarters . . . you can actually see how growing very quickly actually evolves you into the profitable model." | • Not False/Misleading: Br. Section II.C. <br> • Inactionable Puffery: Br. Section II.A. <br> • Forward-looking: Br. Section II.B. |
| 69 | Citi Global Technology Conference (September 6, 2018) | "I think at -- the investment we're making in TV, we'll continue to sort of grow at a reasonable rate. And we see that we get good leverage out of it today . . ." <br> "[T]he bigger investment over the last few years [than television] has really been in the direct online [advertising] where we know exactly what the yield is that | • Not False/Misleading Br. Section II.C. <br> • Inactionable Puffery: Br. Section II.A. <br> • Forward-looking: Br. Section II.B. <br> • Inactionable Opinion: Br. Section II.A. |

| AC ¶ | Source | Alleged Misleading Statement | Why Statement Is Not Actionable[4] |
|---|---|---|---|
| | | what we're getting. And I think that's TV -- and the brand awareness creates a halo around all of that, that's really quite powerful." | |