UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re WAYFAIR INC. Securities Litigation | ) | No. 1:19-cv-10062-DPW |
| | ) | |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) | |
| | ) | |
| ALL ACTIONS. | ) | |
| | ) | |
| | ) | |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................2

III.  ARGUMENT..........................................................................................................3

    A.    The Complaint Pleads Actionable Misstatements and Omissions..........................3

        1.    The Complaint Pleads Falsity with Particularity .......................................3

        2.    Defendants' Misstatements and Omissions Were Material ........................6

        3.    Defendants Had a Duty to Disclose the Material Omitted
            Information ..................................................................................................9

        4.    Defendants' Supposed "Disclosures" Were Inadequate and
            Misleading in Themselves ..........................................................................10

        5.    The Safe Harbor Affords No Protection Here ...........................................13

    B.    The Complaint Pleads a Strong Inference of Defendants' Scienter ......................15

        1.    The Complaint Alleges Particular *Indicia* that Collectively Give
            Rise to a Strong Inference of Defendants' Scienter...................................15

        2.    Defendants Fail to Negate the Strong Inference of Scienter Arising
            from Plaintiff's Allegations .......................................................................19

    C.    The Complaint Sufficiently Alleges Loss Causation............................................24

IV.   CONCLUSION......................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)................................................................................16

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)........................................................................ *passim*

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)....................................................................................6, 7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................................6, 7

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017)...............................................................................24

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ........................................................ *passim*

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prod. Co.*,
270 F.R.D. 247 (D.S.C. 2010) .............................................................................8

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)...............................................................16

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017)................................................................................24

*Coyne v. Metabolix, Inc*
943 F. Supp. 2d 259 (D. Mass. 2013)........................................................ 13, 24

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ........................................................20, 21, 22

*Dahhan v. OvaScience, Inc.*,
321 F. Supp. 3d 247 (D. Mass. 2018) ........................................................ *passim*

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................24, 25

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015)...............................................................................24

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ..............................................................................19

# TABLE OF AUTHORITIES

**Page**

*Freeman v. Town of Hudson*,
714 F.3d 29 (1st Cir. 2013)................................................................................20, 21

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................22

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)...............................................................................10, 12

*Gauquie v. Albany Molecular Research, Inc.*,
No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016).........16

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999)....................................................................................15

*Hill v. Gozani*,
638 F.3d 40 (1st Cir. 2011) ........................................................................................4

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)......................................................................................24

*In re Boston Sci. Corp. Sec. Litig.*,
No. 10-10593-DPW, 2011 WL 4381889 (D. Mass. Sept. 19, 2011),
*aff'd*, 686 F.3d 21 (1st Cir. 2012) ............................................................................24

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002).................................................................4, 16, 19, 23

*In re Credit Suisse-AOL Sec. Litig.*,
465 F. Supp. 2d 34 (D. Mass. 2006) ........................................................................24

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
705 F. Supp. 2d 86 (D. Mass. 2010) ........................................................................14

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012).......................................................................20

*In re ModusLink Global Sols., Inc. Sec. Litig.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ......................................................................19, 21

*In re Salix Pharm., Ltd.*,
No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..............15

*In re Sepracor, Inc. Sec. Litig.*,
308 F. Supp. 2d 20 (D. Mass. 2004) ........................................................................14

# TABLE OF AUTHORITIES

**Page**

*In re Signet Jewelers Ltd. Sec. Litig.*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019).................................................................................7

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ..................................8

*In re Stone & Webster, Inc. Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005).......................................................................................17, 20

*Institutional Inv'r Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009).................................................................................16, 19, 20

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2615 (2019).......................................21

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (E.D. Va. 2015) ................................................................................16

*Levy v. Gutierrez*,
   No. 14-cv-443-JL, 2017 WL 2191592 (D.N.H. May 4, 2017) ..................................................18

*Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*,
   838 F.3d 76 (1st Cir. 2016)...........................................................................................24

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ........................................................................................25

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
   36 F.3d 170 (1st Cir. 1994)...........................................................................................12

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) .........................................................................................16

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013).................................................................................6, 24, 25

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...................................................................................6, 7, 9, 16

*Metzler Asset Mgmt. GMBH v. Kingsley*,
   928 F.3d 151 (1st Cir. 2019).........................................................................................23

*Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008)..................................................................................... *passim*

## TABLE OF AUTHORITIES

**Page**

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)...............................................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    __ U.S. __, 135 S. Ct. 1318 (2015)....................................................................................8

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)...............................................................................................13

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)...............................................................................................8

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)..............................................................................................10

*Reese v. Malone*,
    747 F.3d 557 (9th. Cir. 2014) ...........................................................................................18

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987)..................................................................................................9

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................................................12, 15

*Roofer's Pension Fund v. Papa*,
    No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) .................................................13

*Rosenbaum Capital LLC v. Boston Commc'ns Grp., Inc.*,
    445 F. Supp. 2d 170 (D. Mass. 2006) ...........................................................................9, 14

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ..............................................................................................22

*S. Ferry LP # 2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009).......................................................................17

*SEC v. Revolutions Med. Corp.*,
    No. 1:12-CV-3298-LMM, 2015 WL 11199068 (N.D. Ga. Apr. 3, 2015).........................13

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013).............................................................................................9, 10

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010).............................................................................................14

**TABLE OF AUTHORITIES**

**Page**

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
   243 F. Supp. 3d 1109 (E.D. Cal. 2017)...................................................................................8

*Stratte-McClure v. Morgan Stanley*,
   784 F. Supp. 2d 373 (S.D.N.Y. 2011), *aff'd*, 776 F.3d 94 (2d Cir. 2015)..............................20

*Swack v. Credit Suisse First Boston*,
   383 F. Supp. 2d 223 (D. Mass. 2004) ...................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*.,
   551 U.S. 308 (2007)................................................................................................. *passim*

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc*.,
   28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................................................3

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78j(b)........................................................................................................................1
   §78t(a) ........................................................................................................................1
   §78u-5(c)(1)(A)(i)..........................................................................................................14
   §78u-5(c)(2)(B)(ii)..........................................................................................................15

17 C.F.R.
   §229.303(a)(3)(ii), 229.303(b)...........................................................................................9
   §240.10b5-1(c)(1)(i)(B)(1)-(3), (ii) ..................................................................................22

Lead Plaintiff Iain Kaplan ("Plaintiff") files this opposition to the Motion to Dismiss ("Motion" or "Mot.") filed by Wayfair Inc. ("Wayfair" or "Company"), Niraj Shah ("Shah"), Steven K. Conine ("Conine"), and Michael D. Fleisher ("Fleisher") (collectively, "Defendants").[1]

## I.    INTRODUCTION

The Complaint adequately pleads Defendants' securities fraud under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a).  Defendants knowingly misrepresented and concealed a significant downturn in Wayfair's financial performance during the Class Period.  Unbeknownst to investors, Wayfair was failing to leverage its massive advertising expenses and suffering worse-than-expected losses as a result.  By their own admissions, Defendants closely tracked specific data on those issues during the Class Period.  But instead of disclosing the truth, they repeatedly misled the market that the Company was generating positive advertising leverage and successfully transitioning to a profitable business model.  When the truth began to come out at the end of the Class Period (August 2, 2018 to October 31, 2018), the market was stunned, Wayfair's stock price plummeted, and investors lost millions.  In contrast, Defendants cashed in on the fraud, exploiting the artificial inflation in Wayfair's stock price with insider sales totaling $69 million during the Class Period.

