UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re WAYFAIR, INC. Securities Litigation | ) ) ) ) ) ) ) ) | Civil Action No. 19-10062-DPW |
| This Document Relates To: ALL ACTIONS | | |

MEMORANDUM AND ORDER
July 8, 2020

After Wayfair, Inc., an online home goods retailer, missed its quarterly financial projection by .002% one quarter, several individuals who say they consequently lost money in the stock market initiated the two lawsuits I have consolidated before me. This putative class action litigation is brought against Wayfair and its three most senior officers, all of whom also serve as directors, to recover those losses. Because I find Plaintiffs have not adequately alleged material misstatements of fact, demonstrated actionable scienter, or shown loss causation, I will grant Defendants' motion to dismiss.

**I**
**BACKGROUND[1]**

Wayfair is a huge online home goods store.  As online

---

[1] This background is drawn from the materials available in the motion to dismiss record for review—principally the operative Amended Complaint.  It is presented in the light most favorable to the plaintiffs as non-moving parties.  *Silverstrand Investments* v. *AMAG Pharm., Inc.*, 707 F.3d 95, 101 (1st Cir. 2013).

retail has grown and Wayfair has faced increasing competition,
Wayfair has spent more and more money on advertising — $191
million in 2014, $278 million in 2015, $409 million in 2016,
$550 million in 2017, and $774 million in 2018 — to leverage
revenue.  Revenue correspondingly increased: Wayfair's annual
revenue was $1.32 billion in 2014, $2.25 billion in 2015, $3.38
billion in 2016, $4.72 billion in 2017, and $6.78 billion in
2018.

During the alleged class period (August 2, 2018-October 31,
2018), Wayfair's advertising-revenue leverage was worse
(deleveraged) than in previous years.  Plaintiffs assert that
Defendants knew of this problem but concealed it from investors.
The defendants, Plaintiffs contend, in fact made false
statements to the public about Wayfair's financial position and,
in particular, that defendant Niraj Shah, Wayfair CEO and
President and Co-Chairman of the Board of Directors, made these
false and misleading statements during this time period:

- So ad spend, if you look at it sequentially over the
  last few years, it continues to drift down . . . .
  the costs get less and less on the advertising.

- And what you see, no matter which way you cut, you
  can see systematically that actually as customers
  increasingly repeat, the effective ad cost to get
  them [to] come back goes down and those models are
  kind of self-learning . . . . [W]e're highly
  confident that we understand what each tranche costs
  us. And you pretty much clearly see it coming down.

- And we talked about advertising. We talked about the payback cycle and keeping that very tight . . . . But when you take the profit margin we talk about, and you multiply it by a very large top line, you start talking about a very significantly profitable company.

- The U.S. has now been EBITDA[2] profitable, 6 of the last 7 quarters . . . . you can actually see how growing very quickly actually evolves you into the profitable model.

Wayfair's stock price during the class period reached $151.20 per share on September 14, 2018.  During that same time period, the individual defendants, Shah, Steven K. Conine, Co-Chair of the Board of Directors, and Michael D. Fleisher, Chief Financial Officer, collectively sold $69 million of their personally held Wayfair shares in dozens of transactions.  The record before me does not clearly indicate whether this was unusual transactional activity for those individuals.

Before the stock market opened on November 1, 2018, the day Wayfair would be filing its 3Q 2018 SEC Form 10-Q, Defendants disclosed in a press release and a conference call that their 3Q results were worse than anticipated.  In the conference call,

---

[2] The standard definition of EBITDA is "[a] company's income without deductions for interest expenses, taxes, depreciation expenses, or amortization expenses, used as an indicator of a company's profitability and ability to service its debt." *Earnings before interest, taxes, and depreciation*, BLACK'S LAW DICTIONARY (10th ed. 2014).  The parties do not appear to dispute the common definition of this acronym for an earnings and profitability metric.

Defendant Fleisher said that Wayfair's advertising had deleveraged in a year to year comparison between 3Q 2017 and 3Q 2018, from 11.8% in 3Q 2017 to 11.9% in 3Q 2018.[3]  According to the amended complaint, however, Defendants had "misleadingly signaled during the Class Period" that they were experiencing positive leverage.  Defendant Fleisher explained during the call that the two factors driving the incremental expense which resulted in a loss were advertising spending, which was higher than usual because of paybacks ("we continued to see great opportunities within our paybacks") and headcount hiring.

On November 1, 2018, following that conference call, Wayfair stock suffered a 12.8% loss, closing at $96.16 a share. Wayfair had an EBITDA loss of $76.4 million, a net loss of $151.7 million ($1.69/share), and negative free cash flow of $58.8 million.  Plaintiffs characterize these losses as "much worse than Defendants had signaled during the Class Period [August 2, 2018 – October 31, 2018]."  On November 2, 2018, the stock price fell an additional 3.3%.

---

[3] When Wayfair released its second quarter earnings by filing its 10-Q on August 2, 2018, it had forecasted advertising spending as a percentage of net revenue for the third quarter to be above the 10.7% experienced in its second quarter 2018 but below the 11.8% experienced in the third quarter 2017.  Instead, Wayfair's advertising expense as a percentage of net revenue for third quarter 2018 was 11.9%, which Wayfair treats in its briefing, apparently through a rounding convention, to be .002% above the high end of its August 2, 2018 forecast.

