UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MARILYN GOODSTEIN, Individually  )
and on Behalf of All Others      )      Civil Action
Similarly Situated,              )      No. 19-10062-DPW
                                 )
            Plaintiffs,          )
                                 )
vs.                              )
                                 )
WAYFAIR INC., NIRAJ SHAH,        )
STEVEN K. CONINE and             )
MICHAEL D. FLEISHER,             )
            Defendants.          )



BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


MOTION HEARING
VIDEOCONFERENCE

April 29, 2020



John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiffs:
Andrew T. Rees
Stephen R. Astley
Theodore M. Hess-Mahan
Robbins Geller
Rudman & Dowd LLP
120 East Palmetto Park Road, Suite 500
Bocan Raton, FL 33432
561-750-3000
Arees@rgrdlaw.com
Sastley@rgrdlaw.com

Counsel on behalf of Defendants:
Caroline H. Bullerjahn
Roberto M. Braceras
Goodwin Procter, LLP
100 Northern Avenue
Boston, MA 02210
617-570-1359
Cbullerjahn@goodwinlaw.com
Rbraceras@goodwinprocter.com

P R O C E E D I N G S

COURTROOM CLERK:  Okay.  Before I let the judge into the room, I'm just going to go over some of the protocol that we're going to be following today.

If all counsel can make sure that your camera and audio are connected and in working order.  And if you're having difficulties hearing, sometimes a headset would work better for sound quality.  Mainly on teleconferences it works better, but I'm not sure about videoconferences since this is the first time we've had this many people on a video feed.

When you're not speaking, like I mentioned before, please mute your audio.  We had a hearing last week where, when the attorney was flipping papers, it just made so much interference on who was actually speaking.  So it does pick up the slightest noise.  If you could speak slowly and if you could pause before you start speaking just so you're not speaking over someone, especially the judge.

Now, the last reminder, especially for the people that are participating by phone, we encourage you to abide by Local Rule 83.3, which states that photographing, recording and broadcasting are prohibited during this proceeding, and violation of it will cause sanctions that are deemed appropriate by the court.

Do we have any questions before I let the judge in?  No questions?  Okay.

Good afternoon, Judge.  Civil Action 19-10062, *In Re: Wayfair Securities Litigation*.  Judge, can you hear me?

THE COURT:  I can.  There was a little bit of a glitch here.  I'll try to come back in.

COURTROOM CLERK:  Okay.

THE COURT:  Okay.  Can you hear me?

COURTROOM CLERK:  Yes, you're all set.

THE COURT:  Okay.  I don't know who is going to be speaking for plaintiff here, principally.  Is it Mr. Astley or Mr. Rees?

MR. REES:  Andrew Rees.

THE COURT:  Okay.  We've got a little bit of an echo with your voice.  I don't know what the cause of that is.  At least I'm picking up an echo.

MR. REES:  Okay.

THE COURT:  So Mr. Rees, let's try again.  What I'm really interested in is kind of a chronology here of when it was that you say that the defendant was aware of the misrepresentations that they were making.  You've got statements running from April 2 to September 7, something like that.  When did they know that what they were representing was inaccurate?

MR. REES:  At the beginning of the class period on August 2.

THE COURT:  Okay.  And how do we know that?

MR. REES:  Well, this was, the statements pertained to the third quarter of 2018, which had started a month prior to that.  Now, if you look at the timing of their ultimate revelations towards the end of that quarter, you know, they're talking about a quarter that was much worse than they had previously disclosed, number one.

THE COURT:  I think I know that, but I want to know how it is that they knew.  What's the basis for saying that they knew that there was something wrong.

MR. REES:  Your Honor, you can tell that by their own statements.  They were very closely monitoring metrics such as advertising leverage and profitability in realtime.  They were consistently touting --

THE COURT:  Let me just stop with that because I use as a metric the 10-Qs.  10-Qs speak as of the end of the quarter, but they're generally not filed for about a month.  And so the 10-Q for the third quarter was about a month after the quarter was completed.  There is a reason for that.  The reason is to be sure that they've got accurate information, and the Commission provides for that.

So apart from the fact of their having senior executive roles, I'll use the individuals here, having senior executive roles here and presumably keeping track and saying that they're keeping track of what's going on, do we know anything else about what kind of information was coming in to

them, when it was coming in to them, what kind of reports they were getting on ad spend, that sort of thing, beyond the position that they were in.

MR. REES:  Right, right.  Well, again, they were clearly getting information then in realtime.  In every conference call they were reporting on those metrics.  And in addition, on November 1, Defendant Fleisher stated that they had made a business decision right in the middle of the quarter to forego leverage and profitability in favor of spending more, which was, you know, in turn was a real drag on their profit and ability to capitalize on their expenditures.