Defendants' scattershot challenges to falsity, scienter, and loss causation are unavailing and fail to support dismissal, for the reasons discussed below.  Among other fatal flaws, Defendants' arguments are premised on an improper counter narrative, which mischaracterizes Plaintiff's allegations and seeks to draw inferences in Defendants' favor.  On a motion to

---

[1]    Unless otherwise noted, the defined terms used herein have the definitions set forth in Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws [ECF No. 21] ("Complaint"). Citations to "¶__" refer to paragraphs of the Complaint.  Unless otherwise noted, emphasis has been added, and internal citations, quotations, and footnotes have been omitted.

dismiss, however, the Court must accept all factual allegations as true and draw all reasonable inferences in favor of Plaintiff. Defendants' Motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

Wayfair is an online retailer of household goods. ¶26. The Company sells a wide variety of products at Wayfair.com and other websites, including furniture, kitchen appliances, bedding and bath supplies, and décor. ¶¶27-30. Wayfair is managed and overseen by the Individual Defendants in this action - Shah, Conine, and Fleisher - who serve as the Company's most senior executive officers and directors. ¶¶17-20, 93. In the face of growing competition from the likes of Amazon.com, Defendants employed an aggressive "growth at all costs" strategy during the Class Period. ¶¶35-43. Defendants poured money into all types of advertising in an attempt to build the Wayfair brand and drive new and repeat business around the globe. *See id.*

On the surface, Defendants' massive spending was effective, boosting top line revenue growth. ¶43. But it also crushed the bottom line. ¶¶44-46. The Company was unable to turn a profit, spending much more money than it was able to generate from sales to customers. *See id.* The situation grew worse during the Class Period as competitive pressure mounted, forcing Wayfair to spend even more money to keep pace. ¶¶52-53, 72-82. Defendants concealed these problems during the Class Period. They falsely assured investors that the Company's advertising expenses were becoming more effective at driving revenue (*i.e.*, positive advertising leverage), as shown by decreases in advertising expenses as a percentage of net revenue, decreases in advertising expenses per customer, and decreases in advertising expenses per order. ¶¶47-49, 57-67, 69. Defendants also misleadingly signaled that the Company was becoming profitable, particularly in the U.S. ¶¶57, 66, 68. At minimum, Defendants' misstatements and omissions were made with a high degree of recklessness. ¶¶47-49, 91-103.

- 2 -

Defendants could only conceal the truth for so long. Before the market opened on November 1, 2018, Defendants revealed a higher-than-expected quarterly loss. ¶¶72-77. Even the U.S. market, hyped by Shah as a profitable enterprise just a few weeks earlier, suffered a steep loss, reporting its worst adjusted EBITDA margin in three years. ¶¶73, 76, 81. Moreover, Defendants revealed that the Company experienced *negative* year-over-year advertising leverage in 3Q18, meaning that the Company's advertising expenses were less effective at driving revenue than they were in 3Q17, and that the Company's per-customer acquisition cost was at an all-time high. ¶¶75, 79-81. Securities analysts and financial media reacted to the news, with one analyst commenting that Wayfair's "results were in contrast to the margin optimism we perceived on its last call." ¶¶79-82. In response to this news, the Company's stock price suffered a steep decline, plummeting *12.8%* in a single trading day, resulting in millions in investor losses. ¶¶54, 78, 105. In contrast, while investors suffered, Shah, Conine, and Fleisher each enjoyed a financial windfall. ¶¶98-103. During the Class Period, they sold a combined *$69 million* of their personal Wayfair shares at prices that were artificially inflated by their material misstatements and omissions. *See id.* The same problems continued to plague Wayfair after the Class Period, and the Company's bottom line continued to erode. ¶¶83-90.

## III.   ARGUMENT[2]

### A.   The Complaint Pleads Actionable Misstatements and Omissions

#### 1.   The Complaint Pleads Falsity with Particularity

To plead falsity under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons

---

[2]   Defendants have not challenged the elements of reliance or economic loss (*i.e.*, damages). Accordingly, the Court need not consider those elements at the pleading stage. *See, e.g.*, *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 103 (D. Mass. 2014) (Young, J.); *see also* ¶¶15, 104-118.

why the statement is misleading." *Hill v. Gozani*, 638 F.3d 40, 55 (1st Cir. 2011). "Although the pleading requirements under the PSLRA are strict, they do not change the standard of review for a motion to dismiss." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002). They certainly "do not require a plaintiff to plead evidence" to survive a motion to dismiss. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002); *see also Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) ("[I]n determining the adequacy of a complaint . . . we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence."). To the contrary, "courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remained unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA." *Cabletron*, 311 F.3d at 32.

The Complaint amply satisfies this standard by establishing the time, place, and content of each alleged misrepresentation and omission (¶¶48-49, 59-69); why the misrepresentations and omissions were misleading when made (¶¶45-46, 57, 71); and why the misrepresented information was material to a reasonable investor (¶¶50, 54-55, 58, 78-82). The Complaint explains that Defendants misled investors about Wayfair's financial performance during the Class Period. Defendants admitted they were spending massive amounts on advertising, ***but concealed the ineffectiveness of that spending***, as evidenced by ***negative*** advertising leverage (*i.e.*, increasing advertising expenses as a percentage of net revenue), an all-time high per-customer acquisition cost, and wider-than-anticipated losses experienced during the Class Period. Instead, Defendants made several misleadingly positive statements to investors throughout the Class Period that Wayfair was achieving ***positive*** advertising leverage (*i.e.*, decreasing advertising expenses as a percentage of net revenue), lower costs per customer, and successfully transitioning to a profitable business model. For example, at the beginning of the Class Period on August 2, 2018, Fleisher

stated that Wayfair expected positive leverage in 3Q18 (which was already well in progress, having begun weeks earlier on July 1, 2018) because it was already benefitting "from a growing base of repeat customers who require a lower level of ad spend per dollar of revenue." ¶61; *see also* ¶¶59-60, 62-64 (other misstatements and omissions on August 2).