## II
## MOTION TO DISMISS STANDARD

As a general proposition, a complaint must assert factual
allegations that are more than merely speculative in order to
survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).
*Isham* v. *Perini Corp.*, 665 F. Supp. 2d 28, 33 (D. Mass. 2009).
In evaluating the plaintiffs' allegations in the complaint, I
may look only to the "facts alleged in the pleadings, documents
attached as exhibits or incorporated by reference in the
complaint and matters of which judicial notice can be taken."
*Id.* at 33 (citing *Nollet* v. *Justices of the Trial Court of
Mass.,* 83 F.Supp.2d 204, 208 (D. Mass. 2000) *aff'd,* 248 F.3d
1127 (1st Cir.2000)).  In evaluating the complaint, I must
accept all factual allegations as true and draw all reasonable
inferences in the light most favorable to the plaintiffs.
*Isham*, 665 F.Supp.2d at 33 (citing *Langadinos* v. *Am. Airlines,
Inc.,* 199 F.3d 68, 69 (1st Cir.2000)).

More specific requirements are in play for securities
litigation.  The First Circuit has directed that "[t]o state a
claim under Section 10(b) of the Securities Exchange Act,
plaintiffs must adequately plead '(1) a material
misrepresentation or omission; (2) scienter; (3) a connection
with the purchase or sale of a security; (4) reliance; (5)
economic loss; and (6) loss causation.'"  *Metzler Asset*

*Management* v. *Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019) (quoting *In re Biogen Inc. Securities Lit.*, 857 F.3d 34, 41 (1st Cir. 2017)).  In addition, "[a] complaint alleging a violation of 10(b) must also meet the heightened pleading standards of the PSLRA [Private Securities Litigation Reform Act], which requires that the complaint 'specify each statement alleged to have been misleading' as well as 'the reason or reasons why the statement is misleading.'"  *In re Biogen*, 857 F.3d at 41 (quoting 15 U.S.C. § 78u-4(b)(1)).

### III
### CLASS CERTIFICATION

Federal Rule of Civil Procedure 23(c)(1)(a) directs a court to act on a motion for class certification "[a]t an early practicable time."  In light of the rigorous analysis I would be required to undertake in order to determine whether class certification is appropriate in this Private Securities Litigation Reform Act litigation, I am of the view that addressing the case at the threshold through a motion to dismiss is the best course.  *See generally* 3 Newberg on Class Actions § 7:9 (5th ed.)("Given the early nature of most motions to dismiss, courts will often handle them prior to deciding a motion for class certification."); *cf. In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 26-27 (1st Cir. 2008)("[I]t is not uncommon to defer final decision on certifications pending completion of relevant discovery.").

Accordingly, I follow the direction chosen by the defendants in first filing a motion to dismiss and consider the dispositive question whether the case, irrespective of class treatment, presents claims upon which relief may be granted.

**IV**
**SECTION 10(b) ALLEGATIONS**

Plaintiffs allege securities fraud under § 10(b) of the Securities and Exchange Act.  That section provides:

> It shall be unlawful for any person, directly or
> indirectly . . .**(b)** To use or employ, in connection
> with the purchase or sale of any security registered
> on a national securities exchange or any security not
> so registered, or any securities-based swap agreement
> any manipulative or deceptive device or contrivance in
> contravention of such rules and regulations as the
> Commission may prescribe as necessary or appropriate
> in the public interest or for the protection of
> investors.

15 U.S.C.A. § 78j.

**A.    *Whether Plaintiffs Have Pled Any Actionable Misstatements
or Omissions***

To state a claim for securities fraud, Plaintiffs must allege a material misrepresentation or omission. *Metzler*, 928 F.3d at 158.  Under the Private Securities Litigation Reform Act, at the pleading stage a complaint "alleging securities fraud [must] 'specify each statement alleged to have been misleading' and 'the reason or reasons why the statement is misleading.'" *Mehta* v. *Ocular Therapeutix, Inc.*, 955 F.3d 194, 206 (1st Cir. 2020)(quoting 15 U.S.C. § 78u-4(b)(1)).

Plaintiffs allege four material omissions and approximately twelve actionable misstatements.

I examine each of the statements as part of a group of similar statements.

### 1.   Statements Showing Defendants' Confidence in Wayfair's Performance

Several of the defendants' alleged statements are merely generalized expressions of confidence in Wayfair's performance. Those statements are:

- **August 2, 2018 press release, Defendant Shah**:

  - "We are delighted with the progress that we are making and the way in which we are positioned to keep taking market share as dollars shift online."

- **August 2, 2018 conference call, Defendant Fleisher**:

  - "We remain incredibly bullish about our business, both in the near term and long term. The investments we have been making to bring our customers the best possible offering are clearly working with strength across our customer KPIs [key performance indicators] and our market share growing, as a result."

Those statements are not actionable.

[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 41 (D. Mass.
2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017)(quoting *Shaw v.
Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)).

Such "[c]laims of puffery now require a court to consider
(1) 'whether the statement is so vague, so general, or so
loosely optimistic that a reasonable investor would find it
unimportant to the total mix of information' and (2) 'whether
the statement was also considered unimportant to the total mix
of information by the market as a whole.'" *In re Biogen Inc.
Sec. Litig.*, 193 F. Supp. 3d at 41 (quoting *Brumbaugh* v. *Wave
Sys. Corp.*, 416 F.Supp.2d 239, 250 (D. Mass. 2006)). Here, the
defendants' claims that they were "delighted" with the progress
Wayfair was making, that they were "bullish" about their
business, and that market share would grow are examples of
expressions of loose optimism and here immaterial. *See LSI
Design & Integration Corp.* v. *Tesaro, Inc.*, No. 18-CV-12352-LTS,
2019 WL 5967994, at *5 (D. Mass. Nov. 13, 2019)(finding
defendant's "statement that Tesaro was 'well positioned to take
this forward' is precisely the type of statement of corporate
optimism that courts routinely deem immaterial as a matter of
law").