THE COURT:  That's the first specific statement that I've heard now about this.  That is to say, apart from their positions of responsibility in which they would be receiving some information, although we don't know what, we don't know what they were looking at, what kind of documents they were looking at, that's not alleged here, you're saying that the statement in the middle of the quarter that they were going to be -- they changed their approach to ad spending indicates that they knew at that time that they were doing something different?

MR. REES:  Yeah, that's correct.  That's a statement made by Defendant Fleisher on November 1.  And aside from that, they consistently made statements about how closely they were monitoring that information very granularly, as we've pled in

the complaint.

THE COURT:  But I want to go back to that just to be sure I'm not missing something in particular.  What that is is your statement about what can be expected of senior managers.  That is, senior managers watch their business closely.  They develop information, and they act on that information.  So we have to say, Well, you're a senior manager and you're held accountable for whatever turns up if it's the kind of information that might disclose particular problems, but we don't have particular problems here identified by any under other method than to say this is their job and they did it, right?

MR. REES:  Well, yeah, the problems were directly at odds with their statements throughout the class period.  If you contrast the ultimate revelations in November with their prior class period statements in August and September, they were dramatically different than if you couple that with the statement I just mentioned, Defendant Fleisher tying that to a business decision that was undisclosed in the middle of the quarter, which would have been around August.

THE COURT:  Did they have a duty of disclosure of that?

MR. REES:  They did, absolutely, because they consistently were coming to the market.

THE COURT:  Just a moment.  I want to be sure I know

where that duty comes from.  Should they had filed an 8-K at that point?

MR. REES:  Yes, Your Honor.  They should have disclosed, or if not an 8-K, when they were coming to the market, during those analysts conferences on the earnings call, you know, they should have revealed the truth as opposed to making the alleged false statements that they did.

THE COURT:  Well, I'm really interested in this duty-to-disclose dimension of it.  Because you say it starts as early as August 2 before the market opens.  They file their 10-Q for the second quarter in the afternoon of August 2, right?

MR. REES:  Right.

THE COURT:  And so if we look at the 10-Q, which I believe is Exhibit I to the motion of the defendants or that -- motion, I think it's attached to the declaration of Ms. Bullerjahn, the 10-Q makes clear that these statements are accurate as of the time that they're filed and they can't guaranty any forward-looking statements will be accurate, although we believe that we have a reasonable basis for believing that.

So they had to have, at that point, August 2, under your theory, known that it was inaccurate, right?

MR. REES:  Yeah.  With respect to the third quarter, the --

THE COURT:  This is -- just a moment.  I want to deal with timing because the timing is not instantaneous.  I started this by asking you questions about when the 10-Q relates to the disclosures.  The SEC provides three months -- excuse me -- one month or so, 30 days, to file a 10-Q after the quarter is over.  That's because people are still gathering the information or believed to be gathering the information necessary accurately to disclose.  They do that on August 2.

On August 2, after you say they knew it was inaccurate, they make this statement about forward-looking statements, which would be during the class period, and they specifically call out a caution not to place undue reliance on forward-looking statements.

So we've got two parts here.  Number one, what's the factual basis for saying they knew that what they were saying was inaccurate and, second, whether or not that factual basis, whatever it is, is something that we can say is subject to this cautionary language in the 10-Q, that's the second quarter 10-Q, but the 10-Q that was coincident with the day on which you say they knew it was wrong but takes place after the alleged improper disclosures.

MR. REES:  Right.  Well, regarding the forward-looking statements, the statements we allege as false are not forward-looking.  They're present statements regarding what was going on at that time as opposed to the previous quarter.

THE COURT:  Right.  And they're addressing the question of what are they doing during this quarter?  What do they know during this quarter?  That is the statements made to the analysts and so on.  What are you doing during this quarter that's different, that's the same, what are you looking forward to, what are you not looking forward to?  And that's why it seems to me it has to be tethered to some specific kind of information, and the case law is pretty clear about this, as opposed to just saying, Well, a big job, and you're supposed to get paid big bucks, and consequently you're responsible.

There doesn't seem to be anything else.  There's no statement from someone inside.  There are no documents, not that in the early stages you can develop documents, but there's nothing other than they have a job and things turned out badly so they must have known at that time with specificity that things were turning out badly.  That's really what it comes to, isn't it?