As 3Q18 continued to develop, providing Defendants with even more financial data, they confirmed and doubled down on such misleading statements, while continuing to conceal the true facts. On August 8, 2018, for example, Shah confirmed that "our cost for repeat orders continues to get lower and lower" and "the ad cost as a percentage [of revenue] keeps coming down." ¶¶65-66. Nearly a month later, on September 5, 2018, Shah emphatically confirmed that "no matter which way you cut, you can see systematically that actually as customers increasingly repeat, *the effective ad cost to get them come back goes down . . . . And you pretty much clearly see it coming down*"; "[w]hen you take the profit margin we talk about, and you multiply it by a very large top line, you start talking about a very significantly profitable company"; and "[t]he U.S. has now been EBITDA profitable, 6 of the last 7 quarters . . . . you can actually see how growing very quickly actually evolves you into the profitable model." ¶¶49, 67-68; *see also* ¶69 (additional misstatements and omissions on September 6, 2018 regarding Wayfair's advertising leverage).

Defendants seek to minimize and oversimplify the Complaint as "alleging securities fraud merely because a company barely (here, by a *few tenths of one percent*) missed a quarterly financial projection." Mot. at 1. The Motion is replete with similar mischaracterizations, as Defendants improperly reject what is pled and attempt to color the Court with their version of the facts. *See* Mot. at 2-3, 8, 12, 17-18. In reality, Wayfair's advertising leverage and profitability were significantly worse than disclosed during the Class Period (including negative year-over-year leverage, the highest per-customer acquisition cost ever, and the worst adjusted EBITDA margin

- 5 -

in the U.S. business in three years), in direct contrast to Defendants' misleadingly positive statements. ¶¶46-49, 57-58, 71-82. Defendants' effort to rewrite the Complaint and seek dismissal of their version of the allegations should be rejected. It is axiomatic that the Court must accept all allegations as true and draw all reasonable inferences in favor of Plaintiff. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007); *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013) ("[W]e accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor."); *Aldridge*, 284 F.3d at 78 ("Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor[.]"); *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 251 (D. Mass. 2018) (Talwani, J.) (same).[3]

## 2.      Defendants' Misstatements and Omissions Were Material

The misrepresentations and omissions alleged in the Complaint were material. Materiality is an objective, fact-specific determination that "involv[es] the significance of an omitted or misrepresented fact to a reasonable investor[.]" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 467 (2013). This standard is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Plaintiff easily meets that standard because the allegations involved significant, undisclosed

---

[3]   Based on these well-settled principles, the Court should also reject Defendants' various charts (manufactured for purposes of the Motion) and pre-Class Period SEC filings and conference call transcript, which Defendants submit to dispute the Complaint's facts and advance their own competing factual narrative (such as their factual assertions that they had a history of increasing advertising leverage ***prior to*** the Class Period, which are completely irrelevant to the Complaint). *See* Mot. at 6, 8, Exs. A-D, F-H, P; *see also* §III.B.2, *infra* (discussing the limitations of the judicial notice and incorporation-by-reference doctrines in the First Circuit).

problems related to advertising leverage and profitability, which investors and securities analysts relied on to value and make investment decisions regarding the Company. ¶¶45-46, 52-58, 71-82.

Nonetheless, Defendants argue that certain of the alleged misstatements were non-actionable because they were puffery (*i.e.*, immaterial to investors). Mot. at 19-20. As an initial matter, this type of materiality argument requires a fact-based analysis that is premature at the pleading stage. *See, e.g.*, *Amgen*, 568 U.S. at 471 (Materiality "is properly addressed at trial or in a ruling on a summary-judgment motion."); *Boston Sci.*, 523 F.3d at 87 (materiality "is usually a question for the trier of fact"); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 n.11 (D. Mass. 2006) (Ponsor, J.) ("[T]he puffing concept in the securities context has all but gone the way of the dodo. . . . [D]ismissals on this ground are increasingly rare."). Even if the Court were to entertain the argument at this stage, it fails because the statements identified by Defendants were not puffery. They were concrete, verifiable statements as to some of the Company's most critical financial metrics (advertising leverage and profitability), which a reasonable investor would view as important to the total mix of information available, thus satisfying the materiality standard. *See Amgen*, 568 U.S. at 466-67; *Matrixx*, 563 U.S. at 38. Defendants' conclusory portrayal of those statements as "loose optimism" (*i.e.*, puffery) based on truncated quotes from the Complaint (Mot. at 19) is contrary to the fact-based, contextual review of materiality mandated by the Supreme Court. *See Matrixx*, 563 U.S. at 38; *Basic*, 485 U.S. at 231-32; *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (as with the general standard governing materiality, determining whether statements were puffery entails looking at the context in which the statements were made).

In addition, materiality is supported by the Company's stock price decline (¶¶54, 78, 105) and the reactions of securities analysts and financial media (¶¶79-81) when the truth began to come

out at the end of the Class Period.  If Defendants' Class Period statements were mere corporate optimism of no significance to investors, then the market would not have not reacted in that manner.  *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[W]hen a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prod. Co.*, 270 F.R.D. 247, 255 (D.S.C. 2010) (analyst statement regarding the financial impact of a newly disclosed fact "sufficiently establishes at this stage that a reasonable purchaser or seller of a security would consider the fact important in deciding whether to buy or sell the security").

Defendants also claim that certain statements are not actionable because they were opinions, based on the inclusion of "I think" in the statements.  Mot. at 20.  As the Supreme Court recognized, however, "sentences starting with the phrases 'we believe' or 'we think' . . . . can preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of misleading investors."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1331 (2015).  Because the statements "spoke to a present state of affairs" (*i.e.*, the present state of Wayfair's advertising leverage and profitability) rather than "a belief about future events[,]" they were not opinions.  *In re Signet Jewelers Ltd. Sec. Litig*., No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018).  And even if they were opinions, "[u]nder *Omnicare*, liability can attach to opinions when . . . there are particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1115 (E.D. Cal. 2017) (citing *Omnicare*, 135 S. Ct. at 1326-27, 1332).  Plaintiff's allegations plausibly and

particularly demonstrate that Defendants failed to disclose material facts going to the basis of their statements (problems concerning advertising leverage and profitability), rendering the statements misleading to a reasonable investor, and therefore the statements are actionable even if they are deemed opinions.  ¶¶57-71.