2.  Forward-Looking Statements

Another set of Defendants' alleged statements are forward-
looking projections and forecasts about what the defendants

expected to see in Wayfair's future.

- **August 2, 2018 conference call, Defendant Fleisher:**

  - "For consolidated adjusted EBITDA, **we forecast** margins of negative 3.7% to negative 4% for Q3 2018. **We expect** international adjusted EBITDA to be negative $45 million to negative $50 million in Q3 as we continue to add resources and ad spend in Canada, the U.K. and Germany. In the U.S. business, we expect to deliver adjusted EBITDA margin of approximately negative 1% as we invest primarily in headcount to build continued scale in our primary market."

  - "Q2 advertising spend of $178 million or 10.7% of net revenue represents year-over-year leverage of over 30 basis points, as we invest in engaging both new and repeat customers and benefit from a growing base of repeat customers who require a lower level of ad spend per dollar of revenue. . . . Looking out to Q3, we're comfortable leaning in on ad spend, while maintaining our overall 1-year contribution margin payback target, given the ongoing strength we're seeing in customer KPIs [key performance indicators]. **We, therefore, expect** overall ad spend as a percentage of net revenue to increase sequentially in Q3 versus Q2, as it did last year, while still showing a modest amount of year-over-year leverage compared to the 11.8% level of Q3 last year."

- **August 2, 2018, Form 10-Q for 2Q18, Defendants Shah and Fleisher:**

  - "Advertising consists of direct response performance marketing costs, such as display advertising, paid search advertising, social media advertising, search engine optimization, comparison shopping engine advertising, television advertising, direct mail, catalog and print advertising. **We expect** advertising expense to continue to increase but decrease as a percentage of net revenue over time due to our increasing base of repeat customers."

These forward-looking statements, in which the terms of
expectation have been set in bold for emphasis in this
Memorandum, are covered by the safe-harbor provision of the
Private Securities Litigation Reform Act.  "Congress, in
providing the limited safe harbor protection, sought to
encourage market efficiency by encouraging companies to disclose
future projections without fear that those projections, if they
did not materialize, would result in an action for fraud."  *In
re Biogen*, 193 F.Supp.3d at 39-40 (quoting *In re Biogen IDEC,
Inc. Sec. Litig.*, 05-cv-10400-WGY, 2007 WL 9602250, at *10 (D.
Mass. Oct. 25, 2007)).  Accordingly,

> issuers and underwriters of securities shall not be
> liable in any private action based on an untrue or
> misleading statement of a material fact "with respect
> to any forward-looking statement" if the forward-
> looking statement is "identified as a forward-looking
> statement, and is accompanied by meaningful cautionary
> statements identifying important factors that could
> cause actual results to differ materially from those
> in the forward-looking statement, . . . or . . . the
> plaintiff fails to prove that the forward-looking
> statement . . . [if made on behalf of a business
> entity by or with the approval of an executive
> officer] was made . . . with actual knowledge by that
> officer that the statement was false or misleading."

*In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211-12
(1st Cir. 2005)(quoting 15 U.S.C. § 78u-5(c)(1)).

The Private Securities Litigation Reform Act defines
"forward-looking statement" as:

> (A) a statement containing a projection of revenues,
> income (including income loss), earnings (including
> earnings loss) per share, capital expenditures,

> dividends, capital structure, or other financial
> items; (B) a statement of the plans and objectives of
> management for future operations . . .; (C) a
> statement of future economic performance, including
> any such statement contained in a discussion and
> analysis of financial condition by the management . .
> . .

15 U.S.C. § 78u-5(i)(1).

In other words, a statement is not actionable under the statute if it is identified as forward-looking and is cabined by cautionary language, or if the plaintiff does not show that the officer making the statement knew it was false or misleading. Statements projecting likely growth in the future are examples of such forward-looking statements. *In re Biogen*, 193 F.Supp.3d at 40.

Here, Wayfair's forward-looking projections about how it expected to do in the coming quarters is the type of forward-looking projection that the Private Securities Litigation Reform Act covers. The language "we expect" and "we forecast" is clearly "forward-looking, predictive language." *Coyne* v. *Metabolix, Inc.*, 943 F. Supp. 2d 259, 266 (D. Mass. 2013). More specifically, Plaintiffs have not alleged with particularity that Defendants knew these statements were false at the time they were made; all that has been suggested is that it defies common sense that Defendants did not know.

I find Plaintiffs have not demonstrated that these statements were anything other than forward-looking expressions

of opinion and subject to the safe-harbor provision of the

Private Securities Litigation Reform Act.

### 3.   Other Non-Fraudulent Statements

A third category of Defendants' statements are not forward-

looking or puffery, but are, instead, statements about Wayfair's

strategies, including its advertising strategies, that

Plaintiffs simply have not adequately alleged were fraudulent

when made. These statements are:

- **August 2, 2018 conference call, Defendant Shah:**

    - "I think the key thing to keep in mind on what we do
      on our paid advertising, and this is a very unique
      thing for us when you compare us to other folks, is
      we built all our advertising technology in-house. .
      . . So there's a lot of new customers to get. And
      then, obviously, the share of wallet is a huge
      opportunity. So to your point, repeat is, obviously,
      a big opportunity too. So I think building our own
      ad tech has been a huge advantage, but there's also
      a lot more customers to get, so that's why we keep
      adding them."