MR. REES:  No.  Just based on their own statements again, if you contrast the ultimate revelations with the alleged false statement during the class period --

THE COURT:  Why isn't that the old logic fallacy of post hoc ergo propter hoc, took place afterwards, therefore it must have been going on before?  That doesn't get you through the relatively significant burdens that the PSLRA requires. And so now I'm looking to see is there something here.  You

told me that I should look at a particular statement that was made by Fleisher in the middle of the class period.  Can you tell me the paragraph number of the consolidated complaint where I'll find that.

MR. REES:  Yes, Your Honor.  This is at paragraph 77.

THE COURT:  Okay.  Hold on just a second.  This is the November 1 report?

MR. REES:  That's correct.  It's the earnings conference call, November 1, where they're speaking about the third quarter that took place during the class period.

THE COURT:  Right.  And that's shortly before the disclosure of the 10-Q for the third quarter that day?

MR. REES:  Yeah, that came out on the same day, I believe.

THE COURT:  This is, the statement that you're referring to is in the -- well, morning before the opening of the market.  The 10-Q is filed after it.

MR. REES:  Correct.

THE COURT:  Okay.  And so, is the 10-Q for the third quarter also inaccurate?

MR. REES:  No, Your Honor.  These are revelations as to --

THE COURT:  Well, we're talking about -- if I just may.  You don't say that the 10-Q is inaccurate?

MR. REES:  Correct.

THE COURT:  Okay.  So look at the 10-Q, which is Exhibit L to the submission, and it reports that there is an increase in or terms page -- well, it's 7 of 8 -- I guess it's 27 would be what you have down in your numbering that you have, the pagination on the bottom.  And it talks about the advertising expenses increased 60.9 million over the three months ending September 30, 2018 and says advertising was relatively consistent as a percentage of net revenue in the three months ended September 30, 2018 compared to the same period of 2017.  That's accurate?

MR. REES:  Yes, we don't allege that as being false.

THE COURT:  I know you don't allege it as false, but that's accurate.  That is that it's relatively consistent?

MR. REES:  Yes, as far as we know, that's accurate.

THE COURT:  Okay.  So if it's relatively consistent and the departure is 0.002 percent, is this a material inconsistency?

MR. REES:  It is, Your Honor.  You can tell that by looking at the analyst's reaction as well as the stock price drop when the market --

THE COURT:  I'm not getting into the analysts' reaction yet.  Although I think that you're correct, that that's a good way of figuring out whether or not the market was responsive to new information.  The question is whether or not they knew this at a time that they were distributing it to the

market either with fraudulent intent or recklessly, nevertheless going forward.  And I look at this language, and I don't know, in 10-Q for the third quarter, I don't know how you can say that that's consistently said, that that's not inaccurate, too, unless what's going on here is just plucking statements out without support for some independent basis for knowing that they knew they were false.

MR. REES:  Your Honor, we allege several indicia supporting scienter.

THE COURT:  I want to be sure that I've examined everything you have to say about knowledge of these defendants with respect to the falsity of the statements that you allege were misrepresentations to the market during the class period. And I think we've touched on everything, haven't we, that's in the complaint?

MR. REES:  Yeah.  Your Honor, the big thing is the timing.  I mean, if you look at the contrast between their statements very late in the quarter, the fact that they were sort of doubling down and conferring their messaging throughout with respect to ad leverage of profitability and then in contrast to the statements November 1, which were completely different.  We also allege --

THE COURT:  But I just want to stop with that.  So you say, except that the 10-Q says otherwise.  The 10-Q says that it's relatively consistent.  I mean, you know, you've made

allegations about the statement, and a couple of hours later, they make -- excuse me -- Mr. Fleisher's statement to the analysts, the conference call, and then a couple of hours later they make a representation to the SEC that it's relatively consistent.  That strikes me as stretching to demonstrate that there's an inaccuracy, a recklessness.  And I want to be sure, as I said, that I know more, if there is more to know, about what they knew at the time and when they knew it.

MR. REES:  Your Honor, again, I would point to the timing, how late they were making these statements and the fact that they were closely monitoring.  You know, they made several statements throughout which we pled as to how closely they were looking at these things, Defendant Fleisher's statement, as I said.  We also allege motive, which contributes to the --

THE COURT:  We'll get to motive.  I want to go step by step.  But it is that they were making those statements about, that's it here, and then those statements were, depending on how you describe it, relatively consistent or not consistent at all or maybe not materially consistent.  But in any event, that's the next level that I think I want to go to.

Now, I don't know, Mr. Braceras or Ms. Bullerjahn, if either one of you are going to speak to this issue at this point.