### 3.        Defendants Had a Duty to Disclose the Material Omitted Information

Defendants also argue that they had no duty to disclose the omitted information.  Mot. at 23-24.  This argument ignores the universally recognized tenet that Section 10(b) imposes a duty to disclose material omitted facts when they are "necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading."  *Matrixx*, 563 U.S. at 44; *see also Rosenbaum Capital LLC v. Boston Commc'ns Grp., Inc.*, 445 F. Supp. 2d 170, 175-76 (D. Mass. 2006) (Young, J.) (when a defendant elects to make a disclosure, "there is a duty to make it complete and accurate") (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)).  Under those circumstances, a plaintiff "does not need to rely on a theory that there was an independent duty to disclose[.]"  *Boston Sci.*, 523 F.3d at 87.  By repeatedly speaking about advertising expenses, advertising leverage, and profitability during the Class Period (¶¶48-49, 59-69), Defendants had a duty to fully disclose material contrary facts related to such matters, including negative advertising leverage, record high per-customer acquisition cost, and worse-than-expected losses, in order to make their statements not misleading.  Defendants utterly failed to do so, and instead concealed those material facts from investors in violation of Section 10(b).[4]

---

[4]    Independently, Defendants violated a duty to disclose under Item 303 of Regulation S-K ("Item 303"), which requires disclosure of any known trends or uncertainties reasonably expected to have a material impact on net sales, revenues, or income. *See* 17 C.F.R. §229.303(a)(3)(ii), 229.303(b).  The Complaint adequately alleges that, during the Class Period, Defendants knew of trends and uncertainties with respect to advertising spending and leverage that were reasonably expected to have a material adverse impact on the Company's financial results, thus requiring disclosure under Item 303.  ¶¶71, 91-97.  Defendants' attempt to define a minimum duration for a trend requiring disclosure under Item 303 (Mot. at 24) is contrary to First Circuit authority.  *See Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 106 (1st

### 4. Defendants' Supposed "Disclosures" Were Inadequate and Misleading in Themselves

Defendants also argue that there were no actionable misstatements or omissions because they made certain disclosures related to advertising spending and profitability. Mot. at 3-9, 22-23. None of those general disclosures, however, cured the misstatements or meaningfully informed the market of the particular omissions alleged in the Complaint. ¶¶57-71. This is supported by Wayfair's sharp stock price decline when the truth began to come out on November 1, 2018, as well as the reactions of securities analysts and financial media. ¶¶54, 78-82. Had the alleged omissions been fully disclosed and investors properly informed of the true state of the Company's financial condition, the market would not have reacted in the manner that it did when the truthful information actually came to light.

At core, Defendants' argument amounts to a "truth-on-the-market" defense, which is premature on a motion to dismiss. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (the truth-on-the-market defense "is intensely fact-specific and . . . rarely an appropriate basis for dismissing a § 10(b) complaint"). In order to prevail, Defendants *must prove* that the truth was already known and "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.*; *see also Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004) (Woodlock, J.) ("Whether the extent of the market's knowledge . . . sufficed to render [defendant's] omissions immaterial is a fact-specific question that is rarely an appropriate basis for dismissal.") (citing *Ganino*, 228 F.3d at 167).

---

Cir. 2013) ("Item 303's disclosure obligations, like materiality . . . do not turn on restrictive mechanical or quantitative inquiries.") (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012)). And Defendants' argument pertains only to a trend, not an uncertainty. Defendants are not immunized by their disclosures regarding advertising spending (Mot. at 24), which were inadequate for the reasons further discussed below.

Defendants fail to meet this exacting standard. Their Motion raises an apples-to-oranges comparison by intentionally conflating advertising *spending* with advertising *leverage*. Mot. at 1-2, 4-5, 8, 23. Disclosures about Defendants' overall advertising spending did not "counter-balance effectively" the repeated misstatements and omissions regarding the *effectiveness* of such spending in terms of customer orders, revenue growth, and profit. ¶¶45-49, 57-69, 71. On August 8, 2018, for example, Shah misleadingly told investors that Wayfair's "ad cost as a percentage [of revenue] keeps coming down" and "our cost for repeat orders continues to get lower and lower," which were not remotely immunized by general disclosures regarding increases in overall advertising spending. ¶¶65-66; *see also* ¶¶59-64, 67-69 (detailing additional misstatements and omissions).

Further, these statements spoke to what Defendants were experiencing *at that time* (in 3Q18) with respect to advertising leverage, defeating the improper inference that investors could not have been misled because it was "transparent" that leverage was merely a "longer-term metric that took up to a year to materialize" and was otherwise meaningless due to "short-term fluctuations[.]" Mot. at 5 & n.2. If this were correct, Wayfair would not have reported leverage *every quarter*, confirming the validity importance of that metric in the short term. In any event, Plaintiff is entitled to favorable and plausible inferences over Defendants' version of events.

Defendants also suggest that the truth was somehow disclosed to investors through alleged risk warnings in their 2017 10-K, which was filed months before the Class Period began. Mot. at 4-9, 23, Ex. D. But those warnings were no more than generic statements about risks the Company *might* face in the future regarding competition, expenses, and profitability. These statements could apply to virtually any company in the retail industry. They could not inform investors of the actual problems Defendants were facing during the Class Period (including *negative* advertising

- 11 -

leverage, the highest per-customer acquisition cost in history, and wider-than-anticipated losses), nor could they effectively "counter-balance" the false and misleading statements made by Defendants during the Class Period (which clearly and misleadingly conveyed *positive* advertising leverage, reduced per-customer costs, and a successful progression towards profitability, particularly in the critical U.S. business). *Ganino*, 228 F.3d at 167.  To the extent these statements were relevant to investors during the Class Period, they were misleading in themselves, suggesting that the adverse financial conditions being experienced by Defendants at that time were mere possibilities that might occur in the future.  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Defendants then contend that there is no falsity because they disclosed "past, accurate financial results."  Mot. at 22-23.  This argument fails.  The Complaint alleges misstatements and omissions about financial problems experienced during the Class Period, not during "the three years and two quarters leading into the Class Period[.]"  *Id.* at 22.  On August 8, 2018, for example, Shah's statements conveyed misleading information about the present state of Wayfair's advertising leverage and profitability.  *See* ¶¶65-66; *see also* ¶¶59-64, 67-69.  Even if portions of the alleged statements included true historical facts, as Defendants contend, this was irrelevant to the question of whether those statements, in context, misled investors about Wayfair's *present* financial condition during the Class Period.  *See Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *Brumbaugh*,