- **August 8, 2018, Canaccord Genuity Growth Conference,
  Defendant Shah:**

    - "Actually, so our cost for repeat orders continues
      to get lower and lower, because customers--
      basically we invest a lot to make the experience
      great, okay. And that's useful, if someone
      experiences it, but they have customers who have and
      customers who haven't, so. Then customer
      acquisition, we're very quantitative about that.
      We'll spend an amount of money such that we get paid
      back within a year. So the number of customers we
      get is the outcome of basically how many customers
      we can acquire with that payback methodology. The
      reason we grow so quickly is that every quarter
      since we went public, you can look at our growth
      based on repeat orders and our growth based on new
      orders, so new customers basically, and you look at

our overall growth rate, and our repeat growth has
outpaced our total growth every quarter."

- "[T]he revenue growth, in fact, has accelerated, and
  it's gotten—the revenue growth in dollars got
  increasingly, increasingly high, and the ad cost as
  a percentage keeps coming down. So I think the
  understanding that the repeat base drives leverage
  is reasonable well understood now."

- "So ad spend, if you look at it sequentially over
  the last few years, it continues to drift down, and
  that's despite the fact that international
  deleveraged it, because international ad costs,
  because we don't have a repeat base there, is ad
  cost is much, much higher as a percentage of net
  revenues. So the fact that's coming down, the U.S.
  is even lower than that line, right, delevered then
  by the international, which pulls it back up to
  where you see it. . . . The reason the profitability
  of the business has kept getting better is not
  actually that we've ever pulled back on investing.
  It's just that we're simply not spending all of the
  incremental contribution margin dollars."

- **September 5, 2018, Goldman Sachs Global Retailing
  Conference, Defendant Shah:**

  - "In terms of how we know what it cost us, what we do
    is, basically, every bit of our spend is--we have
    fairly complex attribution. So we don't just do last
    click or multi-click. But we have multiple different
    attribution models that we overlay on top of each
    other to basically make sure we triangulate in on
    what we think actual--every action had cost us in
    spend. And then we also add up spend against the
    cohorts of the different customers. And so we're
    able to know is, well, what's it cost us to get a
    new customer from a certain channel or a campaign.
    But we actually also can know what's it cost us when
    we move customers from one order to 2 orders, or 2
    orders to 3 orders, or 3 orders to 4 orders. And
    what's it cost us for customers of different ages.

    So you can kind of cut it many different ways when
    you do this type of attribution. And what you see,
    no matter which way you cut, you can see
    systematically that actually as customers

increasingly repeat, the effective ad cost to get
them come back goes down and those models are kind
of self-learning. . . .

So that is a long-winded way of saying, we're highly
confident that we understand what each tranche costs
us. And you pretty much clearly see it coming down.
I would agree with you if we only sold a very narrow
set of very high-cost low-frequency goods - if we
were selling cars or something like that.  Then
you're right.  You would have to effectively
reacquire them very - each time unless they had like
particular brand loyalty.  But basically, the mix of
goods we have does lend itself to being able to
build a relationship."

- "And we talked about advertising.  We talked about
  the payback cycle and keeping that very tight. . . .
  [W]hen you take the profit margin we talk about, and
  you multiply it by a very large top line, you start
  talking about a very significantly profitable
  company. . . .  The U.S. has now been EBITDA
  profitable, 6 of the last 7 quarters. . . .  [Y]ou
  can actually see how growing very quickly actually
  evolves you into the profitable model."

- **September 6, 2018, Citi Global Technology Conference:**

  - **Defendant Conine**: "[T]he investment we're making in
    TV, we'll continue to sort of grow at a reasonable
    rate. And we see that we get good leverage out of it
    today . . . ."

  - **Defendant Fleisher**: "[T]he bigger investment over
    the last few years [than television] has really been
    in the direct online [advertising] where we know
    exactly what the yield is that we're getting.  And I
    think that's TV— and the brand awareness creates a
    halo around all of that, that's really quite
    powerful."

Plaintiffs have not provided particularized reasons to find

these statements were false when they were made, or, if so, that

Defendants knew these statements were false when made.  What

these statements essentially say is that Wayfair's growth

15

strategy was to keep the customers it brought in, and that the defendants were optimistic that the strategy was working. Plaintiffs' conclusory allegation that these statements must have been false because Wayfair's advertising was deleveraged during the Class Period even though the statements make it seem as though Wayfair was retaining customers is simply not enough under the Private Securities Litigation Reform Act standard to make these statements actionable as fraudulent.

Accordingly, I find that Plaintiffs have not adequately alleged any fraudulent statements.

4.   Omissions

The plaintiffs argue that the defendants omitted information sufficient to inform the public that:

- in the face of intense competition, Wayfair significantly increased advertising spending to meet revenue growth expectations;

- the Company's high advertising expenses, together with high operating expenses such as headcount hiring, reduced the Company's margins to an extent much worse than the Company disclosed;

- the Company was unable to drive positive advertising leverage (*i.e.*, lower advertising spending as a percentage of net revenue); and

- the Company was becoming increasingly unprofitable due to the escalating expenses needed to maintain revenue growth.

I find this "omitted" information is not sufficiently particularized to be actionable under the Private Securities Litigation Reform Act.  That Wayfair had significantly increased

advertising spending was obvious from the statements it made and
by the fact that it increased advertising spending year to year
over the most recent several years, as Plaintiffs themselves
observe.  That Wayfair's advertising expenses reduced the
company's margins to an extent worse than disclosed is precisely
the matter at issue; Plaintiffs claim that Defendants kept this
information from investors, while Defendants claim they did not.
Merely stating that Defendants omitted this information is not
particularized pleading sufficient to meet Private Securities
Litigation Reform Act standards.