MR. BRACERAS:  Your Honor, Roberto Braceras.  And Ms. Bullerjahn and I will go back and forth on some different

issues, but on this one, on scienter, I don't want to belabor the point.  I think Your Honor is familiar with the law in this area, and you're familiar with the issues, is all I'm hearing about is a statement in November, but I don't know how that's relevant to a specific fact that would render a statement made in August at the beginning of the class period knowingly false.

And as we've argued and Your Honor is familiar, we've seen no allegations that would suggest that when these statements were made that the defendants actually believed them to be anything but, you know, good-faith, accurate estimates, as they were.  So I don't want to belabor the point, Your Honor.

THE COURT:  Well, sorry.  Is there someone else?  I'm hearing noise.  Okay.  I guess I had these in mind.  I will look more carefully at them.  I'm going to look back again at the November 1 statement, but I have some difficulties saying that I can find that there's been alleged, to the degree that's necessary for purposes of the PSLRA, materially false statements by the defendants which they knew to be false at the time that they were made.  The November 1 statement is simply a different take on what was being said in August and early September.

But now let's go to the question of what's vaguely called motive.  And we'll start with Mr. Fleisher. Mr. Fleisher ends up buying more stock than he sells during

this time period.  Isn't that somewhat inconsistent with the idea that he was trading on inside information and making something out of it?

MR. REES:  No, Your Honor.  There's no set formula where that would undercut scienter.

THE COURT:  Just a moment.  There's no set formula. On the other hand, what would be the reason that someone would buy more of something that he knows is worth less.

MR. REES:  Your Honor, we don't know that.  What we have pled, that they made highly suspicious sales throughout, which is supportive of --

THE COURT:  You say "highly suspicious," but I just want to focus on Mr. Fleisher first.  I'll get to the suspicion part of it in a bit.  I mean, someone buys more of something that he knows is worth less is suspicious.  It's suspicious that he doesn't know what he's doing.  And I don't know any other way to deal with some circumstances like that.  It's not a formula.  It's simply looking and saying this seems peculiar, I guess is a way of saying it, and self-destructive financially.  What other way could I read that with respect to Mr. Fleisher?

MR. REES:  Your Honor, I think defendants bringing in those facts, they're just disputing improperly the facts that were pled, trying to bring in these Form 4s outside of the complaint, make a very factual-based argument at the pleading

stage.

THE COURT:  That was what it was all about.  That is, have you alleged sufficient material to be plausible.  There's nothing improper for me looking at the Form 4s, right?

MR. REES:  No.  As we briefed, we disagree with that because we dispute the contents of those Form 4s.

THE COURT:  The Form 4s?

MR. REES:  Correct.

THE COURT:  There's nothing improper for me to look at the Form 4s.  Those are public documents, and they are tied in specifically to the transactions that you complain about.

MR. REES:  No.  These are outside of the class period in terms of comparing, you know, prior periods and looking at the 10b-5-1 plans and things like that.  Defendants are making a very fact-heavy argument.

THE COURT:  I'll stop you.  Let me just start with the transactions themselves.  Where did you get the information about the transactions?

MR. REES:  Yeah.  There were public disclosures in the Form 4s.

THE COURT:  Right.  So you -- just a moment.  You relied on the Form 4s to get the transactions, right?

MR. REES:  Correct.

THE COURT:  Okay.  So you've relied on them.  They brought them to my attention.  I look at them and see the

pattern of transactions.  Just with Mr. Fleisher, starting with him, there is no dispute about what took place there.  You rely on it the same way.  Now I ask with respect to Mr. Fleisher what other explanation could there be?

MR. REES:  Explanation for him purchasing during the class period?

THE COURT:  Yeah, yeah.  I mean, except that he was a misguided chief financial officer.

MR. REES:  Yeah.  Now, before discovery, we don't have an answer to that.

THE COURT:  Well, but you have to have a plausible complaint.  And if something that is so contrary to commonsense understanding is the prop of your complaint, plausibility becomes a little bit more difficult to me.

It's one thing to say we're at the early stage, and you are, and I understand the problems that that presents.  It presents problems to people who have to comply with Rule 11, too.  But the short of it is that there are particular standards for a PSLRA, and I want to explore them.  And if it is that there's really no explanation, just, what a dummy, I guess would be the contrary argument, I'll weigh that in terms of plausibility.  But that's all there is, isn't it, with respect to Mr. Fleisher?

MR. REES:  I mean, we allege the sales, which were made throughout the class period at highly suspicious times,

including right before, days before that November 1 statement --

THE COURT:  And days after.  Just a moment.  Just days after as well, and then thereafter and thereafter and thereafter, before the disclosure is made.  So there's consistent pattern of sales, and they're not just immediately after as late as September 8.  They go on through September, so it's not a kind of contemporaneous matter.  It's a consistent pattern.