- 12 -

416 F. Supp. 2d at 249 n.10 (same); *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (same).

### 5.    The Safe Harbor Affords No Protection Here

Defendants suggest that they are entitled to immunity under the PSLRA safe harbor because certain of the alleged misstatements were forward-looking. Mot. at 20-22. This argument fails because the *substance* of those statements related to the Company's *present* financial performance (during 3Q18), and therefore the statements were not forward-looking. *See, e.g.*, §III.A.1, *supra* (discussing alleged misstatements that plainly spoke to present matters). The statements regarding "forecasted" and "expected" results pertained to 3Q18, which was already well underway when the statements were made, meaning the statements were informed by and related to *current* information regarding those results. *See Dahhan*, 321 F. Supp. 3d at 254 ("[T]he element of Defendants' statements that pertained to the status of Defendants' *current* expectations or status were not forward-looking, and are not protected by the safe harbor.") (citing *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 n.13 (1st Cir. 2008)) (emphasis in original).[5] Defendants' argument also fails because none of the alleged omissions are entitled to safe harbor protection, which Defendants ignore.[6]

Even assuming, *arguendo*, that certain of the alleged misstatements were forward-looking, safe harbor protection applies only if they were "*accompanied* by *meaningful* cautionary

---

[5]    Defendants' citations to *Coyne v. Metabolix, Inc.* are inapposite. Mot. at 20-21. That case involved forward-looking "predictions" of "*future* economic performance in the form of sales needed to reach the commercial phase milestone" at a *future* point in time, and thus is distinguishable from statements in this case, involving the Company's present financial performance in 3Q18. 943 F. Supp. 2d 259, 266 (D. Mass. 2013) (Woodlock, J.).

[6]    *See Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *7 (D.N.J. July 27, 2018) ("[T]o the extent plaintiffs [ ] challenge defendants' alleged omission of present facts . . . , PSLRA's safe harbor does not apply."); *SEC v. Revolutions Med. Corp.*, No. 1:12-CV-3298-LMM, 2015 WL 11199068, at *4 (N.D. Ga. Apr. 3, 2015) (same).

statements." 15 U.S.C. §78u-5(c)(1)(A)(i). To be meaningful, "[c]autionary language must be *extensive and specific*. A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate . . . . To suffice, the cautionary statements must be *substantive and tailored to* the specific future projections" at issue. *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010); *see also In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 93 (D. Mass. 2010) (Gorton, J.) (cautionary language must "expressly warn of the particular risk that allegedly brought about the plaintiffs' loss"); *Rosenbaum*, 445 F. Supp. 2d at 177 ("Vague or boilerplate disclaimers are insufficient[.]").

Here, Defendants failed to "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor[.]" *Slayton*, 604 F.3d at 773. The language cited by Defendants (Mot. at 4-6, 21) was not meaningful at all. It was boilerplate repeatedly parroted in their annual 10-Ks regarding general concerns over advertising spending and revenue. For example, the general statement, "we *may* spend more than we anticipate acquiring and retaining customers or *may* generate less net revenue per active customer than anticipated," appeared *verbatim* in three consecutive 10-Ks filed before the Class Period.[7] These generic warnings could apply to any sales company, and were not tailored to the specific risks and circumstances that *had already materialized* and the Company was then confronting (*i.e.*, that advertising leverage and profitability were materially worse than disclosed in 3Q18). *See, e.g.*, *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) (Lasker, J.) (generic cautionary statements do not shield defendants from liability for forward-looking statements

---

[7]     *See* Mot. Ex. D, 2017 10-K at 15; Wayfair's Form 10-K for the year ended December 31, 2016, filed with the SEC on February 28, 2017, at 7; Wayfair's Form 10-K for the year ended December 31, 2015, filed with the SEC on February 29, 2016, at 16; *see also Slayton*, 604 F.3d at 772-73 (inadequacy of cautionary language "bolstered by the fact that the defendants' cautionary language remained the same" over time).

- 14 -

undermined by current, known facts); *Rombach*, 355 F.3d at 173 (no safe harbor protection "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").[8]

### B.    The Complaint Pleads a Strong Inference of Defendants' Scienter

#### 1.    The Complaint Alleges Particular *Indicia* that Collectively Give Rise to a Strong Inference of Defendants' Scienter

Plaintiff alleges with particularity facts giving rise to a "strong inference" that Defendants acted with scienter, a "showing that defendants either consciously intended to defraud, or that they acted with a high degree of recklessness." *Boston Sci.*, 523 F.3d at 85.  Recklessness requires "a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents **a danger of misleading** buyers or sellers that is . . . so obvious the actor must have been aware of it."  *Brumbaugh*, 416 F. Supp. 2d at 252 (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999)).

As the Supreme Court explained in *Tellabs*, a court must accept a plaintiff's allegations as true and evaluate them "holistically" to determine "whether **all** of the facts alleged, **taken collectively**, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  551 U.S. at 323, 326.  The standard is met where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any

---

[8]    In addition, as to Defendants' oral statements on conference calls (¶¶60-63, 65-69), the safe harbor does not apply because there was no "***accompanying*** oral statement" that "identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement. " 15 U.S.C. §78u-5(c)(2)(B)(ii).  Defendants' vague cross-references at the beginning of conference calls (Mot. Exs. E, K, P-R) were inadequate.  *See In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (finding similarly vague statements at the beginning of conference calls to be "inadequate to warn of the specific risk that Plaintiffs have alleged"). Defendants also claim that their statements are entitled to safe harbor protection because Plaintiff fails to allege their actual knowledge.  Mot. at 22 n.21.  This is wrong for the reasons discussed in the following section.

opposing inference one could draw from the facts alleged." *Id.* at 324. "[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008). The First Circuit "has rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." *Cabletron*, 311 F.3d at 38. Under this approach, "[e]ach individual fact about scienter may provide only a brushstroke, but the resulting portrait satisfies the requirement for a strong inference of scienter under the PSLRA." *Id.* at 40; *see also Matrixx*, 563 U.S. at 48-50 (undertaking collective review of scienter allegations).