**B.   *Whether the Amended Complaint Alleges Facts Giving Rise to
       a Strong Inference of Scienter***

A fundamental aspect of actionable securities fraud is
scienter.  Scienter is "a mental state embracing intent to
deceive, manipulate, or defraud." *Mehta*, 955 F.3d at 206
(quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S.
308, 319 (2007)).  This requires "intentional or willful conduct
designed to deceive or defraud investors by controlling or
artificially affecting the price of securities," *City of Dearbon
Heights Act 345 Police & Fire Ret. Sys.* v. *Waters Corp.*, 632
F.3d 751, 757 (1st Cir. 2011)(quoting *Ernst & Ernst* v.
*Hochfelder*, 425 U.S. 185, 199 (1976)), or a "high degree of
recklessness." *Mehta*, 955 F.3d at 206 (quoting *Kader* v. *Sarepta
Therapeutics, Inc.*, 887 F.3d 48, 57 (1st Cir. 2018)).
Recklessness in this context is a very high bar; it must be "an

extreme departure from the standards of ordinary care [] which
presents a danger of misleading buyers and sellers that is
either known to the defendant or so obvious that the actor must
have been aware of it." *Mehta*, 955 F.3d at 206 (quoting *Brennan*
v. *Zafgen, Inc.*, 853 F.3d 606, 613 (1st Cir. 2017)).

   A strong inference of scienter "must be more than merely
plausible or reasonable—it must be cogent and at least as
compelling as any opposing inference of nonfraudulent intent,"
*Mehta*, 955 F.3d at 206 (quoting *Tellabs*, 551 U.S. at 314).
Consequently, the court must consider "competing inferences
rationally drawn from the facts alleged." *Mehta*, 955 F.3d at
207 (quoting *Tellabs*, 551 U.S. at 314).  This demanding standard
for scienter is met "where a complaint 'contains clear
allegations of admissions, internal records or witnessed
discussions suggesting that at the time they made the statements
claimed to be misleading, the defendant[s] were aware that they
were withholding vital information or at least were warned by
others that this was so.'"  *Mehta*, 955 F.3d 206-07 (quoting
*Brennan*, 853 F.3d at 614).  Facts and circumstances
demonstrating motive, opportunity, and fraudulent intent can be
evidence of scienter.  *Brennan*, 853 F.3d at 614.

   The Amended Complaint alleges that Defendants knowingly or
recklessly disseminated materially false information in issued
statements and also neglected to disclose material facts.  The

plaintiffs allege that the defendants did so through their public statements.  The plaintiffs further allege that Defendants had a motive to make these false statements.

### 1.   Did Defendants Knowingly or Recklessly Make False Public Statements?

One of Plaintiffs' primary arguments is that Defendants demonstrated scienter through making publicly false statements that they knew or must have known were false.  The Amended Complaint alleges that the defendants were deeply involved with Wayfair's finances and operations, were intimately aware of Wayfair's financial condition, and therefore knew that Wayfair's financial condition was worse than they disclosed to the market during the Class Period.  From the outset, it will be important to distinguish facts that I must accept as true for the purposes of a motion to dismiss from mere speculation, which I am not to accept as true.  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).

Here, that Defendants were quite familiar with Wayfair's financial condition is superficially reasonable, since the individual defendants were the CEO, Co-Chairman, and CFO of the company.  I accept that assumption as true for purposes of this motion.  However, to say that this means that the defendants failed to disclose material information to the public during the class period is speculative, and I will not adopt such speculation.

Plaintiffs provide nine statements that Defendants allegedly made showing that they knew the precise data regarding Wayfair's advertising expenses, leverage from those expenses, customer key performance indicators, and profitability.  For instance:

- **August 2, 2018 Conference Call, Defendant Fleisher:**

  - "Looking out to Q3, we're comfortable leaning in on ad spend, while maintaining our overall 1-year contribution margin payback target, given the ongoing strength we're seeing in our customer KPIs [key performance indicators]. **We, therefore, expect overall ad spend as a percentage of net revenue to increase sequentially in Q3 versus Q2, as it did last year, while still showing a modest amount of year-over-year leverage compared to the 11.8% level of Q3 last year.**"

- **September 5, 2018 Goldman Sachs Global Retailing Conference, Defendant Shah:**

  - "And what you see, no matter which way you cut, you can see systematically that actually as customers increasingly repeat, the effective ad cost to get them come back goes down and those models are kind of self-learning. . . . **[W]e're highly confident that we understand what each tranche costs us**. And you **pretty** much clearly see it coming down."

- **September 6, 2018 Citi Global Technology Conference, Defendant Fleisher:**

  - "But the bigger investment over the last few years has really **been in the direct online [advertising] where we know exactly what the yield is that what we're getting.**"

Plaintiffs' argument, essentially, is that because Defendants said that they paid close attention to their financial position and their financial position ended up being

different than Defendants said it was, Defendants must have been lying and/or were recklessly indifferent about Wayfair's financial position.  That is akin to saying that any time a company's financial projection is wrong, the speaker has engaged in securities fraud.  But that is not the law.  *See Fitzer* v. *Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 20 (D. Mass. 2000) ("Fitzer cannot merely speculate in hindsight that because Security Dynamics ran into a sales slowdown and reduced revenue by the end of the Class Period that statements of good corporate health made toward the beginning of the Class Period must have been inaccurate. To comply with the demanding pleading requirements of the Private Securities Litigation Reform Act, Fitzer must articulate the particularized facts upon which her information and belief are formed.")