MR. REES:  Yeah.  We would argue that's very consistent with the fraud.  They were capitalizing on the artificial inflation throughout the class period, continually selling, and in terms of purchase, we don't know, they could have thought that the fraud would go on and therefore be able to capitalize further from those purchases.  Without prior discovery, we can't answer that --

THE COURT:  Okay.

MR. REES:  -- adds to the -- is additional indicia of scienter, along with the other facts I mentioned.

THE COURT:  Let me move off of Mr. Fleisher here because he seems to be the clearest case.  Then we go to the material that's within the Form 4s that has to do with the necessity to make tax payments that makes it nondiscretionary and that potential for some sort of 10-b plan.  Have you looked at all the other Form 4s, that is the previous Form 4s?  Do you

know when the plan was created, or if there is in fact a plan?

MR. REES:  No.  This goes to the issue, Your Honor. We don't know much about these plans.  That's actually an affirmative defense, but defendants have not introduced them so we can't accept --

THE COURT:  Well, putting to one side burdens, who has got the burden, you allege from Form 4s, you relied on them and you brought me the Form 4s that you relied on, and I see them.

MR. REES:  They also brought in Form 4s from outside of the class period that --

THE COURT:  I understand.

MR. REES:  -- rely on.

THE COURT:  You said they brought in Form 4s beyond the class period.  What were those --

MR. REES:  In terms of trying to show --

THE COURT:  They are showing the same Form 4s that you relied on.  It's just additional information that is in that Form 4 that you don't like.

MR. REES:  Well, that's true as well.  I mean, they're asking, you know, raising a fact-based dispute regarding why the sale --

THE COURT:  Right.  Let me separate those, if I can. The Form 4s are admissible on the basis at least of your reliance on them to show them in full form.  I'll put to one side the question of -- well, Mr. Astley, maybe you have some

view that you'll express in a minute about the evidence.  I notice your nonverbal communication of disagreement.

But turning to the question of reliance on the Form 4s for the transactions themselves, there is nothing improper about that, is there?

MR. REES:  Yeah, that's correct, to the extent that we're using them during the class period.

THE COURT:  Okay.  So now your complaint -- not complaint but your reservation about fact-based disputes that the defendants are introducing has to do with what's the character of that 10-b plan, at least for Mr. Shah and Mr. Corine -- I'm not sure I'm pronouncing correctly -- but the other two people.  Fleisher doesn't fall into this category, or maybe he does with respect to tax matters.  I haven't looked at it carefully.

But in any event, this is additional information about why it is that they would be making transactions.  And that's the guts -- not guts, but that's the core of your concern about the Form 4s, misuse of Form 4s, right?

MR. REES:  We're bringing them in to dispute facts in the complaint.  You know, again we don't have those 10b5-1 plans.  And yeah, we think that's improper.  They're not -- sorry.  You're talking about the ones during the class period.  Yes, in terms of their uses, to dispute facts --

THE COURT:  I guess your argument, I don't want to

trivialize it, but I think it clarifies it.  I can use the Form 4s for purposes of the transaction.  You did, too.  We're on common ground.  If however in the Form 4s it said he did all these transactions and the moon is made up of blue cheese, I could not take that as a factual matter.  It's really beyond the use that's proper for the Form 4s here.  Isn't that really what you're saying?

MR. REES:  Right, to the extent that defendants will be bringing that in to dispute the facts in the complaint.

THE COURT:  Right.  Okay.  So Mr. Braceras, what do you want to say about that, anything?

MR. BRACERAS:  As to the Form 4s?

THE COURT:  As to the plan.  You've got the plan, right?

MR. BRACERAS:  Yes, Your Honor.  Well, a couple of things.  First of all, they're relying on the Form 4s.

THE COURT:  I'm talking --

MR. BRACERAS:  It's common practice in this district.

THE COURT:  No, it's not.  In point of fact, it's not common practice in this district to rely on publicly available matters for disputed facts only to expand upon the complaint itself.  The complaint makes no mention of the existence, nonexistence of a 10b5-1 plan.  It doesn't make any reference to the need to pay taxes for essentially nondiscretionary sales, they have to cover it, tax matters.

MR. BRACERAS:  Right.

THE COURT:  That's dehors the use of the Form 4.  Now, if you say everything that's in the Form 4, including the blue cheese, is something I should include, well, I'd like to engage in a discussion about that.  I don't think that's true.  So is there anything else to say about that?