Here, Defendants' scienter is strongly supported by several *indicia*, including their repeated and specific Class Period statements about the Company's advertising expenses, ability to leverage such expenses, and profitability. ¶¶60-69, 94-96. Because Defendants served as Wayfair's designated representatives for communicating with the market about those matters, it was "exceedingly unlikely" that Defendants were "unaware of the problems" involving them, thus supporting a strong inference of their scienter. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008). Indeed, "the most powerful evidence of scienter is the content and context of [the defendant]'s statements," particularly when "specifically asked, directly and repeatedly," about the matters at issue. *Institutional Inv'r Grp. v. Avaya, Inc.*, 564 F.3d 242, 269-70 (3d Cir. 2009).[9] That those matters were critical to Wayfair's financial strength provided an

---

[9]   *See also, e.g.*, *Dahhan*, 321 F. Supp. 3d at 255 (defendants' public statements regarding the product at issue supported their scienter); *Gauquie v. Albany Molecular Research, Inc.*, No. 14 CV 6637 (FB) (SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (it would be "absurd to consider that the senior vice president did not have knowledge of information contradicting her statements when she took an active role in communicating with the press about the [particular matter at hand]"); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 606 (E.D. Va. 2015) ("Defendants' repeated public discussion of [the company operations at issue] is relevant to their state of mind."); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (specificity of defendants' statements regarding division of Lockheed was "strong circumstantial evidence" that defendants received specific information about that division, supporting an inference of scienter).

additional inference of scienter. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 211 (1st Cir. 2005) (scienter adequately pled where the "financial strength of the Company was undoubtedly a matter of principal concern to its Chief Executive Officer and Chief Financial Officer"); *Aldridge*, 284 F.3d at 84 (scienter adequately pled where "the CrossPad product line was very important to" the defendant and "the primary driver of [division] growth"). Even assuming, *arguendo*, that Defendants were unaware of the alleged problems, it was the height of recklessness to offer repeated, specific statements on the affected matters without being informed about them. *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (If a defendant speaks but does not have actual knowledge about the subject, "it would be at least actionably reckless to reassure the public about these matters at all.").

Scienter is further bolstered by Defendants' repeated admissions that they were actively monitoring specific data relating to Wayfair's advertising leverage and profitability. During the Class Period, for example, Fleisher stated that the Company was expecting positive advertising leverage during the current quarter (3Q18), which was well underway at the time, "given the ongoing strength we're seeing in our customer KPIs [key performance indicators]," while Shah stated that "our cost for repeat orders continues to get lower and lower" and "no matter which way you cut, you can see systematically that actually as customers increasingly repeat, the effective ad cost to get them come back goes down and those models are kind of self-learning. . . . [W]e're highly confident that we understand what each tranche costs us. And you pretty much clearly see it coming down." ¶¶49, 61, 65, 67, 95.[10]

---

[10]   *See also, e.g.*, ¶¶47, 95 (Fleisher: "[w]e take a highly analytic approach to how we invest ad dollars measuring ROI [return on investment] on the spend"; Fleisher: "[w]e've been, I think, very thoughtful about protecting and being very maniacally focused on our unit economics"; Shah: "we are very, very quantitative" and "very focused on protecting the unit economics"; Conine: we take a "data-driven approach . . . across our business . . . constantly using data to drive our business forward," have a "culture that has always placed a high degree of importance on data," and "collect rich customer and product data . . . that is

Shortly thereafter, Defendants admitted on November 1, 2018 that the metrics they were monitoring were materially worse than they had communicated to the market during the Class Period, revealing that the Company was actually experiencing negative advertising leverage and greater losses than the market expected. ¶¶72-75, 77, 96. The close proximity of those contrasting admissions (on November 1, 2018) to Defendants' prior misstatements just a few weeks earlier (on August 2, August 8, and September 5-6, 2018) further supports scienter.[11]

Buttressing these allegations, the Complaint alleges that *every* Individual Defendant sold shares of his personal Wayfair stock at times designed to take advantage of Wayfair's artificially inflated stock price during the Class Period, reaping massive combined proceeds of $69 million in a single quarter. ¶¶98-103. These trades were suspicious in both timing and amount, supporting an inference of Defendants' scienter.[12] Several significant sales occurred within a few trading days after the alleged misstatements, which sent the stock price soaring to an inflated Class Period high, and within a few days before the truth began to come out. ¶¶99, 101-103.

---

rare within the home category due to the scale of our customer base and product offering and longevity of our business online"; Fleisher: "in the direct online [advertising] . . . we know exactly what the yield is that . . . we're getting").

[11]   *See Boston Sci.*, 523 F.3d at 91 ("the very short amount of time" between alleged misstatements and a disclosure of truth "is strong evidence [of scienter]"); *Reese v. Malone*, 747 F.3d 557, 574 (9th. Cir. 2014) ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter."); *see also Levy v. Gutierrez*, No. 14-cv-443-JL, 2017 WL 2191592, at *13 (D.N.H. May 4, 2017) (scienter established "where the complaint contains clear allegations of admissions . . . suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so").

[12]   *See Aldridge*, 284 F.3d at 82 (An inference of scienter may be supported by alleging that, as part of the "mix of facts," the defendants "had the motive (concrete benefits that could be realized by . . . the false statements and wrongful disclosures) and opportunity (the means and likely prospect of achieving concrete benefits by the means alleged) to commit the fraud."); *Brumbaugh*, 416 F. Supp. 2d at 253-54 (allegations of insider sales can be used to "buttress" allegations of motive and opportunity in support of an "argument for scienter").

- 18 -

### 2.    Defendants Fail to Negate the Strong Inference of Scienter Arising from Plaintiff's Allegations

Defendants make a host of arguments in an effort to defeat the strong inference of scienter here.  Many are premature at the pleading stage, and none are availing.  Defendants contend that the Complaint lacks "direct evidence" of scienter, and that it lacks certain types of *indicia* such as employee testimony or documentary evidence.  Mot. at 11-13.  But the scienter standard does not require direct evidence or any particular type of *indicia*.  *See Tellabs*, 551 U.S. at 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre[.]").  Rather, a plaintiff need only show that his "characterization of the events and circumstances as showing scienter is highly likely."  *Aldridge*, 284 F.3d at 82.  This analysis focuses on collectively assessing ***the holistic allegations of the pleading at hand***, not the lack of certain *indicia* that may be found other pleadings.  Each case is different, and the First Circuit "has rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case."  *Cabletron*, 311 F.3d at 38.[13]

Defendants' efforts to downplay and discredit their own statements also fail.  Mot. at 14-15.  It defies common sense that Defendants would know nothing about matters on which they repeatedly and confidently spoke throughout the Class Period, particularly where, by their own admission, they were closing monitoring specific data regarding those matters.  ¶¶47-49, 57-69,

---

[13]    *See also Dahhan*, 321 F. Supp. 3d at 256 ("no particular types of indicia of scienter are required" and therefore a pleading need not include statements from confidential witnesses to allege a strong inference of scienter); *In re ModusLink Global Sols., Inc. Sec. Litig.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (Casper, J.) (rejecting defendants' attempt to "divide and conquer . . . by picking apart each allegation [of scienter] one-by-one. . . . Individually, the facts pled may not be sufficient to defeat a motion to dismiss, but collectively they are."); *Avaya*, 564 F.3d at 272 ("Given [*Tellabs*'] instruction, we are hesitant to formulate categorical rules about the sufficiency of different types of allegations in the abstract. . . . [I]t is the composite picture, ***not the isolated components***, that judges must evaluate in the last instance."); *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("[T]he ***only*** appropriate approach following *Tellabs's* mandate [is] to review scienter pleadings based on the collective view of the facts, not the facts individually.").