Instead, the First Circuit has required pleading containing "clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so."  *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d at 31.  Where Plaintiffs do not identify any evidence suggesting fraudulent intent on the part of Defendants, scienter cannot be inferred.  *Id.*

While Plaintiffs are correct that they are not expected to allege fully detailed evidentiary support at the motion to dismiss stage, before they have had the opportunity to conduct discovery, "where a complaint is devoid of any direct-evidence allegations, the indirect-evidence allegations in the complaint will need to do more work to carry the burden of raising a 'strong inference of scienter' on their own." *Brennan*, 853 F.3d at 615 n.8 (quoting *Local No. 8 IBEW Ret. Plan & Tr.* v. *Vertex Pharm., Inc.*, 838 F.3d 76, 83 n.9 (1st Cir. 2016)).

Here, rather than supplying any "facts bearing on the mindset of the top executives of the company," the plaintiffs merely "speculate" about what they "might have known or thought." *Cody* v. *Conformis, Inc.*, 199 F. Supp. 3d 409, 421 (D. Mass. 2016). Indeed, when the rhetoric is peeled away, Plaintiffs' argument is simply that Defendants were top executives and so they must have known that Wayfair was doing worse than they were publicly saying it was doing. Plaintiffs style this argument as "common sense." But "[a] vague assertion that Defendants must have known something by virtue of their position of authority does not suffice to adequately allege a strong inference of scienter." *Sousa* v. *Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017); *Orton* v. *Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 306 (D. Mass. 2004) ("Nor does a vague assertion that a defendant must have known about the

fraud by virtue of his position of authority suffice to prove a strong inference of scienter."); *Coyne*, 943 F. Supp. 2d at 272 (collecting cases).  The Private Securities Litigation Reform Act requires facts, not attenuated circumstantial "guesswork." *Cody*, 199 F.Supp.3d at 421.[4]

The Amended Complaint presents precisely the kind of pleading the Private Securities Litigation Reform Act was designed to prevent.  Among the abuses that Congress passed the Private Securities Litigation Reform Act to correct was

---

[4] I note that under SEC regulations Large Accelerated Filers such as Wayfair must file their 10-K no later than 60 days after the end of the year and 10-Qs no later than 40 days after the end of the quarter being reported on.  Fast Answers: Form 10-Q, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 2, 2011), https://www.sec.gov/fast-answers/answersform10qhtm.html (last visited July 8, 2020).  Companies are also required to report "major events that shareholders should know about" in a Form 8-K, which must be filed within four days of the major event. Fast Answers: Form 8-K, U.S. SECURITIES AND EXCHANGE COMMISSION (Aug. 10, 2012), https://www.sec.gov/fast-answers/answersform8khtm.html (last visited July 8, 2020).

That the SEC permits companies 40 days to file Forms 10-Q indicates an acknowledgement on the part of the SEC that it takes some time for a company to analyze its finances accurately and thoroughly.  It is only where the filing is reporting a major event, not an analysis, that the SEC requires a filing within days.  Plaintiffs' assertion that the defendants must have known, with great specificity, their advertising leverage as it unfolded in real time is inconsistent with the understanding of the responsible regulators that it ordinarily takes some time to analyze this data in retrospect.  Certainly, Plaintiffs allege no direct evidence like the "admissions, internal records or witnessed discussions" that the First Circuit has looked for to establish awareness that the defendants "were withholding vital information" sufficient to establish scienter.  *In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d at 31.

> the routine filing of lawsuits . . . whenever there is
> a significant change in an issuer's stock price,
> without regard to any underlying culpability of the
> issuer, and . . . the abuse of the discovery process
> to impose costs so burdensome that it is often
> economical for the victimized party [i.e. the
> defendant] to settle.

*In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d at 30 (quoting

H.R.Rep. No. 104–369, at 31 (1995), *reprinted in* 1995

U.S.C.C.A.N. 730, 730 (Conf. Rep.)).  This appears to be such a

case.

> ## 2.   Did Defendants Demonstrate a Motive to Maximize Proceeds from Inside Stock Sales?

Plaintiffs also claim that Defendants had a motive to feed

inaccurate information to investors.  By telling the public that

Wayfair was doing better than it was, Plaintiffs contend, the

defendants were able to make tens of millions of dollars by

selling their stock in Wayfair during the Class Period.

According to the plaintiffs, Defendants' "false and

misleading Class Period statements and omissions" caused Wayfair

Class A common stock to "explode" from $107.23/share on August

1, 2018, the day before the Class Period began, to $151.20/share

on September 14, 2018.  The three individual defendants

collectively sold more than $69 million of their personally held

Wayfair stock during the Class Period.  Plaintiffs detail the

date, number of shares sold, sales price per share, and sales

proceeds of each defendant's sale of his personal Wayfair stock

during the Class Period.  According to the plaintiffs, Defendant

Shah sold a total of 256,772 shares for a total of about $33.64 million in proceeds; Defendant Conine sold 255,991 shares for a total of $33.55 million in proceeds; and Defendant Fleisher sold 20,565 shares for $2.58 million in proceeds.

Plaintiffs argue that these stock sales were suspiciously timed because they came "within a few days after each misstatement, near the inflated Class period high, and within a few days before the revelations of truth began to come out." Looking closely at the dates of sales for each individual defendant, however, I find the sales are spread out fairly evenly across the Class Period and are not clumped together around specific dates.