MR. BRACERAS:  So, Your Honor, a couple of things.  I think that this is a bit of a distraction, right, because the burden is on plaintiffs to identify unusual stock sales, and they have not done this here.  And, you know, the First Circuit in just the recent case that we submitted to you, Ocular and Abiomed, they make the point that it's the plaintiffs' burden to identify the context of the stock sales.  And plaintiffs don't do this here.

THE COURT:  If I can, I would just like to step back from burdens and try to understand the nature of the competing arguments.  I do agree that I have to look at the competing inferences to be drawn, and you have just said they haven't done it.  You said there's a much more compelling way of looking at it and arguing, frankly, about the existence of the plans.  I don't think I can consider that.  But they're available to both parties.

I don't know about the plans themselves, whether the parties would be able to get their hands on the plans themselves, the plaintiff.  But previous Form 4s, which could

show consistency or inconsistency, later Form 4s that could show consistency or inconsistency are available to the parties. I don't have them.  Nobody's brought them to my attention.  I could take judicial --

MR. BRACERAS:  Your Honor, in fact, we have submitted previous Form 4s for July of 2018.  And that's in the record. And that's in the record because by way of the footnotes in it, you can see that there were 10b5-1 plans already in place and that the sales were already in that consistent basis.  So it's just to make the point by way of the Form 4 that the 10b5-1 plans were already there.  They were not enacted during the class period.

THE COURT:  Can't tell that.  Can't tell whether the plan was enacted or different plans were enacted at different stages in it, under what circumstances they were enacted.  I don't know anything about those plans.  You've given me a little bit of information about consistency in the sales.  I can look at the sales and find consistency.

MR. BRACERAS:  Correct.

THE COURT:  From the plaintiffs' point of view, why didn't you offer the rest of those to try to rebut it?

MR. BRACERAS:  Offer the rest of the Form 4s?

THE COURT:  No.  For the plaintiff, why didn't you offer something more?

MR. REES:  Your Honor, that's outside the scope of the

class period and what we're alleging.  I mean, the sales kind of support scienter during the time that the false statements were made.  So, you know, it's irrelevant as to what was going on after the class period or before.

THE COURT:  How do we decide about consistency in sales if we don't look at what they've done over, say, three years or two years or one year.

MR. REES:  Yeah, that's not from the complaint.  I don't think that's necessary.  There's not sort of a checklist we have to follow.  I think we haven't --

THE COURT:  There is --

MR. REES:  -- suspicious sales so --

THE COURT:  There isn't, but the sale becomes less suspicious when you don't have evidence of its suspiciousness.  So what you have is a series of Form 4s that show consistent sales over a period of time, both before or during the time period that you say false statements were made and after they were made and before the disclosure and on a consistent basis.  So I have to look at it and say what's going on here.

I'll tell you that I'm not looking at the plan because I don't know what the plan is.  Nobody's submitted the plan, and in fact, I think you would be correct to say that at the pleading stage, I shouldn't be looking at their submission of evidence with respect to an affirmative defense, effectively an affirmative defense.

But I look at this and I can't draw a conclusion from this other than the fact that there were sales being made at a fairly high level in aggregate amount and also purchases by all of these people.  And it's hard for those of us that work on a government's salary to think that's not a lot of money until we look at what the proportion is of the amount of stock that they hold, when you look at the percentages involved, too, which I think I would have to look at in terms of this.  And I say, Well, okay, what's suspicious about this, except it's a lot of sales during the time period coincident with the time period.

We know that Mr. Fleisher improbably buys more than he sells.  With respect to the other two, that's not quite the same.  But for the other two, I'm just wondering what else I can say is suspicious.

MR. REES:  Again, Your Honor, the factors I would point to would be that each and every individual defendant sold all throughout the class period when the stock was artificially inflated and then the large amounts, as you've pointed out.

In addition, just the timing as to when those sales occurred.  These are happening right after the alleged false statements were made, which inflated the stock price, near the class period high, and right before the revelations on November 1 which caused the stock price to drop significantly.

THE COURT:  What am I supposed to make of the purchases during that same time period?

MR. REES:  Your Honor, again, we don't know why they were made in advance of discovery.  It could be that they intended for the fraud to go on longer than it did and therefore they would capitalize on those purchases.  We just don't know.

THE COURT:  So it's entirely speculative to ask the question why would they be purchasing, or it may be cover-up, more sales than purchases, at least for some people.

MR. REES:  Perhaps that's true.  We just don't know that at this stage.

THE COURT:  Okay.  Anything else about scienter?