95. Defendants' demand for more detail, essentially asking for "smoking gun" evidence at the pleading stage, is contrary to *Tellabs*. *See Dahhan*, 321 F. Supp. 3d at 255-56 (rejecting similar argument). And Defendants do not challenge that the statements involved matters critical to the Company's financial condition, which further supports scienter.[14]

Defendants raise a number of other arguments seeking to discredit their massive stock sales during the Class Period, totaling $69 million in a single quarter. Mot. at 15-17. They argue that the sales were not suspiciously timed because they "spread them across a Class Period while the Company's stock price is increasing." Mot. at 16. The fact that each Individual Defendant cashed in several times over the Class Period was entirely consistent with and supportive of the fraud. ¶¶98-110. It makes perfect sense that they would capitalize on the increasing stock price during that time (*i.e.*, artificial inflation caused by their misstatements and omissions), which was the very purpose of the fraud. This wave of selling included suspiciously timed sales within a few days after each misstatement, near the inflated Class Period high, and within a few days before the revelations of truth began to come out. *Id.*

Defendants' remaining arguments are based on extrinsic documents (Forms 4) attached to their Motion. *See* Mot. Exs. M-O. As an initial matter, these extrinsic documents, and the factual assertions and inferences drawn from them, are improper at the pleading stage.[15] Relying on these

---

[14]  *See Aldridge*, 284 F.3d at 84; *Avaya*, 564 F.3d at 271 ("The financial strength of the Company was undoubtedly a matter of principal concern to [its highest level officers].") (citing *Stone*, 414 F.3d at 211); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (Young, J.) ("[f]acts critical to [defendant's] core operations" support an inference of scienter); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) ("surely an inference of knowledge may be appropriate, even if not determinative, where it would be absurd to suggest that management was without knowledge of the matter"); *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 389 (S.D.N.Y. 2011) ("While officers cannot be imputed with knowledge about all transactions which occur at a corporation, they do have a duty to familiarize themselves with the core operations of the Company.") (collecting cases), *aff'd*, 776 F.3d 94 (2d Cir. 2015).

[15]  "On a motion to dismiss, a court ordinarily may only consider facts alleged in the complaint and exhibits attached thereto . . . or else convert the motion into one for summary judgement." *Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013). While there are narrow exceptions to this rule, they do not

documents, Defendants assert that their stock sales fail to support scienter because Defendants "retained nearly all or increased their Wayfair stock holdings during the Class Period." Mot. at 16-17. But there is no requirement that the stock sales exceed a certain percentage of Defendants' total holdings to support scienter. *See ModusLink*, 9 F. Supp. 3d at 74-75 (rejecting argument that retaining stock, or even purchasing additional stock during the class period, undercut scienter). Nor is there a requirement that sales during the Class Period exceed sales from other periods. Mot. at 15; *see Brumbaugh*, 416 F. Supp. 2d at 254 (rejecting argument that sales must be inconsistent with past trading practices). Defendants "could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell [a larger percentage of their stock holdings], such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability." *Crowell*, 343 F. Supp. 2d at 15. Regardless, the timing and amount of Defendants' sales were highly suspicious for the reasons stated above, thus supporting a strong inference of scienter.

Defendants also use the Forms 4 to raise arguments that their stock sales were "non-discretionary," in that such sales either were made pursuant to 10b5-1 trading plans or made to cover tax withholding obligations. Mot. at 16-17. The first argument is an affirmative defense under Section 10b5-1 of the Exchange Act, which Defendants have not met their burden of

---

apply here because the documents are not referenced in or central to the Complaint, and contain unverified content prepared by the very Defendants accused of fraud. *See Boston Sci.* 523 F.3d at 86; *Freeman*, 714 F.3d at 36. Moreover, the documents are being introduced for improper purposes: to dispute the Complaint's factual allegations, present a counterfactual narrative, and advance an affirmative defense. A court "cannot take judicial notice of disputed facts" and cannot assume the truth of extrinsic documents "if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1003 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2615 (2019). "[T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery. . . . Such undermining of the usual pleading burdens is not the purpose of judicial notice or the incorporation-by-reference doctrine." *Id.* at 998-99.

proving, or even attempted to prove.[16]  In *Boston Scientific*, the First Circuit rejected a similar argument, finding that trading plans failed to negate scienter because, at the pleading stage, "there is no evidence of when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans."  523 F.3d at 92.  Indeed, 10b5-1 trading plans can be manipulated to enable an insider to profit from material non-public information.  *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) ("[A] clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan.").  Defendants' second argument regarding tax withholding obligations also requires a factual analysis inappropriate for resolution at the pleading stage.  *See Rubinstein v. Collins*, 20 F.3d 160, 169 n.38 (5th Cir. 1994) (rejecting similar argument because "at this stage of the litigation . . . it is impossible for us to consider this 'evidence'").  This argument is unavailing, at any rate, because the sales benefited Defendants regardless of whether the proceeds were used to cover tax withholding obligations.[17]

Finally, Defendants' "non-fraudulent inferences" (Mot. at 17-18) are improper and certainly no stronger than the Complaint's inference of scienter.  While *Tellabs* allows defendants to offer a competing inference based on the alleged facts, it does not allow defendants to plead, as fact, their own contradictory version of events.  Even when assessing scienter, "courts must, as

---

[16]   *See* 17 C.F.R. §240.10b5-1(c)(1)(i)(B)(1)-(3), (ii); Selective Disclosure and Insider Trading, SEC Release No. 34-43154, 73 SEC Docket 3 (Aug. 15, 2000) (setting forth specific requirements to prove an affirmative defense based on a 10b5-1 trading plan).

[17]   Even if the Court were to accept these arguments, and disregard Defendants' stock sales entirely, the Supreme Court has made clear that "[t]he absence of a motive allegation" such as stock sales "is not fatal. . . . allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."  *Tellabs*, 551 U.S. at 325; *see also Crowell*, 343 F. Supp. 2d at 15 (The absence of stock sales "does not establish that [defendants] lacked any motive to mislead the investing public" and "a recklessness argument by definition would not require a motive in any event.").