The table below shows the number of shares of Wayfair stock that each defendant sold in the Class Period.[5]

| Date (2018) | Defendant Shah | Defendant Conine | Defendant Fleisher |
|---|---|---|---|
| August 6 | 14,000 | 14,000 | |
| August 13 | 17,000 | 17,000 | |
| August 15 | 1,145 | 1,145 | |
| August 20 | 17,000 | 17,000 | |
| August 21 | | | 4,520 |
| August 27 | 17,000 | 17,000 | |
| September 4 | 21,000 | 21,000 | |
| September 10 | 21,000 | 21,000 | |
| September 11 | 5,000 | 5,000 | |
| September 17 | 27,168 | 27,163 | 508 |
| September 21 | | | 4,498 |

[5] The defendants' shares were often sold in multiple transactions throughout a given day, but for ease of reference I have presented their sales in this table as total sales per day.  All of the information in this table is taken from the Amended Complaint and matches information in the individual defendants' Forms 4, the accuracy of which the parties do not dispute.

| September 24 | 21,000 | 21,000 | |
| September 26 | 5,000 | 5,000 | |
| October 1 | 26,000 | 26,000 | |
| October 8 | 17,600 | 17,600 | |
| October 15 | 16,408 | 16,358 | 6,632 |
| October 16 | 1,750 | 1,800 | |
| October 22 | 17,000 | 17,000 | 4,407 |
| October 29 | 9,501 | 9,424 | |
| October 31 | 2,200 | 1,501 | |

The four days in which plaintiffs allege misstatements were made were August 2, August 8, September 5, and September 6, 2018. Those dates are not uniquely aligned with sales made by Defendants Shah or Conine; in fact, the defendants traded four or five days after each alleged misstatement. Nor are the trades suspiciously close to the Class Period high, which was September 14. To be sure, defendants Shah and Conine did trade during the two days before the November 1 announcement that the company had performed worse than expected. Simply based on the timing, it seems increasingly likely that they knew, at that point, the information they were to release within the next two days. However, the trades on those days were not unusual in quantity compared to their trading throughout the Class Period, and trading on those days was in keeping with the pattern of not going more than seven days without selling stock during the Class Period and appear consistent with non-discretionary trading. Nor have Plaintiffs offered any non-circumstantial evidence to bolster their assertion that this trading was suspicious. And even the circumstantial evidence is not

particularly problematic.  Given the frequency of Defendants'
trades, it is essentially meaningless to say their sales were
made "within a few days" of a given date; any date within the
Class Period would be "within a few days" of a day when
Defendants Shah and Conine sold shares of stock.

The contention that these trades were timed suspiciously
within the Class Period is unsupported assertion.  Of course, I
do not reject as a general proposition the contention that
selling stock in one's company for over $33 million in the two
months before that share price plummets in the wake of a new
disclosure can be evidence of scienter.  But the sale
circumstances must be set out with greater inculpatory
particularity to support a motive showing.

I note in this connection that Defendant Fleisher sold far
fewer shares than either Shah or Conine and on far fewer days.
According to the Amended Complaint, in the Class Period he sold
stock on August 21, September 17, September 21, October 15, and
October 22.  These sales are even further removed from the dates
of the alleged misstatements than Defendants Shah's and Conine's
were.

In securities cases, "[t]he plaintiff bears the burden of
showing that insider sales were suspicious and must provide a
complete picture of the defendant's trading, both before and
after the class period."  *Leavitt* v. *Alnylam Pharm., Inc.*, No.

CV 18-12433-NMG, 2020 WL 1332862, at *8 (D. Mass. Mar. 23, 2020). Plaintiffs have not done so here. They have not provided me with the percentage of Defendants' shares of Wayfair stock that defendants sold or any information about Defendants' patterns of selling their Wayfair stock. *See id.*

For example, if Defendants Shah and Conine regularly sell $30 million of Wayfair stock every couple of months and Defendant Fleisher regularly sells $2.5 million of Wayfair stock every couple of months, then their activity in the Class Period is not unusual and cannot be evidence of scienter. And it would be perfectly natural for the defendants to sell their stock as share price increased; that they did so is not, on its own, material evidence of scienter. *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 754 (1st Cir. 2016). Of course, if none of the defendants had ever sold his Wayfair stock before or since this period, then the sales would be more significant as evidence of scienter.

Defendants' Forms 4 filed with the SEC, which I accept as undisputed, *see supra* note 5, aspects of the record before me, *see Emerson* v. *Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 37 n.2 (D. Mass. 2018) (unchallenged documents include "Form 4s" in motion to dismiss record), provide a different picture than the one Plaintiffs have tried to paint. This aspect of the record before me demonstrates that Defendant Fleisher increased his

Wayfair holdings during the Class Period by 22%.  Moreover, Mr.
Shah's and Mr. Conine's sales amounted to only 2% of their
Wayfair holdings during the Class Period.  That the individual
defendants sold shares of their Wayfair common stock during the
Class Period is inadequate evidence of scienter when two of them
kept 98% of their shares and the third actually increased his
shares by 22%.  *Brennan*, 853 F.3d at 615 ("[T]he strength of the
insider trading allegations drifts toward the marginal end of
that spectrum because Hughes and all other Zafgen insiders kept
the vast majority of their Zafgen holdings."); *In re Biogen Inc.
Sec. Litig.*, 193 F. Supp. 3d at 50; *Fire & Police Pension Ass'n
of Colorado* v. *Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015).