MR. REES:  No.  I think I've covered it.  Emphasizing the timing, their own statements as to how closely they were monitoring those metrics and the contrast between the admissions at the end of the class period.

Also I want to point out the materiality here.  A lot of the matters at issue defendants admitted that the ability to maximize their advertising spending was absolutely critical. They talked about that at every turn.  And in a lot of the cases the defendants cited they sort of link that materiality concept with scienter.  And here there's no question.  These events were so material, so I think that heavily supports scienter as well, coupled with the other factors when sort of viewed collectively and wholistically.

THE COURT:  Okay.  So let me just turn then finally to

the question of loss causation here.  I'm not sure that it presents something separate, but I guess I want to know not whether or not the losses followed the disclosures.  I'm more or less of the view that the losses were connected to the press release -- the real question -- or the disclosures, number one.  The real question for me is whether or not the press release was connected to prior false and misleading statements by the defendants.

I think if the statements cannot be said to be false, I want you to respond to this so I can be sure I've covered all the bases.  If statements are not -- I say that they're not false and misleading with scienter here, then you have no loss causation.  Isn't that right?  I mean, if I say that they are, then loss causation probably follows at this point because, as you say, the market fell, the analysts were concerned about this apparent failure of the business plan, undisclosed, previously undisclosed, which in a relatively small amount or percentage-wise small amount.  But if I say that it's not materially false statements or I say that this is inadequate disclosure of scienter, then loss causation --

MR. REES:  Your Honor --

THE COURT:  -- that's it.

MR. REES:  That's an independent assessment there under the Dura standard which requires plaintiffs to provide defendant with some indication of the loss and the causal

connection plaintiff has in mind.  And here that's clear.  I mean, the revelations are --

THE COURT:  Just a minute.  I'm sorry.  Sorry, but I want to keep you on point.  The question of loss that I'm asking now is not whether the plaintiffs lost or members of the putative class lost, because that seems to me to be clear.  And that they lost after the disclosure, that seems to be clear.

What I'm asking is, is there anything else that I should be thinking about for loss causation if I find that the statements were not false and misleading as to the PSLRA requirement, or even if they were, they were not made with the requisite scienter?

MR. REES:  Yeah, I think it's an independent assessment there.  I mean, I would point also to, you know, consideration of that, the market reaction, the analysts' statements supporting loss causation, expressing surprise at the news and sort of contradicting those revelations with the statements during the class period.

THE COURT:  Okay.  So that does two things, I suppose.  One is it establishes some materiality for the dissonance between prior statements and the current statements and that the loss is as a result of that.  I think I understand that part of it.  But each one of these three arguments were made by the plaintiff, you know, seriatim, and I'm not sure that loss causation really is a standalone issue on this complaint.

I'll ask Mr. Braceras to respond to it, but let's assume that I do find false and misleading, it was material, and there was scienter in doing it.  Is there anything left about this aspect of loss causation right now on the motion to dismiss?  Is that something that does have to be developed by facts?

MR. REES:  I think that's adequately pled --

THE COURT:  I'm sorry.  I'm asking Mr. Braceras.

MR. BRACERAS:  Your Honor, on this one, on loss causation, I'll hand it off to Ms. Bullerjahn who is much smarter than me on this issue.

THE COURT:  I won't even rise to the occasion to deal with all the implicit underlying assumptions that were involved in the statement, but go ahead.

MR. BRACERAS:  That's a low bar, right?

THE COURT:  No, I didn't say that.  I just said I wasn't going to engage in it.  Ms. Bullerjahn.

MS. BULLERJAHN:  I would just say I agree with Mr. Braceras.  I'll leave it at that.  Thank you, Your Honor.

THE COURT:  That's not the way to start your argument because it raises questions about credibility.

MS. BULLERJAHN:  Your Honor, as you held in Coyne, the announcement on November 1 has to be a corrective disclosure, meaning that that announcement has to connect to the current present negative information to the earlier false and

misleading statement.  So we agree completely with Your Honor that if you find that there are no material misstatements here, and we completely believe that there are not any material misstatements, there can be no loss causation because there can be no connection between the alleged corrective disclosure and those prior false and misleading statements.

THE COURT:  Consider the alternative, that I find there were false and misleading statements and that they were material and that there was scienter.  I would not on this complaint deal with, on this motion, deal with loss causation, would I?  I mean, it's an extra issue that has to be responded to in terms of facts that is summary judgment.

MS. BULLERJAHN:  Your Honor, you did hold in Coyne, I'll remind you, that that Rule 9(b) applies to every single element of a fraud claim, including loss causation and that's a pleading standard.

THE COURT:  It is.  So now I'm asking whether or not on the allegations that are made here, is there anything that would say that it's deficient if I find that there are false statements, that they were material and they were scienter.

MS. BULLERJAHN:  So we still believe, Your Honor, so even if you find that there are false and misleading statements, you still need that connection to the alleged corrective disclosure.  The November 1 corrective disclosure was an earnings release, as you pointed out.  It was a release

that reported on the overall result of the company for the prior quarter, for Q3, and that earnings release didn't just focus on ad spend as a percentage of the net review, which is at the core of the complaint in all of their allegations.  It focused on EBITA and other key metrics.  And if you look at the analysts' reports that Mr. Rees raised, those analyst reports don't mention ad spend as a percent of net revenue, or a vast majority do not.

THE COURT:  But some do.  And the question is do I moot it out on loss causation if I find those other things, and I just don't know how I do that if that's the case on those assumptions.  Because it's going to come back to, here is what we have.  We have a core business plan.  Their business plan is this leveraging advertising, okay.  And they don't do it within the range that they say they're going to do it.  And the market drops precipitously, then is there EBITA problems?  Yes, there are.  But this is at least on this complaint and the allegations of the complaint part of it, sufficiently so that I can't tease it out, or if I do, I'm doing factfinding that I'm not supposed to be doing.

MS. BULLERJAHN:  Well, the one other thing that I would point out, Your Honor, is that the plaintiff alleges in the amended complaint, right, that the decline in advertising leverage continued post the class period, so post-November 1, 2018, and caused the stock drop on May 2, 2019, right?  So

again, to us that indicates that the November 1, 2018 earnings call didn't reveal the truth of some false and misleading statement.  If for some reason this decline continued for several months after the close of the class period, that just makes no sense.  So again that to us also cuts against there being loss causation so that connection between the alleged misstatements here and the alleged corrective disclosure on November 1, 2018.

THE COURT:  But I look at that, the movement of the price after November 1.  It's outside of the class period. That's not the loss we're talking about.  We're talking about something that may be termed gain causation.  What does that mean?  What does that mean?  Why are they gaining?  I have no idea, none.  Furthermore, it's none of my responsibility at this stage.

Now, people can offer post hoc information to support or defend a proposition, but that's really factfinding that, you know, they say, see, look at what happened -- maybe that works, maybe it doesn't, but it's evidentiary.  I just don't know how that helps me one way or the other.

I'm looking at what caused the loss that they experienced in or about November 1 in the class period when there were false statements.  I'm not sure there's anything else on the assumption that they were false statements that loss causation adds to this except, yes, it's another bell they

have to ring to be successful in the case.  But now I'm just talking about the question of pleading.

MS. BULLERJAHN:  Yes, they do, they have to adequately plead it under Rule 9(b).  And here, Your Honor, essentially what they've pled is we allege false and misleading statements, and as of November 1, once the earnings release came out, the stock price dropped.  Therefore it's material; therefore there is loss causation.  And under your decision in Coyne, our position is that that is not sufficient to make that connection between the actual alleged misstatements in the complaint and the resulting drop after that November 1, 2018 earnings release.

THE COURT:  Well, I'm going to have to go back and look at Coyne more carefully.  I keep thinking about a case in which Justice Jackson had to agree that he was wrong in previous cases and offer the observation that I can't believe a man with my capacity could make such a stupid mistake.  But I'm not sure I did in Coyne, but I'll look and see whether or not that adds to this.  But I hope I've learned more since then if I said something like that because it just doesn't ring a bell with me.

Anything else that we need to talk about at this point?  I'll take it under advisement.  I'll try to get it out promptly for you.

MR. BRACERAS:  Not from defendants, Your Honor.

Thank you very much for your time.  I hope everything is well with you and the court.

THE COURT:  Well, we're still sitting, I guess, so are you.  So anything else, Mr. Rees, that you wanted to raise at this point?

MR. REES:  No, Your Honor.

THE COURT:  Okay.  Thank you very much.  We will be in recess.

(Adjourned, 3:26 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


            I, Kelly Mortellite, Registered Merit Reporter

and Certified Realtime Reporter, in and for the United States

District Court for the District of Massachusetts, do hereby

certify that the foregoing transcript is a true and correct

transcript of the stenographically reported proceedings held in

the above-entitled matter to the best of my skill and ability.

                  Dated this 18th day of November, 2021.



                  /s/ Kelly Mortellite

                  _____

                  Kelly Mortellite, RMR, CRR

                  Official Court Reporter