- 22 -

with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." 551 U.S. at 322. The Court then asks, "How likely is it that one conclusion [regarding intent], as compared to others, follows from the ***underlying facts***?" *Id.* at 323. While conducting its "comparative assessment of plausible inferences," the Court must "constantly assum[e] the plaintiff's allegations to be true[.]" *Id.* at 326-27. Here, Defendants violate these principles by attempting to draw inferences from the alternate factual narrative set forth in their Motion. Essentially, they claim that Plaintiff alleges "fraud-by-hindsight" based on nothing more than a narrow guidance miss. Mot. at 17-18. This is contradicted by the Complaint, which alleges material undisclosed problems related to the Company's advertising leverage and profitability (not simply a narrow guidance miss) that were known to, or recklessly disregarded by, Defendants ***at the same time*** they were making positive statements about the same matters during the Class Period (not discovered in hindsight). *See Aldridge*, 284 F.3d at 81-82 (allegations "that the company failed to disclose certain known material information" were not fraud-by-hindsight); *Boston Sci.*, 523 F.3d at 90 (recognizing the "limits" of a fraud-by-hindsight argument, which cuts "off the case as a matter of law, without further factual development"). Defendants' efforts to rehash and draw inferences from their assorted falsity arguments fare no better. Mot. at 17-18. These arguments fail for the reasons discussed above, and hardly undercut an inference of scienter based on the well-pled facts set forth in the Complaint.[18]

---

[18] Defendants' attempts to cobble together and, through sheer force of volume, align this case with other cases dismissed on scienter grounds are unavailing. Mot. at 9 n.6, 11-17. The scienter inquiry requires a "fact-specific approach that proceeds case by case." *Cabletron*, 311 F.3d at 38. The particular facts here, which must be assessed collectively and holistically, support a strong inference of scienter for the various reasons discussed above. Further, the cases cited by Defendants are factually distinguishable in key respects. *See, e.g.*, *Metzler Asset Mgmt. GMBH v. Kingsley*, 928 F.3d 151, 159-62, 165-66 (1st Cir. 2019) (no stock sales alleged, and scienter undercut by timely drug safety and usage updates, problems with witness statements, and flawed allegations as to the extent of medical research presented to the defendants);

### C.      The Complaint Sufficiently Alleges Loss Causation

Defendants contend that the Complaint fails to sufficiently plead loss causation because the alleged corrective disclosures do not "***connect*** the current, present, negative information to the earlier false or misleading statement." Mot. at 24-25.  This argument misstates and misapprehends proper pleading of loss causation.  To satisfy *Dura's* "simple [loss causation] test," Plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *see also In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 45-46 (D. Mass. 2006) (Gertner, J.) ("[*Dura*] reaffirmed the notion that the loss causation pleading requirements should be interpreted so as not to impose a significant burden on plaintiffs.").  Accordingly, Plaintiff is not required to plead "complete corrective disclosures" or a "direct admission that a previous statement is untrue."  *CVS*, 716 F.3d at 240.  Rather, Plaintiff must "plausibly" allege that the loss-causing disclosures "***relate to the same subject matter as the alleged misrepresentation***."  *Id.*  Further, as *Dura* recognized, the truth may "leak[] out" over time, and therefore "loss causation may be pleaded on the theory

---

*Brennan v. Zafgen, Inc.*, 853 F.3d 606, 613-16 (1st Cir. 2017) (scienter allegations flawed for fact-specific reasons not at issue here, including stock sales that were not suspiciously timed); *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 42-44 (1st Cir. 2017) (a "significant timing problem" and other issues with witness statements; no alleged stock sales by defendants); *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 38-42 (1st Cir. 2017) (fact-specific deficiencies not at issue here including the lack of any valid motive allegations and a flawed timeline related to an FDA approval process); *Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*, 838 F.3d 76, 81-86 (1st Cir. 2016) (allegations flawed due to fact-specific issues with drug study results including a pulmonologist's "erroneous interpretation" of study results regarding one of the company's drugs that "would not have been obvious to the executives to whom the pulmonologist reported the results"); *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 243-46 (1st Cir. 2015) (the "marginal materiality" of the allegations, defendants' cooperation with an FDA investigation at issue, and the lack of any suspicious stock sales weighed against scienter); *Coyne*, 943 F. Supp. 2d at 272-73 (the plaintiff alleged no stock sales and "only that the Defendants were high-ranking executives and attended unspecified meetings where they discussed unspecified topics"); *In re Boston Sci. Corp. Sec. Litig.*, No. 10-10593-DPW, 2011 WL 4381889, at *15 (D. Mass. Sept. 19, 2011) (Woodlock, J.) (holding that "[i]mportantly, no allegation of insider trading on the part of any of the individual defendants has been made in the complaint" and that defendants' competing inferences were stronger based on factors not at issue here, such as defendants' conduct in pursuing an internal audit), *aff'd*, 686 F.3d 21 (1st Cir. 2012).

that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) (citing *Dura*, 544 U.S. at 342).

Here, Plaintiff sufficiently alleges the requisite causal connection.  On November 1, 2018, Defendants surprised the market by revealing negative advertising leverage, the highest per-customer acquisition cost in history, and worse-than-expected losses (including a loss in the critical U.S. business), contrary to their Class Period statements.  ¶¶72-82, 105.  These revelations caused the Company's stock price to plummet 12.8% in a single day, and 15.7% over two days as the market digested the new, highly material news.  ¶¶54, 78, 105.  On May 2, 2019, Defendants made additional comments regarding the nature and severity of the same problems, causing an additional 7.1% drop in the Company's stock price.  ¶¶85-90, 106.  These disclosures "as a whole, plausibly revealed to the market that [Wayfair] had problems[,]" undermining Defendants' misstatements and omissions during the Class Period concerning advertising leverage and profitability.  *CVS*, 716 F.3d at 240.  That is enough to plead loss causation.  *See id.* at 243 (In assessing loss causation, "it is appropriate to look for indications of the market's contemporaneous response to [defendant's] statements" revealing the truth, including a stock price decline and analysts' reactions.).

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.[19]

---

[19]    With respect to Plaintiff's Section 20(a) claims, Defendants do not dispute that they are "control persons," but argue that Plaintiff has not alleged a predicate Section 10(b) primary violation.  Mot. at 25. This argument fails for the reasons discussed above.  Therefore, Plaintiff's Section 20(a) claims should be sustained.

DATED:  October 11, 2019

HUTCHINGS BARSAMIAN
   MANDELCORN, LLP


*s/Theodore M. Hess-Mahan*

THEODORE M. HESS-MAHAN, BBO #557109

110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

*Local Counsel for Plaintiff*

ROBBINS GELLER RUDMAN
   & DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ROBERT J. ROBBINS
ANDREW T. REES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
rrobbins@rgrdlaw.com
arees@rgrdlaw.com

*Lead Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 11th day of October 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, and a copy of the foregoing pleading has been electronically mailed to all attorneys of record.

*s/Theodore M. Hess-Mahan*

THEODORE M. HESS-MAHAN, BBO #557109