Furthermore, the Forms 4 report the defendants' sales were
non-discretionary, executed pursuant to a pre-existing 10(b)5-1
trading plan (with respect to Defendants Shah and Conine) or
were required to be sold to cover tax withholding obligations
(in the case of all three individual defendants).  A set of
facts such as this is precisely why a judge may consider
documents, such as these Forms 4, plainly relied upon by
plaintiffs in their complaint; "[w]ere the rule otherwise, a
plaintiff could maintain a claim of fraud by excising an
isolated statement from a document and importing it into the
complaint, even though the surrounding context imparts a plainly
non-fraudulent meaning to the allegedly wrongful statement."

*Shaw*, 82 F.3d at 1220.  This is not, of course, on its own dispositive.  As the First Circuit has observed, at the Motion to Dismiss stage there may be "no evidence when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans." *Mississippi Pub. Employees' Ret. Sys.* v. *Bos. Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2008).  However, the record before me of the defendants' sales, which is not developed or challenged in Plaintiffs' allegations, further erodes any remnants of an argument that the sales demonstrated a motive to lie to shareholders.  *See Leavitt*, 2020 WL 1332826, at *9; *Harrington* v. *Tetraphase Pharm. Inc.*, No. CV 16-10133-LTS, 2017 WL 1946305, at *7 (D. Mass. May 9, 2017).

I find, in fact, no meaningful particularized allegations of a motive to lie about Wayfair's financial condition at all. It is difficult to find wholly plausible that Defendants would "intentionally make a revenue projection in [one month] that they knew to be likely wrong, with the almost certain prospect of having to publicly correct the projection just a little over a month later."  *Sousa*, 261 F. Supp. 3d at 120-21 (finding this proposition to be "at least on the surface implausible, and thus inconsistent with a strong inference of scienter").

Of course, that is not to say that no one would do such a
thing.  Defendants might have lied about Wayfair's financial
state during the Class Period.  They might have done so for any
number of reasons, including that they knew they had some non-
discretionary stock sales coming up and wanted to make
additional money from them, or because they thought they could
fool the market enough that their market share would improve, or
because they wanted to push off the inevitable downfall when
they eventually revealed how the company was actually doing.
Many things are possible.  But the Private Securities Litigation
Reform Act requires a strong inference of scienter, not a litany
of possibilities.  Plaintiffs have fallen short of their burden
in this regard.

**C.   *Whether the Amended Complaint Adequately Alleges Loss
      Causation***

The Private Securities Litigation Reform Act provides:

> [T]he plaintiff shall have the burden of proving that
> the act or omission of the defendant alleged to
> violate this chapter caused the loss for which the
> plaintiff seeks to recover damages.

15 U.S.C.A. § 78u-4.

A common way to show loss causation is to identify a
corrective disclosure ("a release of information that reveals to
the market the pertinent truth that was previously concealed or
obscured by the company's fraud"), show that the stock price
dropped soon after that corrective disclosure, and eliminate any

other explanation for the price drop. *Mass. Ret. Sys.* v. *CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013). "Loss causation is easiest to show when a corrective disclosure is associated with a drop in share price." *Id.* at 238. Wayfair issued an announcement the morning of November 1, 2018 revealing negative advertising leverage, and that day Wayfair's stock price fell 12.8%. The price fell an additional 3.3% the following day.

Wayfair's press release the morning of November 1, 2018 is at least plausibly connected to the loss, and the press release disclosure was "relate[d] to the same subject matter as the alleged misrepresentation." *Mass. Ret. Sys.*, 716 F.3d at 240 (collecting cases). Furthermore, the "alarm of the market" following the press release points to loss causation. *Id.* at 241. For instance, Plaintiffs allege that on November 1, 2018 and in the days following, several financial advisory firms, such as Wells Fargo, IFS Securities, and Cowen and Company, dramatically reduced their Wayfair stock price targets, citing as their reasons for doing so lower-than-anticipated EBITDA performance and customer acquisition problems. At the very least, Plaintiffs here have provided the Defendants "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 347 (2005).

However, the press release was not a "corrective disclosure" because Plaintiffs have not adequately pleaded scienter, so there is no adequate allegation that the defendants "concealed" or "obscured" any information from the public. *Mass. Ret. Sys.*, 716 F.3d at 237.  As I observed in another case, "[i]f Plaintiff's loss resulted from the disclosure of negative information other than a prior false or misleading statement by the Defendants, then [they] cannot show that Defendants' conduct caused [their] injury and [they have] not pled an adequate claim for securities fraud." *Coyne*, 943 F.Supp.2d at 273.  Therefore, although Plaintiffs adequately allege that their losses were connected to the press release, they have not adequately alleged that the press release was connected to a prior false or misleading statement by Defendants, and so they have not adequately pleaded loss causation.

## V
## 20(a) CLAIM

Plaintiffs also assert a Section 20(a) claim.  Section 20(a) of the Securities and Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . .

15 U.S.C.A. § 78t.

33

Section 20(a) claims are "necessarily dependent on the existence of a Section 10(b) violation." *Metzler*, 928 F.3d at 158 n.3; *see also Mehta*, 955 F.3d at 210-11.  Because I have found no § 10(b) violation, I find no § 20(a) violation.

**VI**
**CONCLUSION**

For the independent reasons that Plaintiffs have not adequately alleged any actionable misstatements or omissions, have not adequately alleged scienter, and have not sufficiently alleged loss causation, I GRANT Defendants' Motion [Dkt. No. 24] to Dismiss.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE